1   David N. Lake, Esq., State Bar No. 180775
    **LAW OFFICES OF DAVID N. LAKE,**
2    **A Professional Corporation**
    16130 Ventura Boulevard, Suite 650
3   Encino, California 91436
    Telephone: (818) 788-5100
4   Facsimile: (818) 788-5199
    david@lakelawpc.com
5

6   Attorneys for Plaintiff

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10
    ADVANCED ADVISORS, G.P.,          Case No. **CV 14 - 1420** DSF (FFMx)
11
                 Plaintiff,
12                                    **VERIFIED SHAREHOLDERS'**
         v.                           **DERIVATIVE ACTION**
13
14  STEPHEN BERMAN, an individual;    **JURY TRIAL DEMANDED**
    JOEL BENNETT, an individual;
15  MICHAEL G. MILLER, an individual;
    MURRAY L. SKALA, an individual;
16  ROBERT E. GLICK, an individual;
    MARVIN ELLIN, an individual; DAN
17  ALMAGOR, an individual; LEIGH
    ANNE BRODSKY, an individual; REX
18  H. POULSEN, an individual; and
    PETER F. REILLY, an individual;
19
                 Defendants.
20
    JAKKS PACIFIC, INC.,
21
                 Nominal Defendant.
22
23
24
25
26
27
28



Complaint

Plaintiff Advanced Advisors, G.P. ("Plaintiff"), by its attorneys, alleges this shareholder's derivative complaint against the individual defendants (the "Individual Defendants") named herein. The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiff and its own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action (the "Action") brought for the benefit of nominal defendant JAKKS Pacific, Inc. ("JAKKS" or the "Company") against certain present and former members of JAKKS' Board of Directors. Plaintiff seeks to recover damages inflicted upon JAKKS by their actions in connection with: (a) an $80 million stock repurchase at unduly high prices which had no purpose other than entrenching the Board; (b) other actions taken to entrench the Board and prevent a buy-out of the Company at an advantageous price; (c) an unreasonable compensation package granted to the CEO; and (d) an alleged securities fraud committed upon public shareholders.

2.    From October 2011 to mid-2012 the Board rejected a buy-out of the Company at $20 per share (or possibly more, the "Offer"), from Oaktree Capital Management, L.P. ("Oaktree") claiming that JAKKS business plan would yield higher value to shareholders. The Company had no such realistic plan. The stock had not traded at $20 per share since 2008, and any such offer would reflect a healthy premium.

3.    When another activist shareholder, the Clinton Group, Inc. (the "Clinton Group") joined Oaktree in its effort to maximize shareholder value, the Board bought the Clinton Group off, much to the detriment of JAKKS and its shareholders. To accomplish this, Defendants caused JAKKS to enter into an April 21, 2012 standstill agreement with Clinton Group, Inc. (the "Standstill Agreement"). This Standstill Agreement revolved around a promise by JAKKS to the Clinton

Group to repurchase JAKKS shares (the "Defensive Repurchase"). The Company thus agreed to repurchase 4 million of its shares at $20 per share. This was approximately 15% of its outstanding shares. The Defensive Repurchase, which closed on June 28, 2012, cost the Company $80 million it could not afford to spend, given its need to develop and advertise new toy products.[1]

4.    The Defensive Repurchase was made to mollify the Clinton Group, and prevent it from teaming up with Oaktree to launch a proxy contest that could oust the Board members. The Clinton Group posed a serious "threat" to the Board members. Clinton Group is an activist hedge fund known for pressuring companies into making strategic changes to raise shareholder value, including through proxy contests to oust directors. Indeed, the Clinton Group had previously gone after bedmaker Select Comfort Corp. and fast-food franchiser Red Robin International Inc. The JAKKS Board, which owned relatively little JAKKS stock, could easily have been ousted if the Clinton Group chose to wage a proxy contest. Many of JAKKS shares are owned by institutions. As reflected in JAKKS 2011 Proxy Statement, all of the JAKKS Directors and Officers owned approximately 1.8% of JAKKS shares. On the other hand, four large institutions owned approximately 37% of the Company's shares and could be amenable to monetizing their holdings, or otherwise realizing higher value, in a resulting sale of the Company or by new business methods adopted following a change in the JAKKS Board.

5.    As a result of Standstill Agreement and the Defensive Repurchase, the Company was forced to incur $53 million in debt to fund the Defensive Repurchase and to buy JAKKS shares at an unduly high price. JAKKS was forced to fund the Repurchase by incurring debt because much of its balance sheet cash was held

---

[1]    Reflecting the Board's desperation to stay in office at any costs, the Board bound itself and JAKKS to the Standstill Agreement, without obtaining the customary clause that would allow these fiduciaries to cancel the Defensive Repurchase if the time it was to close it appeared to be wasteful of corporate assets or otherwise injurious to the Company. Such an escape clause is known as a "fiduciary out" or a material adverse change provision ("MAC Provision").

abroad and unavailable for use in the United States, absent the payment of taxes required to repatriate the cash. Thus, JAKKS' practical ability to spend cash domestically was very limited. While JAKKS does not consolidate its domestic and foreign operations for tax purposes, it does so for reporting purposes. It has not disclosed the amount of cash and cash equivalents which would be subject to a repatriation tax but it was finally made clear in an October 23, 2012 Investors' Conference (the "October Investors' Conference") that the amount was very significant.[2]

6. Contrary to their fiduciary duties to advance the interest of JAKKS regardless of their self-interest, directors Almagor, Berman, Ellin, Miller and Skala (the "Repurchase Defendants") literally used corporate funds *to pay Clinton Group not to oust them from office*. (Berman, Ellin, Miller and Skala are still on the JAKKS Board, and comprise a majority of the Board: four of its six members).

7. This conduct violated the *Unocal* Rule which prohibits a corporate Board from entrenching itself through disproportionate and unreasonable measures that are contrary to the best interests of the company. *See, Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (Del. 1985). As will be shown below, JAKKS was not a company with a stellar financial future ahead of it. Rather, it was a bit player in the very competitive toy market and it was not able to compete on an equal footing with toy giants Hasbro and Mattel. While Defendants claimed that JAKKS had value in excess of $20.00 per share, there was no reasonable support for this claim.

8. The Defensive Repurchase hurt JAKKS and was effectuated under unfair circumstances. JAKKS perennially lacked sufficient resources to go toe-to-toe with Mattel and Hasbro; to develop competitive high tech toys; and to advertise

---

[2]    In furtherance of its entrenchment plan, the Board also adopted a poison pill (the "Poison Pill") in March 2012 without shareholder approval. This, too, worked to unreasonably hinder the Clinton Group and Oaktree, and entrench the Board. The Poison Pill generally prohibited anyone, without prior Board consent, from acquiring more than 10% of the Company's shares.

1    sufficiently.  A rational Board would have spent the $80 million dollars not on an

2    entrenching stock purchase, but on securing new products, revenues, and profit

3    centers.

4         9.    Indeed, the Board had adopted no plans whatsoever for such a stock

5    repurchase prior to Clinton Group appearing on the scene.  The huge unnecessary

6    expenditure of cash hampered JAKKS' ability to operate successfully.  Moreover,

7    projections made by toy companies are notoriously unreliable; they rely on trends

8    and consumer reactions that are extremely difficult to predict before a toy hits the

9    market.  JAKKS had little experience with its Monsuno toy line, and other new toy

10   lines.   In addition, JAKKS' fortunes were largely tied to the fortunes of the

11   Nickelodeon network, which was itself in serious decline.  If Nickelodeon could not

12   reverse its negative trends in 2012, then JAKKS would be pulled down with it.

13   Under all these circumstances, the reasonable and rational thing to do would be to

14   conserve and wisely spend cash, not squander it defending the jobs of the Board

15   members.

16        10.    Thus, $20 per share or more as a target value for JAKKS's shares was

17   quite unlikely, as such values depended on (among other things) JAKKS developing

18   toys that would be more technologically competitive with toys offered by Hasbro

19   and Mattel, and such technological efforts were barely underway. And, as a result of

20   the Defensive Repurchase, the Director Defendants ruined JAKKS' balance sheet.

21        11.    The Defensive Repurchase damaged the Company by wasting its funds;

22   forcing it to borrow $53 million to pay for the shares; and leaving the Company's

23   domestic cash position materially weakened.  By late 2012, just weeks after the

24   close of the Defensive Repurchase, projections were being revised and lowered, and

25   JAKKS' stock price reacted accordingly.  By the end of 2012, the stock fell to just

26   $12.50 per share.  By 2013, JAKKS shares had fallen as low as $4.45 per share, and

27   presently trade at about $6.00 per share.  Its cash position has declined from $257

28   million at December 31, 2011 *to $51.5 million as of September 30, 2013.*

12.    In an additional entrenchment effort, the Board beginning in 2012 encouraged a large open market purchase of JAKKS shares by Dr. Patrick Soon-Shiong ("Dr. Soon"), a well-known investor in medical companies.  Dr. Soon did not invest cash directly in JAKKS. Dr. Soon's purchases serve to block any repeat of the Oaktree and Clinton overtures.  Shortly after Dr. Soon began buying JAKKS shares, the Board approved joint ventures with Dr. Soon's companies to make toys and exploit other technologies (the "September 2012 Joint Ventures").  As described herein, these joint ventures stand to unfairly benefit Dr. Soon and CEO Berman, who has peculiarly tied his compensation (with the Board's acquiescence) to the success of the joint venture, and not to JAKKS' stock price.  Moreover, the JAKKS Board extended the employment contract of CEO Berman, despite his disastrous tenure in office, to December 31, 2018, despite the fact that the Company's shares are trading near an all-time low.  The Board modified his employment contract so he can be paid huge bonuses despite the fact that the Company cannot meet EPS earnings goals.  Moreover, much of his compensation is now pegged to the aforementioned "joint venture" with Dr. Soon's company, the full details of which have been concealed.  An independent Board would have fired Berman, not entrenched him, and raised his pay.  The employment scheme is tilted toward enabling Berman to do very well even if JAKKS and its shareholders do not.

13.    The Complaint also asserts claims against the JAKKS top executives (Berman and Bennett) arising out of potential liability related to the securities fraud class actions filed in this District and described below (the "Securities Class Actions").  These actions maintain that these executives (the "Securities Class Action Individual Defendants") defrauded purchasers of JAKKS shares by issuing public statements concerning the financial performance of the Company which allegedly were materially false and misleading.

///

14.    This Court has designated *Melot v. JAKKS, Inc., et al.*, 13 CV 5388 (JAK) (SSx) (C.D. Cal.) as the lead class action.   The "Class Period" asserted is July 17, 2012 through July 17, 2013.

15.    The Class Period in the Securities Class action ends on July 17, 2013, after the market close, when JAKKS slashed its full-year forecast of revenue and earnings, citing poor sales in light of a marked shift in children's playing preference to electronic devices.  The Company said it would suspend its dividend, and implement a restructuring plan involving a "substantial reduction of leased space, employees and other overhead expenses."

16.    On this news, JAKK dropped approximately 39% from a close of $11.48 per share on July 17, 2013, to a close of $7.00 per share on July 18, 2013. The stock price has continued to decline and has mostly traded around the $5 to $6.50 per share range.

17.    Plaintiff in the derivative action does not independently assert that any fraud was committed, but rather seek damages from the Individual Defendants for any harm shown in the Securities Class Actions to have been committed by them and paid for by the Company, so that the innocent shareholders are not forced to bear the cost of such wrongful conduct.

18.    In sum, the claims asserted herein are brought against the following defendants as follows:

(a)    Claims for damages arising out of the wrongful Defensive Repurchase are brought against present and former directors Berman, Ellin, Glick, Miller, Skala and Almagor (the "Repurchase Defendants").  These claims are brought under state law for violation of the *Unocal* standard.   As noted, four of the Repurchase Defendants remain on the six-director JAKKS Board, and constitute its majority;

(b)    Claims for contribution and damages relating to the Securities Class Action are asserted against defendants Berman and Bennett under both federal law and state law;

1   (c) Claims for damages relating to the Securities Class Action are asserted

2 against defendants Almagor Berman, Bennett, Ellin, Glick, Miller, Skala and Reilly

3 (as to conduct subsequent to April 21, 2012, when Reilly joined the Board) for state

4 law breach of fiduciary duty;

5   (d) Claims relating to the description of CEO Berman's compensation

6 scheme and the September 2012 Joint Ventures (as defined below) in the 2013

7 Proxy Statement are brought under federal and state law against all present directors

8 (defendants Berman, Glick, Miller, Poulsen, Reilly and Skala) and former directors

9 Ellin and Brodsky.  Such claims are brought directly and derivatively;

10   (e) Claims for damages arising out of the September 2012 Joint Ventures

11 are brought against director defendants Berman, Skala, Glick, Ellin, Miller,

12 Almagor, Reilly and Brodsky for state law breach of fiduciary duty.

13   (f) Claims relating to the reasonableness of defendant Berman's new

14 employment agreements made in late 2012 are asserted under state law for breach of

15 fiduciary duty against defendants Almagor, Berman, Brodsky, Ellin, Glick, Miller,

16 Reilly and  Skala.

17       **JURISDICTION AND VENUE**

18   19. This Court has jurisdiction over the subject matter of this action

19 pursuant to 28 U.S.C. §§ 1331 and 1367.  The federal claims asserted herein arise

20 under and pursuant to the provisions of the Sections 10(b), 14(a), and 21(D) of the

21 Securities Exchange Act, 15 U.S.C. § 78j(b), 15 U.S.C. § 78n(a), and 15 U.S.C. §

22 78u(4)(f)(8)(the "Exchange Act").  Plaintiff also asserts supplemental common law

23 claims under 28 U.S.C. § 1367.

24   20. This Court has jurisdiction over this action pursuant to the federal

25 securities laws, 28 U.S.C § 1331, insofar as Plaintiff seeks on behalf of the

26 Company: contribution from the Class Action Individual Defendants for all damages

27 and/or other costs incurred by JAKKS arising from the Securities Class Action.  The

28 Securities Class Actions allege violations of Sections 10(b) and 20(a) of the

Exchange Act.  The Exchange Act (Section 21D, 15 U.S.C. §78u-4) provides for contribution to those injured by joint violators of the federal securities laws.  *See also Musick, Peller & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286 (1991) (holding that there is an implied right to contribution under §10(b) of the Exchange Act, now codified at Section 21D(f)), and for violation of section 14 of the Exchange Act and Rule 14a-9 for the dissemination of a materially false and omissive Proxy Statement.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  A number of the claimed wrongful acts and practices asserted herein occurred in this District.

22.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet and the facilities of the national securities exchange.

## PARTIES

23.    Plaintiff has held JAKKS shares since July 2011, and continues to hold JAKKS shares.

24.    Defendant JAKKS is a Delaware corporation with its principal executive offices located at 22619 Pacific Coast Highway, Malibu, California 90265.  Its common stock trades on the NASDAQ under the ticker symbol "JAKK."  JAKKS develops, produces, and markets toys and consumer products in the United States and internationally.

25.    JAKKS operates in two segments, Traditional Toys and Electronics; and Role Play, Novelty and Seasonal Toys. The Company offers action figures and accessories primarily based on Monsuno, Batman, Ultimate Fighting Champion, Total Non-Stop Action wrestling, and Pokémon franchises; Toy vehicles comprising Road Champs, Fly Wheels, and MXS toy vehicles and accessories; and electronics

products under the SpyNet spy products, EyeClops Bionic Eye products, Laser Challenge, and Plug It In & Play TV Games based on Disney and other brands. It also offers small, large, fashion, and baby dolls based on Disney Princess, Disney Fairies, Cabbage Patch Kids, Hello Kitty, Graco, and Fisher Price brands; private label products; and pet products, which comprise toys, consumables, and accessories under the JAKKS Pets, Kong, and American Classics brand names. In addition, the Company offers food play and activity kits under the Creepy Crawlers and BloPens brands; and role play, dress-up, pretend play, and novelty products for boys and girls based on Black & Decker, McDonalds, Dirt Devil, Disney Princess, Disney Fairies, and Dora the Explorer, as well as on its proprietary brands. Further, it offers indoor and outdoor kids furniture, activity trays and tables, and room décor; kiddie pools and seasonal and outdoor products based on Crayola and Disney characters; Funnoodle pool floats; and Halloween and everyday costumes under the Spiderman, Iron Man, Toy Story, Sesame Street, Power Rangers, Hasbro, and Disney Princess brands, as well as Halloween accessories.

26.    Defendant Stephen G. Berman ("Berman") is, and has been, the Company's Chief Executive Officer and President, and a member of the Company's Board of Directors (the "Board") at all relevant times. He has been the corporate Secretary and a director since he co-founded JAKKS in January 1995. From January 1, 1999 he served as President. From February 17, 2009 through March 31, 2010 he was also Co-Chief Executive Officer and since April 1, 2010 he has been Chief Executive Officer.

27.    Defendant Joel M. Bennett ("Bennett") is, and has been, the Company's Chief Financial Officer and Executive Vice President at all relevant times. He joined the Company in September 1995 as Chief Financial Officer and was given the additional title of Executive Vice President in May 2000.

28.    Defendant Murray L. Skala ("Skala") has been a director since October 1995. Since 1976, Skala has been a partner in the law firm Feder Kaszovitz LLP

1    (f/k/a Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP), the Company's

2    general counsel.

3        29.    Defendant Robert E. Glick ("Glick") has been a director since October

4    1996.

5        30.    Defendant Marvin Ellin ("Ellin") was a director from October 2010

6    through December 6, 2013.

7        31.    Defendant Michael G. Miller ("Miller") has been a Director since

8    February 1996.

9        32.    Defendant Dan Almagor ("Almagor") was a director from September

10   2004 through December 26, 2012.

11       33.    Defendant Leigh Anne Brodsky ("Brodsky") was a director from May

12   8, 2012 through December 6, 2013.

13       34.    Defendant Peter F. Reilly ("Reilly") has been a JAKKS director since

14   April 21, 2012.

15       35.    Defendant Rex H. Poulsen ("Poulsen") has been a JAKKS director

16   since December 26, 2012.

17       36.    Non-employee Directors are very well compensated by JAKKS.    In

18   addition to an annual cash stipend of $75,000, payments to committee chairs and the

19   members of the audit committee total $30,000 and $15,000 respectively; payments

20   to the chair of the compensation committee and the nominating and governance

21   committee total $15,000 and each member of such committees receives an annual

22   fee of $10,000. There is also an annual grant of restricted common shares to each

23   Director in the amount of $100,000.

24   ///

25   ///

26

27

28

## SUBSTANTIVE ALLEGATIONS

**A.    THE BOARD BREACHES ITS FIDUCIARY DUTY THROUGH AN ENTRENCHMENT SCHEME**

**1.    The Board Repulses a Premium Bid and Decides to Effect a Defensive Repurchase to Save Itself**

37.    What follows are the facts relating to the Board's actions rejecting any *bona fide* offer to acquire the Company.  Instead, it engaged in improper defensive maneuvers to entrench the Board in violation of the holding in *Unocal, supra* (the "Unocal Standard"). These improper acts included the wholly needless Defensive Repurchase which wasted $80 million of the Company's funds.

38.    On September 13, 2011, Oaktree announced that certain funds and accounts that it managed (the "Oaktree Funds") made a proposal to acquire all outstanding shares of JAKKS common stock for $20.00 per share in cash, representing a total equity value of approximately $670 million on a fully diluted basis.  The offer represented a 25% premium over the Company's closing stock price as of September 13, 2011, the 30-day average closing price of the Company's stock leading up to September 13, 2011; and the average closing price of the Company's stock over the preceding 24 months.[3]  Oaktree announced that it made the proposal public after the Board's continued refusal to engage in meaningful discussions about the options available for maximizing shareholder value at JAKKS, including an acquisition by the Oaktree Funds. The Oaktree Funds were then among JAKKS' largest shareholders, with a collective stake at that time of approximately 4.9% of JAKKS common shares.

39.    On October 5, 2011, the Board rejected the Offer.  It does not appear that the Board sought any meaningful negotiations to increase what was already an offer well above JAKKS' recent trading range.  The Board's letter that day to

---

[3]    Before Oaktree went public, JAKKS share price last exceeded $20 per share in 2008 and for a brief period in April-May 2011.

Oaktree stated in relevant part:

October 5, 2011

**VIA E-MAIL AND FEDERAL EXPRESS**
Mr. B. James Ford
Mr. Matthew Wilson
Oaktree Capital Management, L.P
333 South Grand Avenue, 28th floor
Los Angeles, CA 90071

Gentlemen:

I am writing on behalf of the Board of Directors (the "Board") of JAKKS Pacific, Inc. ("JAKKS" or the "Company") in response to your letter dated September 13, 2011, in which you express interest in discussing a "potential going private transaction at $20.00 per share," subject to your ability to conduct due diligence and raise the necessary debt financing.

*****

***The Company Believes its Strategic Plan Will Produce Significantly Greater Value For JAKKS Stockholders Than Your Indication of Interest***

This is an exciting time for JAKKS. The Company is in a growth mode that includes several lines of new proprietary products and valuable intellectual property. The Monsuno property is ready for launch as a major televised cartoon series, line of toy products and licensing property, and the Company has entered into key partnerships relating to Monsuno with Nickelodeon, Fremantle, Dentsu and Topps. We believe the Monsuno project and the skill set and key relationships that have been developed to bring it to fruition will lead to similar proprietary projects that should have a positive impact on our share price. In addition, the Company has a number of new and promising proprietary and licensed products, including Baby Watch, Action Cam, Shogami and Winx Club, which could also be transformative and enhance stockholder value. ***Finally, given its cash position, strong balance sheet and market conditions***, the Company believes it is well positioned for continued growth and value creation, including through accretive acquisitions as it has done throughout its history - reinforcing the Board's judgment that execution of its strategic plan will create

significantly greater value for the Company's stockholders than your indication of interest.

### Conclusion

I want to emphasize that the Board is committed to increasing the Company's value for all of our stockholders and we are confident that our actions will accrue to the benefit of all of our stockholders, including Oaktree.

Sincerely,
/s/ STEPHEN G. BERMAN

Stephen G. Berman
Chief Executive Officer, President, Secretary and Director

40.    On March 4, 2012, the Clinton Group, in support of Oaktree's position, publically urged the JAKKS Board to conduct an auction for the Company. While Oaktree did not have a history of engaging in hostile takeovers of public companies, the Clinton Group was altogether different. Since at least 2008, the Clinton Group had engaged in hostile maneuvers such as proxy contests to oust current management to increase shareholder value. The Board was painfully aware that the Directors and Officers owned a very small amount of JAKKS shares, that four institutional investors owned approximately 38 percent of JAKKS shares, and that it was likely that smaller institutional investors owned shares in amounts which were likely significant. The Board also knew that the Clinton Group could easily combine with Oaktree to push a successful proxy contest and end the Board's tenure at JAKKS.

41.    On March 5, 2012, JAKKS announced that its Board had unanimously adopted a "poison pill" stockholder rights plan and declared a dividend of one right for each outstanding share of the Company's common stock. The Board claimed it adopted the rights plan in response to Oaktree's Offer as well as a recent indication by Oaktree that it might accumulate additional shares of the Company's stock in the open market. The directors claimed that its rights plan was designed to protect

against any potential coercive or abusive takeover techniques and to help ensure that the Company's stockholders were not deprived of the opportunity to realize full and fair value on their investment. As described below, this was nonsense. The rights plan was adopted to entrench the Board and its adoption for that purpose violated the Unocal Standard.

42. On April 17, 2012, Oaktree made public a letter it had sent to the JAKKS Board accusing it of entrenching itself, and opining that management had no realistic plan to maximize shareholder value. The letter stated:

April 17, 2012

The Board of Directors of JAKKS Pacific, Inc.
22619 Pacific Coast Highway
Malibu, CA 90265

Attention: Stephen G. Berman and Murray L. Skala

Dear Messrs. Berman and Skala:

As investment manager to one of the largest shareholders of JAKKS Pacific, Inc. (JAKKS or the Company), we, Oaktree Capital Management, L.P. (Oaktree), remain deeply concerned by the Company's financial performance and strategic direction. In assessing the competency and motives of JAKKS's management team and Board of Directors, shareholders need only review the facts and events of the three-month period between October 2011 and January 2012:

JAKKSs Board of Directors rejects out of hand a $20.00 per share all cash offer by funds managed by Oaktree (Oaktree Funds) as inadequate and proclaims that execution of the Company's strategic plan will provide significantly greater value to the Company's stockholders.

JAKKS management additionally articulates bullish guidance ahead of the critical holiday season and states the Company's strategic plan would generate continued growth and value creation.

Two months hence, JAKKS management reduces its 2011 fiscal guidance for revenue and earnings by $110-$115 million and 70%, respectively. JAKKSs share price declines to $13.39 on January 19, 2012, prior to news reports indicating that Oaktree Funds were likely to make a reduced acquisition proposal.

Company discloses $3.8 million in legal and advisory fees, which represent over 28% of the Company's earnings for the entire fiscal year 2011. In fiscal year 2011, the Company paid a total of $3.4 million in legal fees to the law firm Feder Kaszovitz LLP, for which Mr. Skala, a member of the Company's Board of Directors, is a Partner.

Board installs material golden parachutes that may ultimately cost the shareholders and enrich an underperforming management team.

Based on the actions outlined above, Oaktree has no confidence in the capability and credibility of the current Board and management team. Immediate change is required to preserve and protect the interest of public shareholders.

Oaktree Funds continue to hold the substantial equity stake in the Company of which we advised you previously. We have attempted repeatedly to engage in meaningful discussions with JAKKS management and its Board of Directors and are disappointed that you have continued to resist our efforts to open a constructive dialogue regarding potential value-enhancing transactions, which we believe would be in the best interest of all of the Company's stakeholders.

Since December we have reengaged actively with this Board's advisors seeking a path to acquire JAKKS at a premium valuation. After months of failed commitments and cat and mouse with your legal and financial advisors, representatives of Oaktree and Guggenheim Securities, LLC, our financial advisor, finally were invited to meet with your financial advisors on February 23, 2012. In this meeting we reaffirmed our pressing interest in engaging in an immediate dialogue toward maximization of shareholder value. We outlined our ability to finance and consummate a compelling transaction for shareholders within a 30-day period. On March 5, 2012, the Board and its advisors again formally rebuffed, without basis or rationale, our proposed premium

cash acquisition of JAKKS. The JAKKS Board also entrenched itself and management further by unilaterally adopting a poison pill without shareholder vote.

This transaction is of the highest priority for us, and we are prepared to proceed as quickly as possible. In addition to engaging Guggenheim Securities, LLC as financial advisor, we have also engaged MacKenzie Partners, Inc. as proxy solicitors and retained Kirkland & Ellis LLP as legal counsel. We are ready to proceed immediately. With the Company's full cooperation, we can expeditiously (a) complete our confirmatory due diligence, (b) finalize committed debt financing, (c) reach agreements with the JAKKS management with respect to their ongoing roles with the Company, and (d) present to the JAKKS Board a firm acquisition proposal with certainty of close.

We would expect to finance the transaction with a combination of equity and debt. Oaktree has approximately $75 billion of assets under management and the Oaktree Funds can commit 100% of the cash equity required to consummate the transaction. Guggenheim Partners, LLC has over $125 billion in assets under management and has an active and successful track record of lending to middle-market consumer/retail leveraged buy-out transactions. Guggenheim Corporate Funding, LLC intends to provide the fully committed debt financing required to complete the proposed transaction.

Given that this Board continues to support a management team who has grossly underperformed and continues to resist our efforts to deliver a premium valuation, we believe it is readily apparent that this Board is not willing to act in the best interests of shareholders. It is clear that we are not alone in this view. To that end on March 14, 2012, a major shareholder in JAKKS, Clinton Group, Inc. (Clinton), openly called for the Board to undertake a review of its strategic options and embark on a targeted auction process. Their letter continued that Clinton was dismayed at the Board's decision to adopt a poison pill and expects that its fiduciaries on the Board will permit any interested buyer to bring their proposal directly to the shareholders, who can decide for themselves whether they would prefer to remain invested in an independent JAKKS or would rather take the proposed offer. We share the views Clinton has expressed in their public disclosures and support Clinton's stated intention to solicit action by written consent.

We are hopeful that the Board will finally act in the interest of shareholders and immediately begin a process to explore alternatives to maximize shareholder value. Absent that, replacing this entrenched Board with new directors who will act in shareholders' best interests is paramount. Given the Company's rapidly deteriorating financial performance and damaged credibility amongst key constituents, we are concerned that further delay in initiating a strategic process will only risk further destruction of shareholder value. If the Board chooses not to pursue this path, please know that we are committed to protecting the value of our investment and, consequently, we are prepared to pursue any and all actions available to us in order to ensure that the JAKKS Board actively and thoughtfully pursues alternatives to maximize value for shareholders.

Sincerely,

B. James Ford
Managing Director
Portfolio Manager, Global Principal Group

Matthew Wilson
Managing Director

43.    Defendant Berman quickly responded, rejecting Oaktree's position.

44.    Despite the war of words with Oaktree, the real threat was the Clinton Group.  To entrench itself, the JAKKS Board therefore badly needed to mollify the Clinton Group in a manner short of a proxy fight, which it could easily lose.  Thus, the JAKKS Board resolved to negotiate a standstill with the Clinton Group. In essence, what the Board determined to do *was to indirectly pay Clinton Group to allow it to stay in office.*

45.    On April 23, 2012 the directors revealed that they had decided, as part of an April 21, 2012 Standstill Agreement, to assuage the Clinton Group by repurchasing at least $80 million of JAKKS shares (the "Defensive Repurchase") and increasing the size of the Board.  The share buyback would be worth at least

$20 a share, representing a 14% premium to stock prices that reflected the hope that JAKKS would be taken over.  The Company agreed to add two members to its Board, for a total of eight.  The Standstill Agreement provided that the Defensive Repurchase could be delayed but not terminated, even if the Board, exercising its fiduciary duty would have been obligated to do so.  The omission of a fiduciary out clause or a MAC Clause is further evidence that the Standstill Agreement was for the benefit of the Board and not the Company or its shareholders.

46.    In exchange, Clinton Group agreed to certain standstill restrictions until 60 days before the Company's December 2013 annual meeting, and to vote for the Company's slate of board nominees at the upcoming annual meeting.  To fulfill the Standstill Agreement, defendants Brodsky and Reilly joined the Board. In order to fund the Defensive Repurchase JAKKS was required to incur debt of over $53 million.  As part of the Standstill Agreement, JAKKS agreed to negotiate with Oaktree.  As before, no progress with Oaktree was made and Oaktree predictably lost interest in this hobbled Company.

47.    The Standstill Agreement was a reflection of the Board's desire to stay in power and to entrench itself.  By agreeing to the Defensive Repurchase, the Director Defendants had neutralized the Clinton Group, and prevented an aggressive proxy battle which it would likely lose.  The cost was JAKKS' financial future.

48.    On June 28, 2012, the Company announced the preliminary results of the Defensive Repurchase.  Based on the preliminary count by the depositary for the Defensive Repurchase, a total of approximately 22,658,441 shares of JAKKS common stock were validly tendered, including 3,990,783 shares that were tendered through notice of guaranteed delivery. Assuming that all guaranteed delivery shares were ultimately delivered, the Company expected to purchase approximately 15.8% of the shares tendered by each tendering stockholder, after giving effect to the purchase of all shares validly tendered by odd lot holders. As such, the Company expected to accept for payment an aggregate of 4,000,000 shares at a purchase price

of $20.00 per share, for a total purchase price of $80,000,000. The 4,000,000 shares bought back in the Defensive Repurchase represented approximately 15.4% of the Company's shares outstanding as of May 24, 2012.

49.   The Defensive Repurchase had no positive effect on JAKKS' share price.  Rather than increasing JAKKS' share price above the $20 per share Oaktree Offer, JAKKS' share price steadily declined thereafter.

50.   Poor results soon began to be reported.  These results are attributable, wholly or in major part, to the adverse effects of the Defensive Repurchase.  The Securities Class action asserts that the key defendants immediately began covering up the debacle they had caused by making various false statements and manipulations.  If so, the Defensive Repurchase and the securities fraud represent a unified and related course of conduct—*i.e,* one thing led to the other.

51.   The financial results for the quarter ended June 30, 2012 (announced on July 17, 2012) were lackluster.  The net loss for the first six months of 2012, adjusted for legal fees, was $13.5 million, up from a loss of $5.6 million for the first six months of 2011.  At the time the Defensive Repurchase at $20 per share was launched and closed, defendants had no reason to believe that results for the quarter would reflect significant improvement or justify management's pronouncements.  Rather, the motivation was to neutralize Clinton Group.  As news service Benzinga.com reported that day: "Jakks Pacific's quarterly profit declined to $214,000, or a penny per share, versus $4.2 million, or $0.16 per share, in the year-ago period. Excluding items, its adjusted earnings came in at $0.06 per share. Its net sales climbed 10% to $145.4 million. *However, analysts were expecting a profit of $0.11 per share on revenue of $137 million...*Jakks Pacific shares closed at $15.81 yesterday."

52.   Within weeks of the June 28, 2012 close of the Defensive Repurchase, JAKKS revised its earnings downward.  On September 28, 2012 the Dow Jones Newswire reported:

Jakks Pacific Inc. (JAKK) lowered its full-year guidance as the toy maker said it experienced "disappointing" domestic product sales and a slowdown in orders, as well as increased expenses. Shares were down 8.9% at $13.27 in after-hours trading.

The company now expects adjusted earnings of about *68 cents to 74 cents* a share and revenue of $690 million to $700 million. Its prior view called for a profit of *$1.04 to $1.08 a share* and revenue between $720 million and $728 million.

Jakks said it will take a one-time non-cash charge of $3.45 a share for impairment of its domestic deferred tax assets. if it doesn't achieve meet at least the top-end of its new earnings projection.

The maker of Pokemon, Monsuno, Winx and Hello Kitty toys in July notched two consecutive quarters of sales growth after 2011's top line slid 9.3%. However, its second-quarter profit slumped 95% on higher legal advisory fees and lower income from a video game joint venture.

Jakks has touted an early favorable response to the launch of Monsuno action figures, the first line the company launched in which it also owns the entertainment content. Monsuno figures are tied to a character-based storyline featured on an animated television show that debuted in February.

The stock is off 24% over the past 12 months.

53.    Investors reacted angrily.  JAKKS had pegged its prospects on the Monsuno line of toys, but these were low-tech gadgets, and were tied to a Nickelodeon show which had met a mediocre reception.  Moreover, Nickelodeon itself was experiencing a steep decline in ratings, a decline that was evident at the time the Standstill Agreement was entered.  On an October 23, 2012 conference call JAKKS convened to discuss its third quarter, Jonathan Fite of KMS Investments summarized his company's grievances:

We have been shareholders of JAKKS for several years now, and given our tenure, just bear with me for a moment.

\*\*\*

[A]bout 18 months ago, you began touting the wondrous prospects of Monsuno, but these failed to deliver. You've severely missed earnings projections in 2011, and you've lowered expectations again for 2012.

Most recently, you refuse to negotiate in good faith with a firm willing to offer shareholders $20-plus, but instead you decided to spend shareholder money on a tender at the same price. Since that tender took place, you've weakened the balance sheet and presented over a 30% drop in the share price. Yet you've had your compensation contract renewed at pretty substantial levels.

So can you explain to me why you might deserve to have that contract renewed and why you think your capital allocation record over the past three years really deserves to be rewarded?

54.     Berman refused to directly address Fite's concerns, to which Fite responded: ***"it seems that you have taken an approach of doing things that keep you and your management team in place, earning a really nice salary, but do that at the expense of shareholders…"***

55.     On that same call, Berman finally admitted that Nick's plummeting popularity had affected Monsuno sales:

[W]e've spent a good amount of marketing dollars and have it on Nick Tunes. ***The viewership of Nickelodeon itself or Nick Tunes has dropped last year, as well it's dropped significantly over the last two years, so we're not getting the retention of the boys here.*** So it's more working based off of advertising. So while it's extremely growing on a rapid basis all overseas, it's doing well here, but not as to what we expected…"

56.     JAKKS shares closed on October 23, 2012 at a price of $12.70 per share, 36.5% below the June 2012 repurchase price.

57.    Before the third quarter ended, desperate to derail any further bids for the Company, the Board searched for a friendly investor who would not have an interest in replacing the Board and management.

58.    Thus, on July 17, 2012 JAKKS announced that Dr. Patrick Soon-Shiong ("Dr. Soon"), a wealthy investor, had agreed to partner with the Company in an interactive toy joint venture. JAKKS announced that the DreamPlay Toys joint venture with Dr. Soon's NantWorks LLC holding company would incorporate NantWorks' proprietary image recognition technology. Dr. Soon had made a fortune in healthcare investments, and was not perceived as a threat to the Board. Thus, the Board welcomed his soon-to-be-announced purchase of a large block the Company's shares in the open market (which purchase produced no funds for JAKKS).

59.    On October 15, 2012, it was announced that an investment company controlled by Dr. Soon had taken a roughly 9 percent stake in JAKKS. As reported, Dr. Soon's California Capital Z LLC, based in Culver City, had first acquired a small stake in JAKKS in August 2012, and then added to its holdings.

60.    As of October 11, 2013, Dr. Soon had increased his stake in JAKKS to 24.9%, making a hostile acquisition of JAKKS at a premium effectively impossible. As noted by Forbes: "Soon's brand of activist investing is different than that of a Carl Icahn or Bill Ackman. He's not an antagonist activist. Soon creates value, working with companies, by being a great visionary, innovator and deal maker. But he has yet to produce value for shareholders, including himself."[4]

### 1.    The Board's Actions and Statements Were Unreasonable

61.    The JAKKS Board claimed that if JAKKS stayed independent it would create greater shareholder value. Whatever business plan JAKKS had, it had not

---

[4]    *Biotech Billionaire Takes A Beating Toying Around With JAKKS Pacific*, Forbes.com, Aug, 30, 2013, available at: http://www.forbes.com/sites/greatspeculations/2013/08/30/biotech-billionaire-takes-a-beating-toying-around-with-jakks-pacific/

been successful.  Indeed, JAKKS had a history of failing to meet its own guidance, reflecting its inability to forecast accurately in this market.

        a.    On December 16, 2011, JAKKS was forced to reveal its sales performance was disappointing during the important holiday season, and this had resulted in higher markdown allowances and higher royalty expenses relating to license guarantee shortfalls.  The Company announced anticipated net sales for the full year 2011 of approximately $660 million, with diluted earnings per share in the range of $0.37 to $0.40, excluding non-recurring financial and legal advisory charges.  This was a very substantial reduction from the Company's previously anticipated full year 2011 net sales of approximately $770 million to $775 million, with diluted earnings per share in the range of $1.32 to $1.35, excluding such one-time charges;

        b.    On February 21, 2012, JAKKS announced guidance for 2012 including an increase in net sales of 6.2% to 7.4% to approximately $720 million to $728 million, with diluted earnings per share in the range of approximately $1.01 to $1.07, excluding any financial and legal advisory fees.  This guidance anticipated first-quarter 2012 net sales in the range of $63 to $70 million, with a loss per share in the range of $0.61 to $0.64;

        c.    The 2012 forecast was heavily reliant on the success of the Monsuno product line which, in turn, was heavily reliant on the success of Nickelodeon, which broadcast the Monsuno animated shows.  But, in March 2012, it was revealed that Nick had for the first time ever fallen to second place in ratings to Disney, and that its ratings were in free-fall, dropping 31% year over year.  The directors did not revise projections based on this development.

        d.    By September 28, 2012, with Clinton Group neutralized, the directors lowered 2012 guidance as a result of claimed disappointing domestic product sales and a slow-down in product orders, coupled with higher expenses, including marketing and advertising expense commitments and minimum license

1  royalty guarantees. The Company announced that it anticipated net sales for the full

2  year of approximately $690 million to $700 million, with revised non-GAAP

3  earnings per share in the range of approximately $0.68 to $0.74. Berman conceded

4  on the October 2012 conference call that there was a correlation between poor

5  Nickelodeon ratings and Monsuno sales. His remarks contain a concession that this

6  situation was no surprise to him personally;

7           e.    On February 21, 2013 JAKKS reported results for the

8  Company's fourth quarter and full year ended December 31, 2012. Net sales for the

9  fourth quarter of 2012 were $133.5 million, compared to $141.1 million reported in

10  the comparable period in 2011. The reported net loss for the fourth quarter was

11  $119.5 million, or $5.45 per diluted share, which included a one-time non-cash

12  charge of $91.7 million or $4.18 per diluted share, related to the impairment of

13  deferred tax assets, and $0.8 million of pre-tax charges, or $0.03 per diluted share,

14  related to legal and financial advisory fees and expenses associated with the

15  unsolicited indication of interest and activist shareholder activities. Defendant

16  Berman stated, "We are disappointed by our performance in the fourth quarter. The

17  difficult and challenging toy environment did not generate the sales that had been

18  anticipated, and several of our key products did not achieve the sales levels that we

19  had planned for, also resulting in license royalty minimum guarantee shortfalls.

20  However, we are optimistic for our future growth and profitability. We believe that

21  our core business lead by our infant/preschool, seasonal and Halloween segments, in

22  conjunction with meaningful reductions in operating costs, will return the Company

23  to profitability in 2013." Berman continued, "We believe that the difficult

24  environment for toys in 2012 resulted from rapid changes in children's play patterns

25  as tablet and smartphone devices and interactive games and toys have more and

26  more become cornerstones of their play and fun experiences. We recognize that it is

27  critical for us to provide new, more exciting and magical experiences for today's

28  child compatible with these new play patterns. We believe that our partnership with

NantWorks in creating our DreamPlay line of toys using NantWorks proprietary ID recognition technology will place JAKKS in the forefront of the play revolution we are witnessing.    We believe that applying this technology to a broad array of characters and play patterns will create new consumer demand for JAKKS products and will help JAKKS achieve substantial long range growth and profitability, warranting the investment in technology and content that we are making;"

f.    At the same time, the Company announced 2013 guidance foreseeing an increase in net sales of 4.0% to 5.0% to approximately $694 million to $700 million, with diluted earnings per share in the range of approximately $0.63 to $0.68.    This guidance anticipated first-quarter 2013 net sales in the range of $70 to $73 million, with a loss per share in the range of $0.83 to $0.85, which reflects 17.6% fewer common shares outstanding primarily as a result of the July 2012 Defensive Repurchase;

g.    On July 17, 2013, JAKKS announced its second Quarter 2013 results. Net sales for the second quarter of 2013 were $106.2 million compared to net sales of $145.4 million reported in the comparable period in 2012.  The reported net loss for the second quarter was $46.9 million, or $2.14 per diluted share, which included charges for license minimum guarantee shortfalls of $14.1 million and inventory impairment of $12.2 million. This compared to net income of $0.2 million, or $0.01 per diluted share, reported in the comparable period in 2012, which included $1.7 million, or $0.5 per diluted share, of legal and financial advisory fees and expenses related to the 2011 unsolicited indication of interest.  Net sales for the six months ending June 30, 2013, were $184.3 million compared to $218.8 million in 2012.  The net loss reported for the six month period was $74.4 million, or $3.40 per diluted share, which includes $0.8 million, or $0.03 per diluted share, of pre-tax financial and legal advisory fees and expenses relating to the 2011 unsolicited indication of interest, and charges for license minimum guarantee shortfalls of $14.4 million and inventory impairment of $14.9 million.  This

compared to a net loss for the first six months of 2012 of $15.8 million, or $0.61 per diluted share, which included $3.1 million, or $0.09 per diluted share, of pre-tax financial and legal advisory fees and expenses. Defendant Berman stated, "We are disappointed that JAKKS has not met its second quarter target and will not achieve its full year 2013 forecast. Sales for the second quarter were significantly below expectations due to a variety of factors. Several retailers, both in the United States and in Europe, are struggling and have substantially decreased their orders. In addition, the poor performance of several of our key properties, including Monsuno and the Winx Club, also contributed to the decline, along with unusually cool weather that affected seasonal toy sales leading to more aggressive markdowns at retail as shelves are cleared for back-to-school products. We also believe the decline in sales reflects the continuing change in play patterns of children of all ages, who continue to rely more and more on smart devices for their fun and entertainment. As previously announced, this shift in play patterns has caused companies like JAKKS to evolve to meet the changing demands of its consumers with technologically enhanced product offerings."   Berman further stated "We are making key, targeted moves to align operations, drive productivity and support innovation with the objective of returning the Company to profitability in 2014. We believe that JAKKS, which has now been in business for almost 18 years, will be able to weather the seismic shift that the toy industry is experiencing due in large part to our commitment to growing a segment of our portfolio that combines the power of digital content with physical product, such as our innovative DreamPlay line of toy products. These initiatives should be seen in this strategic context as we continue to reshape our business to improve innovation and product sales and with it our long-term ability to compete in a rapidly changing industry. Coupled with our core, evergreen business, we expect that JAKKS will be able to solidify its position in 2014 and beyond as one of the leading toy companies in the United States;" and

h.    At the same time as the Second Quarter earnings announcement JAKKS was forced to revise downward its full year 2013 guidance. It was announced that the Company anticipated net sales for the full year of approximately $620.0 million, with revised loss per share in the range of approximately $56.1 million, or $2.56 per diluted share. The revised guidance represented a reduction from the Company's previously anticipated full year net sales of approximately $694 million to $700 million and diluted earnings per share in the range of approximately $0.63 to $0.68, excluding financial and legal advisory fees relating to the 2011 unsolicited indication of interest.

62.    From the time that the Defensive Repurchase was announced, JAKKS shares have never approached $20 per share. Indeed, the Defensive Repurchase was so over-subscribed that JAKKS was only able to purchase approximately 15% of the over 22 million shares tendered. Indeed, a buy-out at $20 per share or above would have received widespread shareholder support. As it was, when the results of the Defensive Repurchase were announced, JAKKS shares dropped over 11% in value the next day.

63.    Given the weaknesses in JAKKS' business over the long term as known by the Board and management its share price has not provided any significant gains for long-term shareholders. The very competitive toy market and JAKKS' apparent inability to thrive in that market certainly signaled to anyone taking a disinterested look that a buy-out of this Company at $20 per share or more was certainly in the best interests of the shareholders. The Defensive Repurchase, the Poison-Pill, the Standstill Agreement, the refusal to negotiate with Oaktree and the repeated dissemination of financial guidance which indicated that success was just around the corner, but which success never materialized, all reflect the Board's breach of its fiduciary duty to act in the best interest of JAKKS and not in their own narrow financial self-interest. JAKKS shares have recently traded below $6.00 per share, a difference of 70% from the Offer. The Board's decisions were self-

interested and not a valid exercise of business judgment.    Accordingly, the

Defendants should be held liable to the Company for all damages flowing from their

breaches of fiduciary duty, including their violation of the Unocal Standard.

2.    **The Director Defendants Cause JAKKS to Repurchase Shares As a Means of Entrenchment**

64.    In effecting the Defensive Repurchase, the Repurchase Defendants injured JAKKS by forcing it to repurchase shares at $20, which price not reflective of fair value.

65.    Much of JAKKS cash as reflected on its balance sheet was held abroad and not available to be used for domestic business purposes.    JAKKS did not have sufficient domestic cash to support its 2012 business goals, including the promotion of existing products, and the development of high tech competitive products.

66.    JAKKS was forced to borrow funds to effect the Defensive Repurchase.

67.    As a result, the Director Defendants severely weakened JAKKS balance sheet and made it impossible for JAKKS to effect its business plans as it lacked the necessary financial resources.

68.    Moreover, the success of JAKKS' Monsuno product line was tied largely to the success of Nickelodeon, and its ability to stanch its ratings slide.    The Defendants knew of this relationship (and its effect on sell-through and marketing costs) at the time the Defensive Repurchase was agreed upon and effectuated.

69.    Thus, as Berman was forced to admit in the October 2012 Analysts' Conference, JAKKS has been constrained in promoting its products by its lack of financial resources.    While it has not discussed the amounts, much of its balance sheet cash is held abroad and unavailable to be used domestically to compete with toy giants Hasbro, Mattel and Disney.    Its Monsuno products, which track the airing of the Monsuno TV cartoon program on the Nickelodeon network, are geared to boys.    Yet Nickelodeon captures more girl viewers than boys and its overall viewer

market share is declining. Monsuno product sales have been weak in the United States due to the Company's inability to properly advertise and promote the products. Thus, the purported business plan was unrealistic due to the lack of JAKK's domestic financial resources.

70. Unocal "requires that directors who take defensive action against a hostile takeover show (i) that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) that the response selected was "reasonable in relation to the threat posed." Defendants cannot show this, and thus violated the Unocal Standard and are liable for all of the financial harm caused JAKKS. *See also, Bennett v. Propp,* Del. Supr., 41 Del. Ch. 14, 187 A.2d 405, 409 (1962)("We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult.").

### 3. The Board's Interactions With Dr. Soon Also Breach Their Fiduciary Duties and Serve Entrenchment Goals.

71. The Board has permitted Dr. Soon, a "friendly" investor to acquire what is now a 24.9% controlling and blocking stake in JAKKS' shares.

72. With Dr. Soon so ensconced, the Board need not worry about Clinton Group or Oaktree or similar overtures. But the relationship with Dr. Soon has come with a heavy price. The transactions with Dr. Soon's companies have been lopsided in favor of Dr. Soon, and any acquirer would inherit them. These transactions, too, violate the Unocal Standard and constitute a breach of the duty of loyalty. They deter takeovers at an unreasonable cost to JAKKS.

73. In its latest quarterly filing on Form 10-Q, JAKKS describes the "joint ventures" (the "September 2012 JV Agreements") with Dr. Soon's companies as follows:

In September 2012, the Company entered into a joint venture ("DreamPlay Toys") with NantWorks LLC ("NantWorks") in which it owns a fifty percent interest. Pursuant to the operating agreement of DreamPlay Toys, the Company paid to NantWorks cash in the amount of $8.0 million and issued NantWorks a warrant to purchase 1.5 million shares of the Company's common stock at a value of $7.0 million in exchange for the exclusive right to arrange for the provision of the NantWorks recognition technology platform for toy products. The Company has classified these rights as an intangible asset and will amortize the asset over the anticipated revenue stream from the exploitation of these rights. The joint venture entered into a Toy Services Agreement with an initial term of three years expiring on October 1, 2015 and a renewal period at the option of the Company expiring October 1, 2018, subject to the achievement of certain financial targets, to develop and produce toys utilizing recognition technologies owned by NantWorks. Pursuant to the terms of the Toy Services Agreement, *NantWorks is entitled to receive a preferred return* based upon net sales of DreamPlay Toys product sales and third-party license fees. *The Company retains the financial risk of the joint venture and is responsible for the day-to-day operations, including development, sales and distribution, for which it is entitled to receive any remaining profit or is responsible for any losses, and the results of operations of the joint venture will be consolidated with the Company's results.* Sales of DreamPlay Toys products have commenced in the third quarter of 2013.

In addition, the Company invested $7.0 million in cash in exchange for a five percent economic interest in a related entity, DreamPlay LLC, that will exploit the recognition technologies in non-toy consumer product categories. *NantWorks has the right to repurchase the Company's interest for $7.0 million.* The Company has classified this investment as a long term asset on its balance sheet.

74.    Thus, for its $8 million investment in the DreamPlay Joint Venture, JAKKS cedes a "preferred return" to Dr. Soon's NantWorks, but yet "retains the financial risk of the joint venture and is responsible for the day-to-day operations,

including development, sales and distribution, for which it is entitled to receive any remaining profit or is responsible for any losses…"  Such a deal, as described, is outrageously one-sided.  In addition, JAKKS has invested $7 million for a paltry 5% stake in DreamPlay, LLC (valuing that company at *$140 million*).  Should that $7 million be used to greatly increase the value of DreamPlay, NantWorks gets to buy back JAKKS' stake *at no profit to JAKKS*.  It is evident that the Board will pay any price to keep Dr. Soon happy, and themselves entrenched in office.

### 4.    **The Board Alters Berman's Pay Formula as a Further Act of Entrenchment**

75.    In a further act of entrenchment, the JAKKS Board extended the employment contract of its failed CEO, Defendant Berman to December 31, 2018, despite the fact that the Company's shares are trading near an all-time low, and modified his employment contract so he can be paid huge bonuses despite the fact that the Company cannot meet EPS earnings goals.  An independent Board would have fired Berman.

76.    By amending Berman's employment contract to extend the term, an acquirer of the Company would owe Berman almost $12 million if he is terminated due to a change in control.  Further, a change in control includes the situation where a majority of the JAKKS directors are not re-elected.

77.    Traditionally, the CEO's compensation was based on performance.  As set forth in the JAKKS' 2010 Proxy Statement at p. 7:

> The Compensation Committee has, with input from the Company's compensation consultant, Frederick W. Cook & Co., Inc. ("FWC"), established target performance levels for incentive bonuses based on a number of factors designed to further our executive compensation objectives, including our performance, the compensation received by similarly situated executive officers at peer group companies, the conditions of the markets in which we operate and the relative earnings performance of peer group companies.

78.    The 2010 Proxy Statement goes on to discuss that compensation and bonus payments were set based on meeting EPS target goals and compensation was compared with a comparable group of companies in the toy and gaming industries.

79.    However, the net result of this plan was not good for Berman. Since JAKKS has performed so poorly, Berman did not receive the compensation he desired.  For instance, in 2011 and 2012, Berman received no bonus or option award, because the Company did not meet performance goals.

80.    For 2013 and beyond, Berman's employment agreement was changed to remove the requirement that the Company meet EPS performance goals.  As stated in the most recent Proxy Statement dated October 28, 2013:

> Mr. Berman's agreement as in effect on January 1, 2012 provided for an annual grant of $500,000 of restricted stock, the initial vesting of which depended *solely on EPS targets established in the agreement*; if initial vesting occurred, then the restricted stock vested over time.
>
> Pursuant to a September 2012 amendment to Mr. Berman's employment agreement, commencing in 2013, his annual bonus has been restructured so that part of it is now capped at 300% of his base salary and the performance criteria and vesting are solely within the discretion of the Compensation Committee, which will establish all of the criteria during the first quarter of each fiscal year for that year's bonus, *based upon financial and non-financial factors selected* by the Compensation Committee, and another part of his annual performance bonus *will be based upon the success of a joint venture entity we initiated in September 2012.* The portion of the bonus equal to 200% of base salary is payable *in cash* and the balance in restricted stock vesting over three years. *In addition, the annual grant of $500,000 of restricted stock was changed to $3,500,000 of restricted stock and the vesting criteria was also changed from being solely based upon established EPS targets* to being based upon performance standards established by the Compensation Committee during the first quarter of each year. (Emphasis added.)

81.     Amazingly, Berman's employment agreement was also amended in December 2012 to extend the term until December 31, 2018.  This is inconceivable given the harm Berman's tenure has done to the Company.

82.     Thus, now Berman can be paid significant sums throughout his extended term of employment while the Company continues to languish in the depths, with its share price near an all-time low.  Independent Directors on an independent Board would have fired Berman.  Further, since this new employment arrangement was so unfair, the Board couched its description in the Proxy Statement in obfuscatory, vague and misleading language so that the shareholders would not understand what was actually transpiring.  They then asked the shareholders to endorse what they could not understand in a "say on pay" advisory vote.

83.     Such a compensation agreement cannot be the result of a reasoned business decision but rather reflects the relationship between Berman, Glick and Miller, and/or Berman's domination of the two directors.

**B.     ALLEGATIONS   PERTAINING   TO   THE   CLASS   ACTION LITIGATION**

84.     What follows are the key allegations contained in the Securities Class Action. (*See, e.g. Melot v. JAKKS, Inc., et al.*, 13 CV 5388, United States District Court, Central District of California.)  Plaintiff does not allege that these allegations are true, but rather that they have been made and if proven would subject the Company to significant liability.  If such liability is proved, Plaintiff seeks damages and/or contribution from the relevant Individual Defendants, the ones responsible for having caused the harm to JAKKS, rather than allowing the innocent shareholders to bear such cost.

85.     The allegations are as follows with respect to the period July 17, 2012 and July 17, 2013 (the "Class Period"):

a.     Throughout the Class Period, Defendants Berman and Bennett made materially false and misleading statements regarding the Company's business

1  and operations and/or failed to disclose that: (i) the Individual Defendants had
2  consistently manipulated JAKKS' sales and forecast numbers in order to mislead
3  investors; (ii) JAKKS systematically laid off workers at the end of a quarter in an
4  effort to meet earnings projections and rehired workers to fill the same positions at
5  the start of the following quarter; (iii) to secure licenses for popular trademarks and
6  brand names, the Individual Defendants guaranteed minimum royalty payments,
7  knowingly or recklessly disregarding that the Company would be unable to meet the
8  minimum sales needed to cover those payments, thereby incurring substantial write-
9  downs; and (iv) Defendants were aware that the Monsuno and Winx lines performed
10 poorly upon their launch yet continued to tout their success to unsuspecting
11 investors.

12          b.      Despite   claiming   consistent   revenue   growth,   confidential
13 witnesses reveal that JAKKS' high level executives had unfettered access to and
14 manipulated the Company's sales and forecast numbers, deceiving the investors
15 about JAKKS' financial health. [Class Counsel or their agents interviewed a number
16 of former JAKKS employees and some of them provided information to Class
17 Counsel which information was incorporated into the current Class Action
18 Complaint. The witnesses are not identified but described as Confidential Witness
19 or "CW".] For example, CW 1, JAKKS' controller and Executive Vice President,
20 who reported directly to Defendant CFO Bennett and designed the sales and
21 forecasting system at JAKKS, observed that the forecasts he/she prepared were
22 often overridden by his/her superiors, Defendants Berman and Bennett. CW 1
23 remarked that "the salespeople would put in their numbers and when it came time to
24 designating the number on forward looking statements, it didn't jive with the
25 system." According to CW 1, [t]he numbers [CW 1] gave were accurate" but "the
26 CEO kept telling me my numbers were wrong," thereby inflating the Company's
27 sales forecast.

28

c.      In addition, confidential witnesses also revealed that in an effort to meet earnings projections, JAKKS routinely laid off workers before the end of the quarter and often rehired workers to fill those positions in the subsequent quarter. For example, CW 9, who helped supervise the design, marketing, and sales of several lines of toys at JAKKS, remarked that every three months, the Company would lay off a large number of workers, with the firings timed to occur several weeks before the end of the fiscal quarter. Workers were rehired the following quarter to fill the same positions. JAKKS carried on this illicit practice without a whisper to the market.

d.      Defendants misled the public regarding the success of its newly-introduced toy lines Monsuno and Winx, which they repeatedly claimed were "showing strong momentum" with "orders on hand and our forecast in-house through both U.S. and international...growing expeditiously," and the "sell-throughs...well beyond what we ever expected." In stark contrast to Defendants' assurances, however, confidential witnesses confirm that Monsuno and Winx underperformed from the outset. For example, CW 3, who was monitoring sales at one of JAKKS' largest customers, recalls that the Monsuno toy line performed poorly from its launch, and that executives at JAKKS were privy to this information.

e.      Following Defendants' repeated guarantees of growth and projected sales revenue increases, on July 17, 2013, after the market close, JAKKS shocked the market when it suddenly slashed its full-year forecast of revenue and earnings, citing poor sales and lackluster performance from the Monsuno and Winx Club line of products. In response, the Company said it would suspend its dividend, and implement a restructuring plan involving a "substantial reduction of leased space, employees and other overhead expenses." Moreover, in a conference call held with investors that same day, the Company blamed its earnings miss in part on "charges for license minimum guarantee shortfalls of $14.1 million," essentially admitting that the Company was simply unable to meet its minimum guarantee

agreements with its licensors without incurring significant charges.  This news sent JAKKS' shares into a tailspin, dropping approximately 39% from a close of $11.48/share on July 17, 2013, to a close of $7.00/share on July 18 2013.

f.    Numerous confidential witnesses [interviewed by or on behalf of Class Counsel] corroborated that the Defendants Berman and Bennett had continuous and unrestricted access to the Company's current sales figures and forecasts via its JAKKS.net system and also were apprised of all changes in sales and projections in weekly meetings with its Controller.  CW 1 served as the Controller and Executive Vice President at JAKKS from 2010 until he was terminated in October 2012.  Based at the Company's headquarters in Malibu, California, CW 1 reported directly to Defendant CFO Joel Bennett.  CW 1 was responsible for overseeing JAKKS' finances. CW 1 designed the sales and forecasting system at JAKKS, and managed the Company's sales meetings. CW 1 was hired to fix JAKKS' finance and forecasting systems after a massive loss at JAKKS on or about Q4 2009 or Q1 2010.  When CW 1 joined JAKKS, the Company had no meaningful forecasting controls in place.  CW 1 built a detailed in-house forecasting system that examined volumes and forecasted each customer's sales by month.  The forecasts were maintained in a spreadsheet format.  CW 1 produced an internal report on a weekly basis, which broke down the actual sales for each toy line by each customer in every region of the country.  The report compared the actual sales to the budgeted forecast of sales. CW 1 emailed the report to the Individual Defendants.  CW 1 and the Individual Defendants met on a weekly basis to discuss the actual sales against the forecasts.  The weekly forecast showed the executives how each toy line was performing and which customers were purchasing the Company's toys, and in what quantities.

g.    CW 1 also explained that to minimize losses, CW 1 implemented a system in which JAKKS received point-of-sale data from large retailers immediately after a toy was launched.  This meant that the Company and its chief

executives knew almost immediately after a product was launched how it was performing.     This way, JAKKS could promptly cease production of underperforming toys.  The Individual Defendants saw this detailed information in the forecasts and Excel spreadsheets.  CW 1 provided them on a weekly basis.  Thus, the Individual Defendants could review sales by toy line, by store, by region, as well as ascertain which toys were sitting on the shelves.  CW 1 observed that Defendants Berman and Bennett did away with this system after CW 1 left the Company because they did not want the sales force spending their time examining the sales data instead of selling toys.

     h.     The Company's published forecasts were primarily based on estimates obtained from the sales team. The salespeople provided confidence levels for the forecasts, and the progress of anticipated sales was continuously monitored.  CW 1 informed management of all changes in product demand: if the numbers on a product started waning, CW 1 would promptly apprise management.

     i.     CW 2 worked as an executive assistant to JAKKS' Senior Vice President of domestic sales, Ken Price, from June 1999 to late June 2012.  CW 2 worked in the New York office, which houses many of the Company's sales executives.  As a long-time employee and executive assistant to a vice president, CW 2 was familiar with how sales forecasts were compiled and disseminated throughout the Company. CW 2 remarked that JAKKS' sales executives regularly received sales figures and forecasts of pending deals from various regions of the country.  Price received sales forecasts for domestic sales, and Vice President of International Sales Carmine Russo received sales forecasts for international sales.  Price was responsible for compiling the domestic sales forecast every quarter into a report.  This report was composed of sales forecasts drawn from sales staff located throughout the country. The forecasts were based upon sales figures from retail stores and merchants. According to CW 2, the quarterly sales reports were sent to the Company's executives, including Defendant Berman. JAKKS' executives would

also request additional sales forecasts between quarters. Carmine Russo also rolled up the sales numbers from overseas and sent quarterly sales reports and forecasts, for international sales, to Berman and Bennett in California.

j.    CW 3 worked as a business analyst for JAKKS from January 2011 to September 2012. CW 3's responsibilities included receiving sales data for all of JAKKS' products from two major vendors, Amazon.com and Toys R Us, which CW 3 would then compile and forward to executives at the Company's headquarters in California. CW 3 worked in the New York office, which housed many of the executives in the Company's sales division. CW 3 reported to Vice President of Sales Dan Cooney. Every week, CW 3 sent sales data from Toys R Us and Amazon.com to the executives in California, as well as most of the top executives in the marketing department. CW 3 said that other business analysts received similar data from all the large chain stores who sold JAKKS' products, including Wal-Mart and Kohl's. Those analysts also sent sales data to the Company's top executives on a weekly basis. The sales data was referred to as the "R Report." Sales forecasts, compiled by sales coordinators, were produced using JAKKS' own software called "JAKKS' VI Tool." As a result of the internal flow of information, the CEO, COO and other top executives at JAKKS knew how well all products were selling on a weekly basis. The sales data was also made available to Price and Russo.

k.    CW 4 worked as a business analyst for JAKKS from October 2011 to August 2012. CW 4's responsibilities included receiving sales data for JAKKS' products from Wal-Mart, one of JAKKS' largest retailers, and producing forecasts for future sales. CW 4 worked out of the Company's office in Bentonville, Arkansas and reported to Senior Vice President of Sales Bryan Shoe. CW 4 received sales data from Wal-Mart and, using a number of variables, including past sales, marketing, and anticipated consumer demand, CW 4 prepared forecasts for future sales at Wal-Mart. These forecasts were provided both to Wal-Mart, to help

the retailer make decisions about inventory, and to JAKKS' executives.  JAKKS used a web-based system called "JAKKS.net" to prepare forecasts.  CW 4 and other analysts entered their forecasts into the system as soon as they were generated.  CW 4 added forecasts to the system on a daily or weekly basis. Forecasts for the sales of JAKKS' products were listed by product name and by the retailer in which the product was sold. The forecasts on JAKKS.net were visible to large numbers of sales staff, including all inside analysts, account managers and senior vice presidents. According to CW 4, the numbers were "rolled up" to all levels of management. "Anybody had full visibility of what you were forecasting," said CW 4.

l.    CW 5 worked at JAKKS as an associate product manager from November 2010 to August 2011 and as a brand manager from August 2011 until March 2013.  Both of these positions were in the Company's marketing department. During that time, CW 5 routinely reviewed the sales data and sales projections of several products.  Sales representatives obtained point of sale ("POS") data directly from major retailers, including Wal-Mart, K-Mart, Target, and Toys R Us.  The sales representatives then entered the sales data into JAKKS.net, the Company's online network.  Sales projections were developed in collaboration between JAKKS' marketing and sales departments.  According to CW 5, sales projections were also placed on JAKKS.net. CW 5 noted that point-of-sale data from retailers was updated at least weekly, and many individuals in both the sales and marketing divisions had access to all or some of the data on the network through a log in system.  Data could also be extracted from the site and emailed to other parties in the form of a Microsoft Excel document.

m.    Throughout the Class Period, Defendants Berman and Bennett continuously touted JAKKS' financial growth and stability.  For example, for full year 2012, Defendants forecasted a 6.2% to 7.4% increase in net sales from the prior year to a range of $720 to $728 million, and represented that the Company is "on

1  track for meeting [its] guidance for the full year." Even after they subsequently

2  reduced the guidance for 2012 in December, Defendants still projected profitability

3  for 2013, with "an increase in net sales of 4% to 5% to approximately $694 to $700

4  million," emphasizing that JAKKS "will return to profitability in 2013." These and

5  similar representations, however, were false and misleading as these Individual

6  Defendants continuously manipulated the Company's reported sales forecasts.

7       n.    According to CW 1, the forecasts prepared by CW 1 were often

8  overridden and manipulated by the Individual Defendants. CW 1 remarked that "the

9  salespeople would put in their numbers and when it came time to designating the

10  number on forward looking statements, it didn't jive with the system." CW 1

11  emailed his superior, Defendant Bennett, just before he was laid off, that CW 1's

12  forecasting showed sales numbers much lower than what Defendant Berman was

13  forecasting. CW 1 remarked that his email to the CFO describes these discrepancies

14  in detail. CW 1 noted that the email "fell on deaf ears." CW 1 believes he was

15  terminated because of his persistence on this issue. CW 1 remarked that "the

16  numbers I gave were accurate, based on the forecasts from the sales group" but "the

17  CEO kept telling me my numbers were wrong and that he talked to the sales guys,

18  and the numbers were wrong." CW 1 explained that he went back to all the sales

19  people to ask if they changed their forecast numbers to the numbers the CEO had

20  and was told by the sales people that they did not change their numbers. CW 1 said

21  that when Q2 2012 numbers were reported to his superiors, they were exactly as he

22  had previously forecasted. As far as CW 1 knew, Defendant Berman just changed

23  numbers as he saw fit, so there was no reason the Individual Defendants would need

24  to get any salespeople to adjust their forecasts.

25       o.    CW 1 explained that in addition to the sales and forecast system,

26  JAKKS had a second IT/production system, which was controlled by the Chief

27  Operating Officer, John McGrath. Before CW 1 was terminated, CW 1 had been

28  working on tying the forecast system into the IT/production system. This would

have allowed the Company to accurately predict which products were suffering and to avoid excess inventory. The IT/production system would have made it more difficult for management to manipulate the forecasts as they saw fit. CW 1 believed that his involvement in the IT/production system was another reason for his termination.

p.    According to CW 1, McGrath brought in an individual with no formal education named Adam Prump (spelled phonetically). CW 1 described Prump as the "henchman" at JAKKS who followed the instructions of senior management. Prump had control of the IT/production system, which allowed him to change sales forecast on the production side. Prump had access to all the passwords needed to make changes in the system. Prump pressured Ken Price, who was the senior sales person and Executive Vice President for JAKKS' core business. Price reported directly to Defendant Berman. Price would typically make high-level sales estimations. According to CW 1, Price had been pressured by senior management to manipulate sales numbers and wrote a letter of protest to senior management.

q.    CW 6 worked in JAKKS' sales division from 1996 to August 2012. He joined the Company as a sales analyst and was later promoted to sales manager, reporting directly to Ken Price, the Executive Vice President of domestic sales, from October 2001 until he left the Company. CW 6 rolled up JAKKS' domestic sales each quarter. CW 6's responsibilities included collecting sales numbers from different divisions within the Company and helping Price organize quarterly forecasts for domestic sales.

r.    CW 6 would help tally the numbers from the Company's different domestic sales divisions and compile them into a report. Price sent the sales forecasts to the executives at the Company's headquarters in California. Each quarter, CW 6 saw the dollar amount of total domestic sales forecasted for the following quarter. After Price sent out the report to headquarters, CW 6 often would listen to or read an account of the Company's quarterly earnings call with analysts

1  and shareholders.  In these public statements, the Individual Defendants would

2  present a forecast for the net sales of the company, equivalent to the domestic sales

3  plus the international sales.  Based upon the report sent by Price to the Company's

4  executives, the numbers provided by the Individual Defendants to investors and

5  analysts were inflated. According to CW 6, "the numbers they were giving were too

6  high."

7          s.     CW 7 worked at JAKKS for over a decade, holding a number of

8  high-level positions, including as Director of Marketing and Licensing, Vice

9  President of Marketing and Licensing, and Senior Vice President of Licensing and

10  Media.  According to CW 7, Price made a formal complaint to the Company (wrote

11  a letter) because he did not believe in the Company's sales forecasts.  Specifically,

12  Price complained that the sales numbers reported to investors were not matching the

13  Company's internal reports.

14          t.     While Defendants announced increased revenues from sales and

15  maintained that JAKKS was "on track" to meet its guidance, Defendants concealed

16  that the Company engaged in systematic layoffs prior to the end of each quarter in

17  order to make its numbers, and rehired workers the following quarter to fill those

18  same positions.  Defendants failed to disclose that JAKKS' perceived ability to meet

19  its guidance did not stem from organic sales but instead was a product of

20  machinations.

21          u.     C W 3 explained that quarterly layoffs occurred at the end of the

22  fiscal quarters in 2012 when it looked like the Company was not going to "make its

23  numbers," i.e., its sales goals. JAKKS' employees would be fired to lower the

24  Company's costs and recorded overheard, lending an appearance of financial

25  viability.  The number of employees who were fired depended on the financial goals

26  set for the quarter.  "They had a number they had to meet," CW 3 said, "and if we

27  weren't going to make our numbers, a certain number of people had to get fired."

28

1    v.    CW 8 worked as the lead designer for JAKKS' line of Winx Club

2    dolls from October 2010 to July 2013. CW 8 observed that the Company engaged

3    in systematic layoffs at the end of the Company's fiscal quarters. It was "common

4    knowledge" at JAKKS that employees were laid off in order to lower costs and

5    make the Company's finances appear healthier to investors. Employees considered

6    the quarterly layoffs a type of "lottery" in which a certain number of people would

7    invariably be terminated. "Everyone there knew it," said CW 8. In many cases,

8    these same positions from which employees had been fired would be filled at the

9    beginning of the following quarter.

10    w.    CW 9 was an associate brand manager at JAKKS from August

11    2011 to March 2013. CW 9 helped supervise the design, marketing, and sales of the

12    Company's Marvel, DC, Star Wars, and Power Rangers' lines of toys.    CW 9

13    reported to the Director of Marketing. CW 9 observed frequent layoffs at JAKKS

14    during his/her tenure.   While the brands for which CW 9 was responsible were

15    performing relatively well and meeting internal projections, CW 9 was aware,

16    through conversations with co-workers that other parts of the company were doing

17    poorly. According to CW 9, "a lot of people were talking about how [the Company]

18    wasn't doing well." CW 9 noticed that approximately every three months, the

19    Company would lay off a large number of workers.   The firings appeared to be

20    timed to occur several weeks before the end of the financial quarter.  CW 9 also

21    observed that the Company would often hire new workers several weeks after there

22    had been a round of layoffs, i.e. after the financial quarter had ended. These workers

23    would often hold the same position as workers who had been laid off.

24    x.    CW 10 was a senior brand manager at JAKKS from February

25    2011 to October 2013. CW 10 reported to the Company's Director of Marketing,

26    Josh Weichbrodt, who reported to Tara Hefter, the Vice President of Global

27    Licensing. CW 10 also observed regular layoffs at the Company. CW 10 described

28    morale as "low." CW 10, too, noticed a pattern wherein many employees were

1  consistently fired before the end of a quarter. CW 10 remarked that "they planned to

2  do it every quarter." CW 10 also observed that new employees were often hired at

3  the beginning of a new quarter.

4          y.      "Substantially all of [JAKKS'] net sales" derive from sales of

5  products under trademarks or brand names licensed from other sources. In its

6  filings, JAKKS represented only that some "license agreements generally require [it]

7  to make specified minimum royalty payments, even if [the Company] fail[s] to sell a

8  sufficient number of units to cover these amounts." Defendants allegedly

9  concealed, however, that in order to secure licenses to popular brands and

10  trademarks, the Defendants guaranteed minimum royalties knowing the Company

11  was unable to generate sufficient sales to cover said payments, resulting in massive

12  write-offs.

13          z.      CW 1 explained that JAKKS wrote a number of "pretty hefty

14  licensing agreements that contained minimum guarantees. Under a minimum

15  guarantee agreement, JAKKS would guarantee a company from whom it is licensing

16  a certain amount of royalty payments, regardless of the actual revenues generated

17  from the product. According to CW 1, the minimum license guarantees were

18  written off once a product was determined to be unsuccessful, even if that event

19  preceded the contract dates when the license guarantees were due. The sales and

20  forecasting system at JAKKS also were used to determine which products should be

21  written off. JAKKS' senior management knew they were going to have to write off

22  some guarantees.

23          aa.     CW 7 similarly observed that, typically, the Company's contracts

24  with licensors are signed by the Individual Defendants and other top management.

25  CW 7 stated that Defendant Berman signs off on every contract and that Berman is

26  always carefully vague in investor calls when talking about which accounts caused

27  minimum license guarantee write-offs. According to CW 7, a JAKKS employee

28  reporting directly to CW 7 told CW 7 that he/she was directed by Defendant Berman

1  to take Executive Vice President of Sales Ken Price's name off a contract because he

2  refused to agree to its terms.  The reason for Price's refusal was that he knew it was

3  an unattainable guarantee amount and objected to its execution.  The contract was

4  for approximately $100 million and was related to a Disney segment.

5           bb.    Defendants attributed JAKKS's second quarter 2012 results, with

6  a 10% increase in sales to $145.4 million from the prior year period to "the

7  expansion of the Monsuno toys...and [the] Winx Club [line]...both of which are

8  already showing strong momentum." Defendants offered upbeat guidance for 2012,

9  anticipating growth in net sales in the range of $720 million to $728 million, with

10  Monsuno "growing...rapidly" and "expeditiously" and the launch of the Winx Club

11  line "off to an amazing start." Contrary to these rosy depictions, however,

12  confidential witnesses confirm that the Monsuno and Winx lines underperformed

13  from their initial launch and at least as early as June 2012.  Despite this failure,

14  Defendants knowingly continued to mislead investors about the products' success. In

15  fact, on October 23, 2012, when an upset shareholder questioned the Company's

16  "wondrous prospects of Monsuno" and opined that "these failed to do," Defendant

17  Berman was quick to disagree: "I will disagree with you on Monsuno. Monsuno has

18  done terrific for us as a company. we have a very solid business."

19           cc.    During his/her tenure at JAKKS, CW 6 was present for the

20  launch of JAKKS' Monsuno and Winx Club toy lines. Based on CW 6's receipt of

21  domestic figures, it was quickly apparent that the lines were underperforming.  The

22  lines launched around March 2012.  According to CW 6, based on the Defendants'

23  Berman and Bennett's receipt of quarterly sales figures, they would have been

24  apprised of the lines' severe underperformance by June 2012.

25           dd.    CW 3, who was monitoring sales at Toys R Us in 2012, similarly

26  recalls that the Monsuno toy line underperformed at Toys R Us from the time of its

27  launch. According to CW 3, this sales data was transmitted to the top executives at

28  JAKKS.

ee.    CW 8, who worked as the lead designer for JAKKS' line of Winx Club dolls from October 2010 to July 2013, observed the toy line's design and its final production.  As its lead designer, CW 8 paid close attention to the performance of the Winx Club line of dolls.  By mid-2012, CW 8 was aware of the fact that the line of dolls did not perform in line with the Company's expectations and the sales were lower than forecasted.  The line's underperformance is attributable to a shift in toy preferences among children towards electronic, smart-phone-type toys, and also to a decision by the television channel Nickelodeon to air a television series entitled "Winx Club," featuring the characters depicted in the toy line, at night instead of in the afternoon, a time slot when the target demographic for the Winx Club line—young children—was unlikely to watch television.

ff.    CW 11 was a sales and account analyst for JAKKS from August 2011 to March 2013.  CW 11 analyzed sales figures received from K-Mart and Kohl's, who sold many of JAKKS' toy lines.  CW 11 reported to the Vice President of Sales.  CW 11 stated that the Monsuno and Winx Club lines underperformed from the outset.  CW 11 received information from K-Mart and Kohl's about the sales figures of the company's Monsuno and Winx Club toy lines.  Because she received sales figures from K-Mart and Kohl's on a regular basis, she had "the initial reads" on sales of the two lines when they first launched.  Almost immediately after the lines' launch - sometime in early 2012 - it was clear that the lines were not flying off the shelf and were in fact failing to meet the Company's forecasts.  K-Mark and Kohl's sent sales figures directly to CW 11 on a daily or weekly basis.  Based upon his/her review of the sales figures, CW 11 relates that it was readily apparent that they "weren't good" and were not in line with the expectations laid out by JAKKS' management.   When CW 11 received sales figures from K-Mart and Kohl's regarding specific brands, including Monsuno and Winx, CW 11 would apprise both the brand managers who managed these toy lines and the account managers who managed the accounts with K-Mart and Kohl's of the relevant sales figures.  CW 11

sent weekly, sometimes daily, reports on sales figures related to all toy lines, including Monsuno and Winx, to the brand managers and account managers. These reports were sent to "everyone who touched the brand," which included individuals in both the marketing and sales departments. Therefore, brand managers associated with Winx and Monsuno were well aware of the lines' underperformance within weeks of their launch.

gg.    On July 17, 2012, the Company issued a press release announcing financial results for the second quarter 2012 ("2Q 2012"). The Company reported that "[n]et sales for the second quarter of 2012 were $145.4 million, up from $131.9 million reported in the comparable period in 2011." The Company also reported that earnings were down from the prior year: "[e]xcluding the legal and financial advising fees, second quarter earnings would have totaled $1.6 million, or $0.06 per diluted share, compared to $4.9 million, or $0.18 per diluted share, in 2011."

hh.    Quoting Defendant Berman, the press release focused on the reported sales growth, including "strong momentum" from the Monsuno and Winx lines:

> We are pleased with the sales growth in the second quarter and year to date, and we are on track to meet our guidance ranges for the full year. Highlights of our second quarter include the expansion of the Monsuno toys in the US and the launch internationally of the animated series and related toy products, which has met the Company's expectations to date, and our Winx Club dolls and Big Wheel line launched at select major retailers, both of which are already showing strong momentum. Our outlook for the third quarter remains optimistic with contributions from a broad range of products including our growing pool of owned content.

///

ii.    The press release then offered the following upbeat guidance for 2012, including an increase in the projected earnings per share:

> For 2012, the Company continues to expect an increase in net sales of 6.2% to 7.4% to approximately $720 million to $728 million, with revised diluted earnings per share in the range of approximately $1.04 to $1.08, giving effect to the repurchase of common stock pursuant to the self-tender and the related anticipated financing costs and excluding the financial and legal advisory fees. The Company's previous guidance for diluted earnings per share was in the range of $1.01 to $1.07, excluding the financial and legal advisory fees.

jj.    During an earnings call with analysts to discuss its second quarter results, Defendants Berman and Bennett again reaffirmed the guidance for full year 2012 and assured investors that sales from the Monsuno and Winx Club lines were solid and would continue that trajectory:

> <Berman>: I'd like to start off by saying that we are very pleased with the sell-in of our products for the second quarter and year-to-date and we are on track for meeting our guidance for the full year. We are working hard to bring high quality and compelling play things to market while tightly managing our business and increasing profitability.
>
> Highlights for our second quarter include strong sell through of our Monsuno toys in the U.S. and the ongoing launches of the toy line and animated series internationally in the markets like the UK, Italy and Australia. Our Winx Club Dolls are off to a positive start and our Big Wheel line launched at select major retailers in June and is already showing strong momentum.
> * * *
> <Bennett>: As per our earnings guidance for 2012, we're still anticipating growth with net sales in the range of $720 million to $728 million...
> ****
> <Berman>: Again, we are very pleased with the results of our second quarter of 2012 and feel positive about our prospects for the remainder of the year, including the ever important holiday season with the initial success of Monsuno, Winx Club, and Big Wheel, and the broad placement of out wide range of products going into the fall 2012 year.

We have some really terrific products in our portfolio and have both new and evergreen contributions coming across all JAKKS divisions this year.

\*\*\*

<Q -Aryind Bhatia>: Okay, a couple things here. One, I know you're not disclosing the amount of business you're doing with Monsuno today, but I would just like to, maybe, get some color on the domestic versus international mix. And should we be expecting Monsuno to become, say, about 10% of your business here in the coming year or two? Just broadly, ii you can put some brackets around how to expect revenue, about how we should model this.

<A -Stephen G. Berman>: Well, as you know, we, as for competitive reasons, not just for our competitors, but also for retailers, we do not break out the percentage of anyone specific category. But I will give you some flavor of Monsuno, both in North America; call it U.S., and International It's growing. It's growing, I would say, rapidly. During the summer months, remember, for majority of toy companies things are a slow period. It's very seasonal. People are getting back to school.

But the orders on hand and our forecast in-house through both U.S. and international is growing expeditiously. And we had a very promising event through our partner Bandai, in Japan, and they're focused very strongly in Japan, which we believe and they believe will be probably the one of on the number one boy's toy properties in Japan. We also have extremely strong promising new ventures in Korea. That's not just to say our international, call it, Western Europe and Eastern Europe, business is growing, so we are extremely excited about Monsuno and we're looking forward to the years ahead with it

\*\*\*\*\*

<Berman>: But while you asked about Monsuno, we launched the Winx Club recently, and from our retailers' point of view and from JAKKS1 point of view, the sell-throughs are well beyond what we ever expected. So that's off to an amazing start.

JAKKS Pacific Q2 2012 Earnings Call, July 17, 2012.

///

kk.    The foregoing statements were allegedly materially false and misleading because they misrepresented and/or failed to disclose the following:

(i)    the Individual Defendants had access to and consistently manipulated JAKKS' sales and forecast numbers in order to present an image of consistent growth;

(ii)    JAKKS methodically laid off workers in an effort to meet earnings projections and rehired workers to fill the same positions at the start of the following quarter;

(iii)    to secure licenses for popular trademarks and brand names, the Individual Defendants guaranteed minimum royalty payments knowingly or recklessly disregarding the Company's inability to meet the minimum sales needed to cover royalty payments, thereby incurring substantial charges; and

(iv)    Defendants in the class action knew that the Monsuno and Winx lines of products performed poorly upon their launch yet Defendants continued to tout their success to the unsuspecting investors.

ll.    On August 7, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2012, which included signed Certifications by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.  The report reiterated the Company's previously announced quarterly financial results and financial position. JAKKS reported net sales of $145.4 million for the second quarter of 2012, compared to net sales of $131.9 million in the same quarter the previous year. 2Q 10-Q 2012 at 4, 7, 23.  With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $72.0 million for the three months ended June 30, 2012, compared to $67.7 million for the prior year period, representing an increase of $4.3 million, or 6.4%. Id. at 24. "The increase in net sales was primarily due to the launch of the Winx Club dolls and sales contribution

of [the Company's] recently acquired Moose Mountain division." Id.  For the Role
Play, Novelty and Seasonal Toys segment, the Company reported net sales of $73.3
million for the three months ended June 30, 2012, compared to $64.2 million for the
prior year period, representing an increase of $9.1 million, or 14.2%. Id. "The
increase in net sales was primarily due to increases in unit sales of [the Company's]
Halloween costumes and accessories." Id. Earnings per share were 0.01 for the three
months ended June 30, 2012 vs. 0.16 for the three months ended June 30, 2011. Id.
at 11.

mm.   With respect to licensing and royalties, the 10Q disclosed only
that the Company's "license agreements generally require [it] to make specified
minimum royalty payments, even if [the Company] fail[s] to sell a sufficient number
of units to cover these amounts." Id. at 32.

nn.   The foregoing statements were materially false and misleading
for the reasons set forth in

oo.   On September 28, 2012, the Company issued a Press Release
announcing lower guidance for 2012, with anticipated net sales for the full year of
approximately $690 million to $700 million, representing a reduction from the
Company's previously anticipated full year net sales of approximately $720 million
to $728 million.  The Company also revised downward its non-GAAP earnings per
share to approximately $0.68 to $0.74, excluding non-recurring legal and financial
advisory charges of $0.19 per share, from its prior guidance of diluted earnings per
share in the range of approximately $1.04 to $1.08. JAKKS attributed the revised
guidance to "disappointing domestic product sales and a slow-down in product
orders, coupled with higher expenses, including marketing and advertising expense
commitments and minimum license royalty guarantees."

pp.   On this news, the price of JAKKS' shares dropped 4 % from
$14.57 at the close of September 28, 2012 to $14.00 on October 1, 2012, on

1   unusually high trading volume of 1.52 million shares or six times the average daily

2   volume.

3           qq.    The foregoing statements were materially false and misleading

4   for the reasons set forth above.

5           rr.    On October 23, 2012, the Company issued a press release

6   announcing financial results for the third quarter 2012 ("3Q 2012").  The Company

7   reported that "[n]et sales for the third quarter of 2012 were $314.5 million,

8   compared to $332.4 million reported in the comparable period in 2011.  "With

9   respect to earnings, the Company reported that "[excluding the legal and financial

10  advising fees, third quarter earnings would have totaled $31.2 million, or $1.13 per

11  diluted share, compared to $35.3 million, or $1.11 per diluted share, in 2011."

12          ss.    Quoted in the press release, Defendant Berman again struck an

13  optimistic note:

14      In our third quarter we saw better than expected growth from our
        international business reflecting the success of our Monsuno line of toy
15      products and solid performance from our Winx Club, Disney Princess
        and Disguise Halloween product lines. Our Monsuno, Winx Club,
16      Cinderella and Big Wheels products, to name a few, have been received
        well at retail and have earned coveted positions on many retailer and
17      media Hot Holiday Toy Lists both in the U.S. and abroad.
18

19      We are in the midst of our Fall Toy Fair meetings with retailers,
        licensors and other industry partners and are excited by the enthusiastic
20      response to our 2013 product line, including our new DreamPlay Toys
        products. We believe that our DreamPlay technology positions JAKKS
21      to be a leader in interactivity and augmented reality play for children
        and will put JAKKS in the forefront of new trends with smart phones
22      and other devices being used more and more each day by children of all
        ages for their gaming enjoyment and experiences. Looking ahead to
23      2013, we are optimistic about future opportunities including the launch
        of DreamPlay products and the solid performance of our core business
24      lines, which spans a wide spectrum that includes action figures, dolls,
        dress-up and role play; Halloween costumes from Disguise, kids
25      furniture and seasonal products from Kids Only; infant/pre-school
26

27

28

products from Tollytots; ride-on vehicles and wagons from Moose Mountain, and outdoor and junior sports products and impulse toys from Maui Toys.

tt.    The press release then offered the following reduced guidance for 2012, albeit still projecting profitability after excluding one-time charges:

> As previously announced, the Company anticipates net sales for the full year of approximately $690 million to $700 million, with revised non-GAAP earnings per share in the range of approximately $0.68 to $0.74, excluding non-recurring legal and financial advisory charges of $0.19 per share . . . The revised guidance represents a reduction from the Company's previously anticipated full year net sales of approximately $720 million to $728 million and diluted earnings per share in the range of approximately $1.04 to $1.08, excluding the financial and legal advisory fees. The Company's guidance with respect to diluted earnings per share is a non-GAAP financial measure, due to the exclusion of such one-time charges.

uu.    In an earnings call discussing the Company's third quarter results, Defendants again led the market astray:

> <Q -Jonathon Troy Fite>: We've been shareholders of JAKKS for several years now and given our tenure, just bear with me for a moment. Early in our ownership, we watched you guys impressively navigate the downturn and even while you don't let the loss of key properties like WWF, but over the past two years or so, we've been baffled by some of your cap allocations decisions and I'd like to understand a little bit better your process -your thought process behind your capital allocation decision.
>
> Let me give you a few examples. So through the crisis, you managed the cash hoard, which was great. But rather than leveraging that cash hoard to pay down or renegotiate your convertible bonds, you refinanced the bonds with lower strike prices, which diluted your shareholders.
>
> Next, about 18 months ago, you began touting the wondrous prospects of Monsuno, but these failed to do, whether you've severely missed

your earnings projections in 2011 and you've lowered expectations again for 2012.

Most recently, you refused to negotiate in good faith with the firm willing to offer shareholders $20 plus, but instead you decided to spend shareholder money on a tender at the same price. Since that tender took place, you've weakened the balance sheet and provided over a 30% drop in the share price, yet you re-hedge your compensation contracts renewed at pretty substantial levels. So can you explain to me why you might deserve to have that contract renewed and why you think your capital allocation record over the past three years really deserves to be rewarded?

<center>* * *</center>

<A -Stephen G. Berman>:.../ will disagree with you on Monsuno. Monsuno has done terrific for us as a company, maybe it has fluctuated versus U.S. to international, but we have a very solid business, we still have a very solid balance sheet, we try to appease as many shareholders as we can.

JAKKS Pacific Q3 2012 Earnings Call, October 23, 2012

    vv.    The foregoing statements were materially false and misleading for the reasons set forth above.

    ww.    On November 9, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended September 30, 2012, which included signed Certifications by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting. The report reiterated the Company's previously announced quarterly financial results and financial position. JAKKS reported net sales of $314.5 million for the third quarter of 2012, compared to net sales of $332.4 million in the same quarter the previous year. 3Q 10-Q 2012 at 4, 7, 23. With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $171.2 million for the three months ended September 30, 2012, compared to $163.2 million for the prior year period, representing an increase of $8.0 million, or 4.9%. Id. at 24. "The increase in net

sales was primarily due to the launch of Power Train, action figures based on the animation series Monsuno®, Disney® large dolls and accessories, Winx Club® dolls and sales contribution of [the Company's] recently acquired Moose Mountain division." Id. For the Role Play, Novelty and Seasonal Toys segment, the Company reported net sales of $143.3 million for the three months ended September 30, 2012, compared to $169.2 million for the prior year period, representing a decrease of $25.9 million, or 15.3%. Id. "The decrease in net sales was primarily due to decreases in unit sales of [the Company's] Disney Princess® dress up and role play items, Halloween costumes and accessories and [the Company's] kids outdoor furniture and activity tablets." Id. Earnings per share were 1.38 for the three months ended September 30, 2012 vs. 1.32 for the three months ended September 30, 2011. Id. at 12.

xx.    The 10-Q also reported that on September 12, 2012, the Company entered into a joint venture called DreamPlay Toys with Dr. Soon's NantWorks, LLC ("NantWorks"), in which it owns a fifty percent interest, in order to obtain "the exclusive right to arrange for the provision of the NantWorks platform for toy products." 3Q 10-Q 2012 at 15.  The consideration paid by the Company consists of cash in the amount of $8.0 million and a warrant issued to NantWorks to purchase 1.5 million shares of JAKKS' common stock at an exercise price of $16.2823 per share.  The warrant has an option value of $7.0 million.

yy.    With respect to licensing and royalties, the 10Q disclosed only that the Company's "license agreements generally require [it] to make specified minimum royalty payments, even if [the Company] fail[s] to sell a sufficient number of units to cover these amounts." Id. at 32.

zz.    The foregoing statements were materially false and misleading for the reasons set forth above.

aaa.    On February 21, 2013, the Company issued a press release announcing financial results for the fourth quarter 2012 ("4Q 2012"), and the full

year 2012 ("FY 2012").   The Company reported that "[n]et sales for the fourth quarter of 2012 were $133.5 million, compared to $141.1 million reported in the comparable period in 2011," while "[n]et sales for the full year of 2012 were $666.8 million compared to $677.8 million in 2011."   With respect to earnings, the Company reported that "[excluding the legal and financial advisory fees and expenses and the deferred tax asset impairment charge, the fourth quarter net loss in 2012 would have totaled $27.2 million, or $1.24 per diluted share, compared to a loss of $18.8 million, or $0.72 per diluted share, in 2011, while "[excluding the deferred tax asset impairment charge and legal and financial advisory fees and expenses, the full year 2012 results would have been a loss totaling $9.3 million, or $0.39 per diluted share, compared to earnings of $10.9 million, or $0.41 per diluted share, in 2011."

bbb.   In the press release, Defendant Berman acknowledged the disappointing fourth quarter performance that led to a sharp miss of prior guidance:

> We are disappointed by our performance in the fourth quarter. The difficult and challenging toy environment did not generate the sales that had been anticipated, and several of our key products did not achieve the sales levels that we had planned for, also resulting in license royalty minimum guarantee shortfalls."

ccc.   Despite the bad news, Defendant Berman again struck an optimistic tone:

> However, we are optimistic for our future growth and profitability. We believe that our core business lead by our infant/preschool, seasonal and Halloween segments, in conjunction with meaningful reductions in operating costs, will return the Company to profitability in 2013.

> We believe that the difficult environment for toys in 2012 resulted from rapid changes in children's play patterns as tablet and smartphone devices and interactive games and toys have more and more become cornerstones of their play and fun experiences. We recognize that it is critical for us to provide new, more exciting and magical experiences for today's child compatible with these new play patterns. We believe

that our partnership with NantWorks in creating our DreamPlay line of toys using NantWorks proprietary iD recognition technology will place JAKKS in the forefront of the play revolution we are witnessing.

We believe that applying this technology to a broad array of characters and play patterns will create new consumer demand for JAKKS products and will help JAKKS achieve substantial long range growth and profitability, warranting the investment in technology and content that we are making.

ddd.   The press release then offered the following upbeat guidance for 2013 (which was reiterated by Defendant Bennett on a conference call with analysts the same day):

For 2013, the Company anticipates an increase in net sales of 4.0% to 5.0% to approximately $694 million to $700 million, with diluted earnings per share in the range of approximately $0.63 to $0.68. This guidance anticipates first-quarter 2013 net sales in the range of $70 to $73 million, with a loss per share in the range of $0.83 to $0.85, which reflects 17.6% fewer common shares outstanding primarily as a result of the July 2012 self-tender of 4.0 million shares and includes incremental operating expenses associated with the recent acquisition of Maui Toys in a seasonally low sales volume quarter, and incremental operating and marketing expenses associated with the launch of our DreamPlay product lines. This is compared to net sales of $73.4 million and a loss per share of $0.62 per diluted share in the first quarter of 2012.

eee.   During the conference call with analysts, Defendant Berman maintained a highly optimistic outlook:

With the backdrop of a fairly challenging season for the toy industry and the global economy overall, weaker-than-expected product demand during the holidays led to a lower-than-expected results for fourth quarter and full year 2012. However, our core business remains strong. Our products in Traditional Toy segment, such as Infant/Pre-school, Seasonal, Dress-Up, and Role Play and Halloween continued to perform at retail and remained our areas of strength.

The world is changing and JAKKS is changing along with it. We have experienced such excitement and receptiveness on our DreamPlay technology initiative. What we have shown on the iD image recognition and DreamPlay technologies, combined with toys and kids consumer products, has been nothing short of redefining the boundaries of the physical and digital toy play. From retail partners in the U.S. and internationally, to our licensing partner, Disney, as well as some of the biggest toy and consumer product companies and brands in the world, there is a strong belief in the long-term adoption by children and adults of this technology.

We believe that toys and technology have to change to adapt to the way kids play today, as kids gain more and more access to smart devices. By applying the technologies to a broad array of characters and play patterns, we believe we will create a new consumer demand for our toy products. Through the DreamPlay venture, we aim to achieve substantial long-range growth and profitability, warranting the investment in this technology and content that we are making,

2013 will be a period of focused transition as we build the infrastructure for our DreamPlay venture, while also continuing to execute on our core business strategy of organic and external growth. We have added to our core business a number of new brands and licenses that we are launching this year that we feel show great promise.

We are keeping a tight rein on our operational expenses, starting with a meaningful internal restructuring. Our outlook for 2013 remains cautiously optimistic as we invest for the future and begin to rollout our plans with exciting growth opportunities in 2014 and beyond with our DreamPlay initiatives, as well as our continued focus on capitalizing on our international distribution growth opportunities.

While we recognize that it's critical for us to provide new, exciting and magical experiences for today's wired families, we will not deviate from our core business strategy to offer a diverse portfolio of evergreen products that support traditional play patterns and products that remain core to our business.

**** 

<Bennett>: Turning to our 2013 guidance, the company anticipates an increase in net sales of 4% to 5% to approximately $694 million to

$700 million with diluted earnings per share in the range of approximately $0.63 to $0.68 per diluted share.

****

Despite a challenging year we had, we are optimistic in the future of JAKKS. Our diverse product portfolio is built on core, evergreen products that make up a large part of our business and remain solid with little fluctuation. Our Toddler and baby dolls, Dress-up and Role Play, Infant/Pre-school products, such as our foot-to-floor ride-ons and activity tables, outdoor seasonal products and Disguise Halloween Costumes had terrific sales in 2012. We also had nice success with a few of our own JAKKS brands, including Power Trains. These are examples of back-to-the-basic products that resonate with consumers every year on our less per age to age compression and to the rapid changes in children's play patterns.

We are also pleased with the success of our international business in 2012, with a record full year sales. Securing license for international territories continue to be a priority. China represents a big growth opportunity, and we recently met with one of the largest Chinese retailers to expand our distribution in this territory. There's a great incremental sales potential in this region in 2014 and beyond, and we are focused on expanding licensing rights where appropriate in Asia.

Again, 2013 will be a year of transition for JAKKS. We will continue to consolidate operations to gain efficiencies and lower occupancy costs and enhance profitability in the short term with the closing of our New York office and moving our Maui division into our headquarters. We recently completed a meaningful internal restructuring, and we believe our worldwide team today has the drive, passion and creativity to move our business forward. We are optimistic that their efforts, aligned with our focused long-term strategy and investment discipline, will produce strong, creative product lines and financial results for our company. We remain focused on our brand management and growing our core business, and are looking forward to the new product launches target for extensive mass and specialty retail distribution networks.

****

The toy industry is undergoing a challenging macroeconomic environment, including the rapid growth of mobile and smart device usage amongst children that is competing with physical toys and changing how kids and parents play today. With a sharp eye on the future, our DreamPlay initiative headlines our efforts to stay ahead of

the evolving play patterns by developing a segment of our product portfolio focused on physical toys that can interact with smartphones and tablets in a compelling and revolutionary way. Using iD recognition technologies, we believe DreamPlay is the answer to the new hybrid model of smart device technology and toy interactive ecosystem, where our merchandise becomes a full experience, interacting with both consumers and other items in the toy aisle and/or at home.

fff.   When questioned by an analyst on the call about areas of weakness in 4Q 2012 with respect to licensed properties, Defendant Berman responded that the Company's core business remained solid:

The 2 biggest components that we're - that did less than our expectations, and it was more for the U.S., Monsuno has performed terrific overseas is was — it did perform to our expectations in the U.S. The animated series which is on Nickelodeon, was not stripped and ended up being on, I think, it was a Saturday morning time slot, which wasn't very conducive for kids to watch. So the expectations we have in the U.S. weren't — they didn't achieve our high-end goal. And the same thing occurred with the Winx Club that the immediate sales in spring or the mid part of the year were terrific, but the programming changed. Those are the 2 biggest areas that we spent the most amount of media, so those 2 areas are really the components of the lower sales. All of our normal — not all. Majority of our normal, basic business is extremely solid from our foot to floor, which is the Moose area, from our Kids Only!, from our Toy division, to Disguise, to CDI, to our basic business in Power Trains, MXS, our 31-inch figures, but those are the 2 major areas that really affected us in fourth quarter. And what we realized is, what we've always said in the past is going back to the basics of the singles and doubles, which has been the core asset of our business. Keeping that in mind, we do need to adapt our business to go into the areas of where children are playing, and they are playing more and more from a younger age from 18 months, which are smart devices, and the engagement and initiative that we're doing with NantWorks and DreamPlay is the direction we're going with our core business as well. But we're not taking any big bets as we did last year by focusing on the Monsuno and/or Winx.

///

ggg.   On this news, the Company's shares fell $0.31 per share to close on February 21, 2013 at $12.74.  The Company's shares continued to drop in the following trading session, and closed on February 22, 2013 at $12.06, a one day decline of $0.68 or over 5%, and a two day decline of $0.99 or approximately 7.5%.

hhh.   The foregoing statements were materially false and misleading for the reasons set forth above.

iii.   On March 15, 2013, JAKKS filed an annual report for the period ended December 31, 2012, on Form 10-K with the SEC, which was signed, among others, by Defendants Berman and Bennett, and reiterated the Company's previously announced financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting.  The 10-K disclosed net sales of $73.4 million for Q1 2012; $145.4 million for 2Q 2012; $314.5 million for 3Q 2012, and $133.5 million for Q4 2012. 2012 10-K at 35, 72.  The Company reported net sales of $666.8 million for full year 2012. 2012 10-K at 53. With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $363.7 million in 2012, compared to $348.9 million in 2011, representing an increase of $14.8 million, or 4.2%. Id. at 29. "The increase in net sales was primarily due to the launch of Power Train, action figures based on the animation series Monsuno®, Disney® large dolls and accessories, Winx Club® dolls and sales contribution of [the Company's] recently acquired Moose Mountain division." Id. For the Role Play, Novelty and Seasonal Toys segment, the Company reported net sales of $303.1 million in 2012, compared to $328.9 million in 2011, representing a decrease of $25.8 million, or 7.8%. Id.  "The decrease in net sales was primarily due to decreases in unit sales of role play and dress-up toys, including those based on

Disney Princess® and Disney Fairies.®" Id. The Company also reported basic and diluted earnings per share in 2012 of (4.37) vs. 0.32 in 2011. 2012 10-K at 23, 52.

jjj.    The foregoing statements were materially false and misleading for the reasons set forth above.

kkk.    On April 25, 2013, the Company issued a press release announcing financial results for the first quarter 2013 ("1Q 2013"). The Company reported that "[n]et sales for the first quarter of 2013 increased 6.4% to $78.1 million up from sales of $73.4 million reported in the comparable period in 2012." With respect to earnings, the Company reported that "net loss for the first quarter was $27.6 million, or $ 1.26 per diluted share, which included the final $0.75 million, or $0.03 per diluted share, in financial advisory fees related to the 2011 unsolicited indication of interest and reflects the non-recognition of a previously forecasted first quarter tax benefit of $5.3 million, or $0.24 per diluted share. This compares to a net loss of $16.0 million, or $0.62 per diluted share, reported in the comparable period in 2012, which includes $1.4 million, or $0.03 per diluted share, of legal and financial advisory fees and expenses related to the unsolicited indication of interest."

lll.    In the press release, Defendant Berman represented that the Company was on track to meet prior guidance:

> Our first quarter represents approximately 10% of our projected sales for the 2013 calendar year and we believe we are on track to achieve our previously announced sales and earnings forecast for the year. During the first quarter, sales of our broad array of core product lines got off to a good start and we are optimistic that they will continue to perform as projected Top contributors were centered on our evergreen, core brands including our JAKKS-owned Fly Wheels, Disney Princess dolls and dress-up, Fisher-Price ride-ons, outdoor and indoor preschool furniture, and outdoor activity items from our Maui division. While our costs were somewhat higher, including the deferral of the $5.3 million tax benefit, which is expected to be recognized in the third quarter based on our forecast, we believe that operating efficiencies and

continued cost reductions for the balance of the year will also deliver the projected earnings.

mmm.    The press release then offered the following upbeat guidance for 2013 (which was reiterated by Defendant Bennett on a conference call with analysts the same day):

> For 2013, the Company continues to anticipate an increase in net sales of 4.0% to 5.0% to approximately $694 million to $700 million, with diluted earnings per share in the range of approximately $0.63 to $0.68, excluding financial advisory fees related to the 2011 indication of interest.

nnn.    During the conference call with analysts, Defendant Berman continued to maintain a highly optimistic outlook:

> Sales are off to a solid start in 2013 exceeding our guidance and up 6.4% over last year. The early response to our broad mix of product line has been encouraging, and we are cautiously optimistic for the year ahead.  We have some really terrific products in our lineup this year with contributions coming from a broad range of toys and toy-related products and electronics for all ages and for the entire family.
>
> Our portfolio is an exciting blend of top licenses that give us leadership in a broad array of categories, high profile movie properties and our own intellectual developed brands that we believe are right on trend. Evolving along with our environment is vital to JAKKS Pacific's future prospects. And our DreamPlay initiative headlines our efforts to stay ahead of these continually developing play patterns. We are looking forward to the launch this fall of our DreamPlay Little Mermaid toys enhanced with iD recognition technology.
>
> We continue to focus on carrying out the cost-saving initiatives and company-wide restructuring plans that were put into place late last year. Our infrastructure is aligned with our current business levels, and we believe the benefits from the restructuring will be evident in our short and long-term financial performance.
>
> ***
>
> J<Bennett>: Turning to our guidance for 2013, the company continues to anticipate an increase in net sales of 4% to 5% to approximately

1   $694 million to $700 million, with diluted earnings per share in the
2   range of approximately $0.63 to $0.68, excluding financial advisory
    fees related to the 2011 indication of interest.
3                                    ***
4   We will continue to execute on our core business strategy of organic
    and external growth while investing for the future and rolling out plans
5   for exciting growth opportunities in 2014 and beyond.
6
    Recent internal restructuring allowed us to consolidate operations, gain
7   efficiencies and enhance profitability while allowing us to continue to
8   effectively focus on our core business. We believe these efforts,
    combined with our focused long-term strategies and investment
9   discipline will greatly benefit JAKKS in both the short and long term.
10
    While the toy industry environment is more challenging than ever
11  before, we tend to forget that there are many good positive things
12  happening with this company. We are pursuing all avenues to grow our
    distribution. And we have exciting programs at retail, such as Costco
13  and Coles this year.
14
15       ooo.   The foregoing statements were materially false and misleading
16  for the reasons set forth above.
17       ppp.   On May 10, 2013, the Company filed with the SEC a quarterly
18  report on Form 10-Q for the period ended March 31, 2013, which included signed
19  Certifications by Defendants Berman and Bennett, stating that the financial
20  information contained in the Form 10-Q was accurate and that they disclosed any
21  material changes to the Company's financial reporting.   The report reiterated the
22  Company's previously announced quarterly financial results and financial position.
23  JAKKS reported net sales of $78.1 million for the first quarter of 2013, compared to
24  net sales of $73.4 million in the same quarter the previous year. 1Q 10-Q 2013 at 4,
25  7, 23. With respect to the Traditional Toys and Electronics segment, the Company
26  reported net sales of $38.1 million for the three months ended March 31, 2013,
27  compared to $41.6 million for the prior year period, representing a decrease of $3.5
28

million, or 8.3%. Id. at 24. "The decrease in net sales was primarily due to the tapering off of sales of action figures based on the animation series Monsuno and Winx Club® dolls." Id. For the Role Play, Novelty and Seasonal Toys segment, the Company reported net sales of $40.0 million for the three months ended March 31, 2013, compared to $31.8 million for the prior year period, representing an increase of $8.2 million, or 25.5%. Id. "The increase in net sales was primarily due to sales contribution of [the Company's] recently acquired Maui Toys division and increases in unit sales of Halloween costumes and accessories.' Id. Earnings per share were (1.26) for the three months ended March 31, 2013 vs (0.62) for the three months ended March 31, 2012. Id. at 12.

qqq.  On July 17, 2013, the Company issued a press release announcing financial results for the second quarter 2013 ("2Q 2013"). The Company reported that "[n]et sales for the second quarter of 2013 were $106.2 million compared to net sales of $145.4 million reported in the comparable period in 2012," staggering 27% decrease. With respect to earnings, the Company reported that "net loss for the second quarter was $46.9 million, or $2.14 per diluted share, which included charges for license minimum guarantee shortfalls of $14.1 million and inventory impairment of $12.2 million. This compares to net income of $0.2 million, or $0.01 per diluted share, reported in the comparable period in 2012, which included $1.7 million, or $0.5 per diluted share, of legal and financial advisory fees and expenses related to the 2011 unsolicited indication of interest."

rrr.    In the press release, Defendant Berman delivered devastating news:

> We are disappointed that JAKKS has not met its second quarter target and will not achieve its full year 2013 forecast Sales for the second quarter were significantly below expectations due to a variety of factors. Several retailers, both in the United States and in Europe, are struggling and have substantially decreased their orders. In addition, the poor performance of several of our key properties, including Monsuno and the Winx Club, also contributed to the decline, along with

unusually cool weather that affected seasonal toy sales leading to more aggressive markdowns at retail as shelves are cleared for back-to-school products. We also believe the decline in sales reflects the continuing change in play patterns of children of all ages, who continue to rely more and more on smart devices for their fun and entertainment As previously announced, this shift in play patterns has caused companies like JAKKS to evolve to meet the changing demands of its consumers with technologically enhanced product offerings.

sss.    The press release then disclosed that the previously provided full year guidance was being slashed, the Company's dividend was being suspended and announced the implementation of a major restructuring:

The Company currently anticipates net sales for the full year of approximately $620.0 million, with revised loss per share in the range of approximately $56.1 million, or $2.56 per diluted share. The revised guidance represents a reduction from the Company's previously anticipated full year net sales of approximately $694 million to $700 million and diluted earnings per share in the range of approximately $0.63 to $0.68, excluding financial and legal advisory fees relating to the 2011 unsolicited indication of interest.

The Company also announced that due to business conditions, it has suspended its quarterly dividend, which it will re-evaluate upon a return to profitability.

The Company also announced a restructuring plan to commence in the third quarter, which will include the substantial reduction of leased space, employees and other overhead expenses. Despite the projected loss this year, JAKKS is anticipating a return to profitability in the year 2014.

ttt.    The Company also announced a plan to raise $100 million in capital through an offering of convertible senior notes due 2018 in a private placement, with a potential $15 million in over-allotments.

uuu.    On a conference call with analysts the same day, Defendant Bennett revealed that part of the huge second quarter loss was attributable to "charges for license minimum guarantee shortfalls of $14.1 million."

1          vvv. On the call, analysts grilled management about the magnitude of

2    the license minimum guarantee shortfall and the deteriorating sales:

3        Sean P. McGowan - Needham & Company, LLC, Research Division

4
    Second question, this isn't the first time, by any means, that minimum
5    license guarantees have been the source of some reduction and I'm
surprised at this point that there would be the magnitude of $14 million.
6    What does this say about the viability of those underlying licenses? I
mean, this must be some pretty big properties if there is $14 million of
7    guarantees being written off

8

9        Stephen G. Herman - Co-Founder, Chief Executive Officer, President,
Secretary and Director
10

11        They come from several different licensee content — licensor content
12    holders. Some of them were previous deals done back with previous
management in specific divisions. So the deals that were done and set
13    forth were quite rich and due to the environment and the, call it the
shrinkage of retail space, the minimum guarantees were not met with
14    the decline in sales. The other license shortfall is from a property that
15    was no longer put on air as we had expectations that this property was
being on air for quite a few years of obligation and on strip. So based
16    off of what we see, those 2 areas of businesses, we ended up having to
17    take the write-off of the shortfalls. But we — in addition to what you're
asking, Sean, there's about a — 85% to 90% of our business is
18    extremely constant, solid and evergreen, which goes from our Kids
19    Only! outdoor furniture product to our foot-to-floor ride-on Moose
product to our Tollytots Pre-School division to Maui to so on. What
20    we've realized in this new environment is we need to enhance that play
21    pattern with the, call it, iD technology, which is enhancing the, call it,
physical world with the digital world, You can play with the physical
22    world without the digital component. You can play with the digital
23    component without the physical. But when you combine them both
when a child wants to, it just is a magical experience, and we've seen it
24    from working with Lego with our technology and they do a lot of
25    testing. Their feedback and their focus groups was truly breathtaking.
So with our core business is where we're really solid, what we realize
26    now and what the industry is and we've seen it, the likes and days of
27    launching an item, and I'll use as we launched 4 years ago, our night
vision goggles that did 20 million, 30 million, 40 million, 50 million in
28

sales and a Furby, call it, that has done, those days of the euphoric items of marketing and TV advertising and looking for these euphoric items to take off is few and far between because retailers won't bid on the inventory. There's not the top 20 retailers anymore. Where our segmentation of retail, which we're very proud of, spans throughout the mass retailers that we all know about — the Target, the Walmart, the Toys"R"Us', the Sears, but it goes to Sports Authority, Dicks Sporting Goods, Sports Chalet, Big 5, Kohl's, Spencers, Ross, Party City. So while we're diversifying the customer base, we're focusing on the basic play pattern, which is primarily we see around under 6 is where the key play pattern for children are with playing with toys. But at the same time, they're utilizing smart devices. So the enhancement of what we're doing, and we've seen it, is a magical combination.

Sean P. McGowan - Needham & Company, LLC, Research Division

I can't disagree. This actually dovetails into my final question. I can't disagree, the kids are certainly interested in these technology products. But this isn't like it happened overnight and yet your sales shortfalls go back several years and you say 80%, 90% of it is rock solid. The sales decline suggests that maybe even there's weakness there. But my question is how much confidence can you have that you're making the right bet when there's still going to be a lot of business that needs to be done in basic, traditional toys that don't have a technology element? I'm saying that other companies are not seeing their business decline as much as your business is declining. Lego couldn't be lower tech and they just keep crushing it year after year. So somebody else is doing something that you guys aren't doing to generate sales of traditional non-technical toys. So I'm not disagreeing that there needs to be some technology component to your toys, but you can't abandon the non-tech part either and you got to get that right

      www.  As a result of these alarming disclosures, analysts at Piper Jaffray announced that, having missed their revenue estimate by nearly 30%, confidence remained "quite low and risk to losses of key licenses continues to mount, especially if the company continues to fall short of contract minimums. PiperJaffray Company Note on JAKKS Pacific, Inc., July 17, 2013. Visibility into

1 sales or margin recovery "also remain[ed] very limited" and the analysts expected
2 "significant losses in 2013."

3       xxx.   Following these earth-shattering disclosures regarding the
4 Company's poor 2Q 2013 performance, and management's response thereto,
5 JAKKS' stock dropped precipitously by approximately 39% from a close of
6 $11.48/share on July 17, 2013, to a close of $7.00/share on July 18, 2013.

7 **C.   DERIVATIVE DEMAND ALLEGATIONS**

8       86.   Plaintiff brings this action as a derivative action pursuant to Federal
9 Rules of Civil Procedure 23.1 on behalf of and for the benefit of JAKKS.

10       87.   Plaintiff will fairly and adequately represent the interests of JAKKS in
11 enforcing and prosecuting its rights, and has retained competent counsel
12 experienced in this type of litigation.

13 **D.   DEMAND IS EXCUSED FOR FUTILITY**

14       88.   Demand on the JAKKS Board to bring this action has not been made
15 and is excused because such demand would be futile.  As of the filing of this
16 Complaint, JAKKS Board consists of the following six Directors: Defendants
17 Stephen G. Berman, Robert E. Glick, Michael G. Miller, Murray L. Skala, Peter
18 F. Reilly and Rex H. Poulsen.

19       89.   Of these directors Defendant Berman is the Chief Executive Officer
20 and is not independent.

21       90.   Defendant Murray Skala is a partner in the law firm which acts as
22 the Company's General Counsel, and the Company has acknowledged that
23 Skala is not independent.

24       91.   Defendants Miller and Glick cannot be deemed independent
25 because each knowingly participated in the entrenchment scheme to protect the
26 JAKKS Board and voted to effect the Defensive Repurchase of shares, despite
27 its lack of business justification.  In addition, Glick and Miller as members of
28 the Compensation Committee, engineered a sweetheart compensation deal for

Berman where he may be paid millions while the Company languishes in the depths. The net effect of this sweetheart deal is Berman gets paid millions but the Company can continue to be as unsuccessful as ever. In addition, they authorized the unreasonable and lopsided September 2012 Joint Venture agreements to entrench themselves and the Board. Finally, there is a substantial risk that they will be held personally liable for the violations alleged, and thus they cannot be deemed independent. Accordingly, there is reasonable doubt that Glick and Miller could fairly evaluate a pre-suit demand.

92. The details as to Berman's sweetheart compensation deal are as follows. Director Glick has been on the Compensation Committee for at least 10 years, and its Chairperson for the last nine years. Miller has been a Committee member for a number of years. Their tenure as Directors goes back to the mid-1990's, near the time that JAKK's was founded by Berman. Glick's and Miller's actions in the Committee positions give rise to an strong inference that they are controlled and dominated by defendant Berman, as they he have repeatedly increased Berman's compensation and favorably amended his employment agreement, in the face of actions by Berman which have driven JAKKS shares to new depths. Here they handed the Failed CEO a huge contract extension despite the fact that the Company's shares are trading near an all-time low, and modified his employment contract so he can be paid huge bonuses despite the fact that the Company cannot meet EPS earnings goals. An independent Board would have fired Berman, or at least tied his compensation to stock performance. Among other things:

a. JAKKS performance under Berman has been abysmal when compared to the performance of competitors Mattel and Hasbro, as shown below:

b.    Despite this, Glick and Miller extended Berman's employment contract repeatedly, so that it now runs to December 31, 2018;

c.    Glick and Miller have voted to repeatedly increased Berman's compensation, despite the value destruction over which Berman has presided. As stated in the most recent Proxy Statement dated October 28, 2013:

> Mr. Berman's agreement as in effect on January 1, 2012 provided for an annual grant of $500,000 of restricted stock, the initial vesting of which depended *solely on EPS targets established in the agreement*; if initial vesting occurred, then the restricted stock vested over time.
>
> Pursuant to a September 2012 amendment to Mr. Berman's employment agreement, commencing in 2013, his annual bonus has been restructured so that part of it is now capped at 300% of his base salary and the performance criteria and vesting are solely within the discretion of the Compensation Committee, which will establish all of the criteria during the first quarter of each fiscal year for that year's bonus, *based upon financial and non-financial factors selected* by the Compensation Committee, and another part of his annual performance bonus *will be based upon the success of a joint venture entity we initiated in September 2012.* The portion of the bonus equal to 200% of base salary is payable in cash and the balance in restricted stock vesting over three years. *In addition, the annual grant of $500,000 of restricted stock was changed to*

*$3,500,000 of restricted stock and the vesting criteria was also changed from being solely based upon established EPS targets* to being based upon performance standards established by the Compensation Committee during the first quarter of each year.

d.    Thus, Glick and Miller have decided that Berman's compensation will be disentangled from strict earnings per share ("EPS") targets, as Berman has shown over the course of many years that he cannot meet reasonable targets.

e.    What is worse, Glick and Miller, with minimal and confusing disclosure to the public, have agreed to enrich Berman by paying him a share of the cash distributions from a joint venture formed with Dr. Soon, which is the very joint venture which is touted as designed to help JAKKS out of the ditch into which Berman has driven it.  This is on top of a multitude of others benefits heaped on Berman.  As the Proxy Statement indicates:

> The following description modifies and supersedes, to the extent inconsistent with, the disclosure in the preceding paragraphs. The term of Mr. Berman's employment agreement has been extended to December 31, 2018 and provides (i) that commencing on January 1, 2013 the amount of the annual restricted stock award *shall increase to up to $3.5M*, with the vesting of each annual grant to be determined by the Compensation Committee based upon performance criteria it establishes during the first quarter of the year of grant; (ii) commencing with 2013 Mr. Berman can earn an annual performance bonus described below. Part of the annual performance bonus in an amount not exceeding 300% of that year's base salary can be earned *based upon financial and non-financial factors* determined annually by the Compensation Committee during the first quarter of each year. The other part of the additional annual performance bonus can be earned *in an amount equal to one-half of the cash distributions we receive from DreamPlay LLC,* subject to satisfaction of the following three conditions: (1) we have positive net income after deducting the aggregate annual

performance bonus, (2) the aggregate annual performance bonus cannot exceed 2.9% of our net income for such year except that if our net income exceeds $385,000 for the year the percentage limitation shall be reduced to 1% and if our net income for the year exceeds $770,000 the percentage limitation is reduced to 0.5% and (3) we have received an aggregate of at least $15 million of net income from DreamPlay Toys LLC and DreamPlay LLC. The amendment also provides (i) that the portion of the annual performance bonus up to amount equal to 200% of that year's base salary shall be paid in cash, and any excess over 200% of such base salary shall be paid in shares of restricted stock vesting in equal quarterly installments with the initial installment vesting upon grant and the balance over three years following the award date; (ii) for a life insurance policy of $5 million or such lesser amount we can obtain for an annual premium of up to $10,000; (iii) for the reimbursement of legal fees in negotiating this amendment of up to $25,000, (iv) that the full amount of the payments and benefits payable in the event of a Change in Control (as defined in the employment agreement) shall be paid, ***even if it triggers an excise tax imposed by the tax code if the net after-tax amount*** would still be greater than reducing the total payments and benefits to avoid such excise tax, and (vi) the term "Good Reason Event" ***has been expanded to include a change in the composition of our board of directors where the majority of the directors were not in office on September 15, 2012.***

f.      That this "wish list" of emoluments has been bestowed upon an executive whose performance has been disastrous speaks volumes as to Glick's and Miller's independence of Berman.  Glick and Miller are not independent.

93.     Additional reasons justify that demand is futile:

a.      There is a substantial risk that each of the Directors will be held liable for violation of their fiduciary duty as having engineered an entrenchment of the JAKKS Board.  As a result, there is more than reasonable doubt as to their ability to fairly assess a pre-suit demand.

b.    Given that the JAKKS Board will have to defend the Securities Class Actions and maintain in those Actions that the Defendants sued therein did nothing wrong, they are sterilized from deciding fairly to commence action against Defendants Berman and Bennett.

94.    Thus, there is no majority of the six-member Board who are disinterested; accordingly any demand upon the Board is futile. Therefore, Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

### FIRST CLAIM FOR RELIEF

(Against the Defendants Berman and Bennett for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

96.    Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

97.    These Individual Defendants have been sued in the Securities Class Action alleging that these Individual Defendants caused the Company to issue materially false statements to the investing public, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

98.    It is alleged in the Securities Class Action that these Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, these Individual Defendants,

1  by virtue of their receipt of information reflecting the true facts regarding JAKKS

2  and its financial performance and prospects and/or their associations with the

3  Company which made them privy to confidential proprietary information

4  concerning JAKKS, were active and culpable participants in the fraudulent scheme

5  alleged herein. These Individual Defendants knew and/or recklessly disregarded the

6  falsity and misleading nature of the information which they caused to be

7  disseminated to the investing public. The ongoing alleged fraudulent scheme

8  alleged in the Securities Class Actions could not have been perpetrated over a

9  substantial period of time without the knowledge and complicity of the personnel at

10  the highest level of the Company, including the Individual Defendants.

11      99.    During the Class Period alleged in the Securities Class Actions, the

12  Individual Defendants allegedly caused JAKKS to carry out a plan, scheme and

13  course of conduct which was intended to and, throughout the Relevant Period, did:

14  (i) deceive the investing public, including plaintiff and other Class members, as

15  alleged herein; (ii) artificially inflate and maintain the market price of JAKKS

16  securities; and (iii) cause the class action plaintiff and other members of the Class to

17  purchase JAKKS stock at artificially inflated prices.

18      100. As alleged in the Securities Class Action, these defendants: (a)

19  employed devices, schemes, and artifices to defraud; (b) made untrue statements of

20  material fact and/or omitted to state material facts necessary to make the statements

21  not misleading; and (c) engaged in acts, practices and a course of business which

22  operated as a fraud and deceit upon the purchasers of the Company's securities in an

23  effort to maintain artificially high market prices for JAKKS securities in violation of

24  Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as

25  primary participants in the wrongful and illegal conduct charged herein.

26      101. It is alleged in the Class Actions that these defendants, individually and

27  in concert, directly and indirectly, by the use of the mails or other means or

28  instrumentalities of interstate commerce, engaged and participated in a continuous

course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of JAKKS as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS's value and performance and substantial growth.  This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JAKKS and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS securities during the Relevant Period.

102.  As alleged in the Securities Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS's securities was artificially inflated during the Relevant Period. Unaware of the fact that the market price of JAKKS's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Relevant Period, and Class members acquired JAKKS securities during the Relevant Period at artificially high prices and were damaged thereby.

103.  As alleged in the Class Actions, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true.  Had the Class members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of JAKKS,

1    which were not disclosed by these defendants, plaintiff and other members of the

2    Class would not have purchased or otherwise acquired their JAKKS securities

3    during the Relevant Period, or, if they had acquired such securities during the

4    Relevant Period, they would not have done so at the artificially inflated prices which

5    they paid.

6        104.   As alleged in the Securities Class Action, by virtue of the foregoing,

7    these individual defendants each violated Section 10(b) of the Exchange Act and

8    Rule 10b-5.

9        105.   It is further alleged in the Class Actions that the Company participated

10    in the wrongful conduct and is equally liable for violation of Section 10(b) of the

11    Exchange Act. Assuming that the Company is liable, these individual defendants

12    caused the Company to violate Section 10(b) of the Exchange Act, and incur

13    liability for damages for violation of the Securities Fraud laws.

14        106.   If the Company is deemed to have violated the Federal Securities Laws,

15    and incurs damages therefore, these individual defendants are liable to the Company

16    for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

17                        **SECOND CLAIM FOR RELIEF**

18        (Derivatively and Directly Against Defendants Berman, Brodsky, Ellen, Glick,

19        Miller, Reilly, Poulsen and Skala for Violation of Section 14 of the Exchange Act

20                                and Rule 14a-9)

21        107.   Plaintiff incorporates by reference and realleges each and every

22    allegation contained above, as though fully set forth herein.  This Cause of Action is

23    brought both derivatively and directly.

24        108.   Defendants had the obligation in disseminating the JAKKS Proxy

25    Statement dated October 25, 2013, to disclosure Defendant Berman's compensation

26    in clear, concise and understandable language. *See,* 17 CFR § 229.402.

27        109.   The Discussion and Analysis section of the Proxy Statement is

28    obfuscatory, vague and confusing as it applies to Defendant Berman's

1  compensation. Specifically, the Proxy Statement fails to make disclosure of
2  Defendant Berman's compensation in clear, concise and understandable language.
3  Rather, the discussion of how Berman will be paid, the criteria used to determine his
4  payment and the discussion of his amended employment agreement is materially
5  misleading.

6  110. In order to understand compensation issues, and the transactions with
7  Dr. Soon's companies, the Proxy was required to explain how these joint ventures
8  work, including specification of the preferences allotted to Dr. Soon; the financial
9  loss detriments accepted by JAKKS; the reasons for and valuation of the 5% interest
10  in DreamPlay, LLC, and the $7 million "no profit to JAKKS" repurchase right
11  related to JAKKS' $7 million investment in DreamPlay, LLC. Only with these facts
12  in hand, can investors fully understand the nature of the September 2012 Joint
13  Ventures; the stewardship of the directors; the relationship with Dr. Soon; and the
14  factors which may affect Berman's compensation and his judgments and decisions.

15  111. As a result of the foregoing deficiencies, Defendants have violated
16  Section 14(a) of the Exchange Act, and Rule 14a-9.

17  112. Plaintiff seeks a declaration on behalf of JAKKS that the Proxy
18  Statement disclosure as to Defendant Berman's compensation and the September
19  2012 Joint Ventures violated the above statute and rule, and that the Directors be
20  compelled to order that a new vote be held, and compelled to correct such errors
21  and omissions in the next Proxy Statement.

### THIRD CLAIM FOR RELIEF

22
23  (Derivatively Against Defendants Berman, Miller, Skala, Glick, Ellin, Reilly,
24  Brodsky and Almagor for Breaches of Fiduciary Duty, Including
25  Unocal Violations)

26  113. Plaintiff repeats and realleges all previous allegations, set forth above,
27  as if fully set forth herein.

28

114. The Defendants, as Directors, had a duty to act with loyalty toward JAKKS, and in its best interests, and with the utmost good faith.

115. The Defendants had the obligation not to oppose acquisition interest in the Company unless such opposition was in utmost good faith and to the benefit of the Company and its shareholders.

116. That was not the case here. JAKKS had no viable and superior plan for increasing shareholder value, and that the best interests of the Company were not served by rebuffing Oaktree's $20 offer.

117. Rather, in order to entrench themselves, and avoid a proxy contest in which a combined effort of Oaktree and Clinton Group would likely unseat them, the Defendants determined to effectuate the Defensive Repurchase, which was approved so as to pay Clinton Group a premium price not to unseat them. To use corporate funds to effect entrenchment is unreasonable misconduct.

118. In addition, Defendants entered into a standstill to avoid any proxy contest.

119. Further, defendants Berman, Skala, Glick, Ellin, Miller, Almagor, Reilly and Brodsky permitted and caused JAKKS to enter into lopsided and unfair transactions, i.e., the September 2012 Joint Ventures—to curry favor with Dr. Soon and entrench themselves.

120. For the foregoing reasons, the Defendants named in this Cause of Action are liable to JAKKS for all damages suffered as a result of the violation of the Unocal standard, including the value of the Defensive Repurchase, and any harms attributable to the September 2012 Joint Ventures.

## FOURTH CLAIM FOR RELIEF

(Against the Defendants Berman and Bennett for Breach of Fiduciary Duty as To Liabilities the Company is Exposed to in the Securities Class Action)

121. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

122. Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

123. The Defendants had a fiduciary duty to carry out the actions of JAKKS in accordance with the law, including the federal securities laws, and conscious failure to do so is a bad faith breach of fiduciary duty.

124. In light of the above, these Defendants are liable to JAKKS for the damages it has or may incur by virtue of their breaches of fiduciary duty.

## FIFTH CLAIM FOR RELIEF

(Against Defendants Almagor, Berman, Brodsky, Ellin, Glick, Miller, Reilly, Skala, for Breach of Fiduciary Duty Relating to Berman's Compensation)

125. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126. Defendants caused JAKKS to enter into a sweetheart compensation deal with Defendant Berman whereby Berman could be handsomely rewarded even if JAKKS is not a profitable, well-run company.

127. Rather, Berman may be paid millions to continue his failed management even though JAKKS is unsuccessful and mired in losses.

128. The approval of such compensation and the extension of Berman's employment contract could not have been the product of disinterested business judgment.

129. As a result, Defendants are liable for breach of fiduciary duty.

130. Since Berman will be compensated based on a plan which is not the product of valid business judgment, he is being unjustly enriched and must pay back such money to the Company, and his contract extension cancelled.

## DEMAND FOR TRIAL BY JURY

To the full extent available, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    Awarding compensatory damages in favor of the Company against the Individual Defendants, for all damages sustained by the Company as a result of defendants' wrongful acts and misconduct as alleged herein;

B.    Awarding the Company prejudgment and post-judgment interest, and awarding Plaintiff and its counsel their reasonable attorneys' fees, expert fees and other costs; and

C.    Awarding such other and further relief as this Court may deem just and proper.


DATED: February 24, 2014              LAW OFFICES OF DAVID N. LAKE


                                      By: _____
                                          DAVID N. LAKE
                                          Attorneys for Plaintiff

**OF COUNSEL:**

Laurence D. Paskowitz, Esq.
**THE PASKOWITZ LAW FIRM P.C.**
208 East 51st Street, Suite 380
New York, New York 10022
212- 685-0969
212-685-2306 (fax)
classattorney@aol.com

Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**
317 Madison Avenue 21st Floor
New York, NY 10017
212- 867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com

## VERIFICATION

I hereby verify under pain and penalty of perjury that, as Managing Partner of Plaintiff, I have read the foregoing Verified Shareholder's Derivative Complaint, that its allegations are true, to the best of my information, knowledge and belief, and that I have authorized is filing.

_Lawrence Bass_
Lawrence Bass