FILED

2014 APR 30 PM 3:03

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1  David N. Lake, Esq., State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE**
2    **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
3  Encino, California 91436
Telephone: (818) 788-5100
4  Facsimile: (818) 788-5199
david@lakelawpc.com
5

6  Attorneys for Plaintiffs

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ADVANCED ADVISORS, G.P. and          Case No. 2:14-01420-JAK (SSx)
LOUSIANA MUNICIPAL POLICE
12  EMPLOYEES RETIREMENT               [CONSOLIDATED]
SYSTEM,
13              Plaintiffs,            **VERIFIED SHAREHOLDERS'**
**DERIVATIVE AMENDED**
14       v.                           **COMPLAINT**

15  STEPHEN BERMAN, an individual;     **JURY TRIAL DEMANDED**
16  JOEL BENNETT, an individual;
MICHAEL G. MILLER, an individual;
17  MURRAY L. SKALA, an individual;
ROBERT E. GLICK, an individual;
18  MARVIN ELLIN, an individual; DAN
ALMAGOR, an individual; LEIGH
19  ANNE BRODSKY, an individual; REX
H. POULSEN, an individual; and
20  PETER F. REILLY, an individual;

21              Defendants.

22  JAKKS PACIFIC, INC.,

23              Nominal Defendant.

24

25

26

27

28

Complaint

Plaintiffs Advanced Advisors, G.P. and Louisiana Municipal Police Employees Retirement System ("Plaintiffs"), by their attorneys, allege this shareholders' derivative complaint against the individual defendants (the "Individual Defendants") named herein.  The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiffs and their own acts, which are asserted on personal knowledge.

**NATURE OF THE ACTION**

1.     This is a shareholders' derivative action (the "Action") brought for the benefit of nominal defendant JAKKS Pacific, Inc. ("JAKKS" or the "Company") against certain present and former members of JAKKS' Board of Directors. Plaintiff seeks to recover damages inflicted upon JAKKS by their actions in connection with: (a) an $80 million stock repurchase, which severely damaged JAKKS' balance sheet and its ability to effectively compete in the toy market, that had no purpose other than deflecting a premium buy-out offer and entrenching the Board; (b) a subsequent effort to attract a "friendly investor" who would not seek to oust the Board; (c) various transactions with the aforementioned friendly investor's companies, on lopsided terms which were unfair to JAKKS but which furthered the entrenchment goals of the Board and certain insiders; (d) dissemination of Proxy Statements which did not fully and fairly describe the one-sided transactions; and (e) a securities fraud class action which, if successful, will cost JAKKS substantial money—money that should be paid by the insiders and not JAKKS' innocent shareholders.[1]

2.     JAKKS is a company which manufactures, distributes, and sells children's toys.  In 2011, JAKKS reported disastrous financial results, as it found itself having trouble competing with better financed competitors such as Hasbro and

---

[1]  Plaintiffs do not assert herein that any fraud was committed, but do assert a contingent "claim over" should the class action result in damages to JAKKS.

1   Mattel. The stock closed as low as $12.84 per share on January 6, 2012. It would not

2   have closed even that high except for the fact that the stock price was buoyed by a

3   $20 per share takeover overture from activist investor Oaktree Capital Management,

4   LP ("Oaktree"), first announced in September 2011. The stock had not traded at $20

5   per share since 2008, and any such offer would reflect a healthy premium. Despite

6   JAKKS' poor prospects, this overture was repeatedly rebuffed.  From October 2011

7   to mid-2012 the Board rejected a buy-out of the Company, claiming that JAKKS'

8   business plan would yield higher value to shareholders. Subsequent events showed

9   that the Board had no such realistic plan, as JAKKS continued business as usual,

10  and losses cascaded.

11         3.      In March 2012, when another activist shareholder, the Clinton Group,

12  Inc. (the "Clinton Group") joined Oaktree in its effort to maximize shareholder

13  value, the Board quickly bought the Clinton Group off, to the severe detriment of

14  JAKKS and its shareholders.  To accomplish this, Defendants caused JAKKS to

15  enter into an April 21, 2012 standstill agreement with Clinton Group, Inc. (the

16  "Standstill Agreement").  This Standstill Agreement revolved around a promise by

17  JAKKS to the Clinton Group to repurchase JAKKS shares (the "Defensive

18  Repurchase"). The Company thus agreed to repurchase 4 million of its shares at $20

19  per share.  This was approximately 15% of its outstanding shares.  The Defensive

20  Repurchase, which closed on June 28, 2012, cost the Company $80 million it could

21  not afford to spend, given its need to develop and advertise new toy products.[2]

22         4.      The Defensive Repurchase was made to mollify the Clinton Group, and

23  prevent it from teaming up with Oaktree to launch a proxy contest that could oust

24  the Board members. The Clinton Group posed a serious "threat" to the Board

---

[2]   Reflecting the Board's desperation to stay in office at any costs, the Board bound itself and JAKKS to the Standstill Agreement, without obtaining the customary clause that would allow these fiduciaries to cancel the Defensive Repurchase if the time it was to close it appeared to be wasteful of corporate assets or otherwise injurious to the Company.  Such an escape clause is known as a "fiduciary out" or a material adverse change provision ("MAC Provision").

1    members.  Clinton Group is an activist hedge fund known for pressuring companies
2    into making strategic changes to raise shareholder value, including through proxy
3    contests to oust directors.   Indeed, the Clinton Group had previously gone after
4    bedmaker Select Comfort Corp. and fast-food franchiser Red Robin International
5    Inc.  The JAKKS Board, which owned relatively little JAKKS stock, could easily
6    have been ousted if the Clinton Group chose to wage a proxy contest.  Many of
7    JAKKS shares are owned by institutions.   As reflected in JAKKS 2011 Proxy
8    Statement, all of the JAKKS Directors and Officers owned approximately 1.8% of
9    JAKKS shares.  On the other hand, four large institutions owned approximately 37%
10   of the Company's shares and could be amenable to monetizing their holdings, or
11   otherwise realizing higher value, in a resulting sale of the Company or by new
12   business methods adopted following a change in the JAKKS Board.

13       5.    As a result of Standstill Agreement and the Defensive Repurchase, the
14   Company was forced to incur $53 million in debt to fund the Defensive Repurchase
15   and to buy JAKKS shares at an unduly high price.  JAKKS was forced to fund the
16   Repurchase by incurring debt because much of its balance sheet cash was held
17   abroad and unavailable for use in the United States, absent the payment of taxes
18   required to repatriate the cash. Thus, JAKKS' practical ability to spend cash
19   domestically was very limited.  While JAKKS does not consolidate its domestic and
20   foreign operations for tax purposes, it does so for reporting purposes. It has not
21   disclosed the amount of cash and cash equivalents which would be subject to a
22   repatriation tax but it was finally made clear in an October 23, 2012  Investors'
23   Conference (the "October Investors' Conference") that the amount was very
24   significant.[3]

25

26   _____

[3]    In furtherance of its entrenchment plan, the Board also adopted a poison pill (the "Poison
27   Pill") in March 2012 without shareholder approval.  This, too, worked to unreasonably hinder the
     Clinton Group and Oaktree, and entrench the Board. The Poison Pill generally prohibited anyone,
28   without prior Board consent, from acquiring more than 10% of the Company's shares.

6.    Contrary to their fiduciary duties to advance the interests of JAKKS regardless of their self-interest, directors Almagor, Berman, Ellin, Glick, Miller and Skala (the "Repurchase Defendants") literally used corporate funds *to pay Clinton Group not to oust them from office.* (Berman, Glick, Miller and Skala are still on the JAKKS Board, and comprise a majority of the Board: four of its six members). As a consequence of the Defensive Repurchase, JAKKS (all in the course of less than two years) has been unable to spend competitive sums to develop and market new products; has been unable to return to profitability; has borrowed even more heavily; has issued $100 million in convertible notes at low conversion prices which exert downward pressure on the stock; and has fallen to the range of $7-8 per share. Although JAKKS has a market value of only $180 million, the machinations of its Board have cost its investors roughly $300 million, based on the difference between the current market price and what the investors could have had if JAKKS accepted a $20 bid in mid-2012.  The Board was not acting reasonably and rationally; it was acting defensively, and to entrench itself.

7.    This conduct violated the *Unocal* Rule which prohibits a corporate Board from entrenching itself through disproportionate and unreasonable measures that are contrary to the best interests of the company. *See Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (Del. 1985).

8.    Despite having fended off Oaktree and Clinton, the Board knew it was still susceptible to being ousted down the road by them, or by a new hostile bidder. A friendly party willing to take a very large stake in JAKKS' shares would solve this issue for them. In late 2012 the Board encouraged a large open market purchase of JAKKS shares by Dr. Patrick Soon-Shiong ("Dr. Soon"), a well-known investor in medical companies. *Dr. Soon did not invest any cash directly in JAKKS.* Dr. Soon's purchases served to block any repeat of the Oaktree and Clinton overtures. Shortly after Dr. Soon began buying JAKKS shares, the Board approved joint

ventures with Dr. Soon's companies to make toys and exploit other technologies (the "DreamPlay Joint Ventures"). As described herein, these joint ventures stand to unfairly benefit Dr. Soon and CEO Berman, who in 2012 tied his compensation (with the Board's acquiescence) to the success of the joint ventures, and not to JAKKS' stock price.[4] Moreover, the JAKKS Board extended the employment contract of CEO Berman, despite his disastrous tenure in office, to December 31, 2018, even though that the Company's shares were trading near an all-time low. The Board modified his employment contract so he can be paid huge bonuses despite the fact that the Company has faltered. Moreover, much of his compensation is now pegged to the aforementioned "joint venture" with Dr. Soon's company, the full details of which have been concealed. An independent Board would have fired Berman, not entrenched him, and raised his pay. The 2012 employment scheme was tilted toward enabling Berman to do very well even if JAKKS and its shareholders did not.

9. In sum, the claims asserted herein are brought against the following defendants as follows:

(a) Claims for damages arising out of the wrongful Defensive Repurchase are brought against present and former directors Almagor, Berman, Ellin, Glick, Miller, and Skala (the "Repurchase Defendants"). These claims are brought under state law for violation of the *Unocal* standard. As noted, four of the Repurchase Defendants remain on the six-director JAKKS Board, and constitute its majority;

(b) Claims for damages flowing from subsequent *Unocal* violations, relating to the inducement in or about August 2012 of Dr. Soon's purchases that have provided him with a controlling interest that can block any premium bid.

---

[4] Subsequent to the filing of the initial complaints herein, which challenged the tying of Berman's compensation to the success of the joint venture, JAKKS changed the compensation scheme to make stock price goals a part of Berman's compensation formula. As discussed herein, these goals do not require the stock price to reach $20 or more—the "bottom rung" begins at $9 a share and the "top rung" is set at "$16 or more."

1  These claims are brought against director defendants Berman, Skala, Glick, Ellin,

2  Miller, Almagor, Reilly and Brodsky for state law breach of fiduciary duty;

3      (c)    Claims for damages resulting from the lopsided DreamPlay Joint

4  Venture agreements entered with Dr. Soon's companies, which benefit Dr. Soon and

5  further the Board's entrenchment interests, to the detriment of JAKKs and its

6  shareholders. These claims are brought against director defendants Berman, Skala,

7  Glick, Ellin, Miller, Almagor, Reilly and Brodsky for state law breach of fiduciary

8  duty, including the *Unocal* standard;

9      (d)    Claims for damages, injunctive and declaratory relief stemming from

10  Defendants' federal and state law violations of the laws requiring Proxy Statements

11  to provide full and fair disclosure, particularly with regard to conflict of interest

12  transactions. Such claims are brought against defendants Berman, Brodsky, Ellin,

13  Glick, Miller, Poulsen, Reilly and Skala. Such claims are brought directly (and

14  individually) and derivatively;

15      (e)    Claims for contribution and damages relating to the Securities Class

16  Action are asserted against defendants Berman and Bennett under both federal law

17  and state law and against defendants Almagor Berman, Bennett, Ellin, Glick, Miller,

18  Skala and Reilly (as to conduct subsequent to April 21, 2012, when Reilly joined the

19  Board) for state law breach of fiduciary duty.

20  **JURISDICTION AND VENUE**

21      10.    By Order entered April 18, 2014 the constituent actions herein brought by

22  Advanced Advisors, GP ("Advanced Advisors") and Louisiana Municipal Police

23  Employees Retirement System ("LMPERS") were consolidated, with the *Advanced*

24  *Advisors'* action being designated "the Lead Case" and the *LMPERS'* action being

25  designated "the Consolidated Action."

26      11.    Under federal law, including the law of the Ninth Circuit, subject matter

27  jurisdiction over each constituent complaint in a consolidated action is gauged separately

28  as of the time of each action's original filing, and regardless of the consolidation. *See e.g.,*

1  *Continental Airlines v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n.1 (9th

2  Cir. 1987); *Cella v. Togum Constructeur Ensemleier en Industrie Alimentaire,* 173

3  F.3d 909, 913 (3d Cir. 1999).

4       12.  This Court had and has jurisdiction over both constituent actions

5  pursuant to the federal securities laws, 28 U.S.C § 1331, insofar as Plaintiffs seek on

6  behalf of the Company contribution from the Class Action Individual Defendants

7  for all damages and/or other costs incurred by JAKKS arising from the Securities

8  Class Action.  The Securities Class Actions allege violations of Sections 10(b) and

9  20(a) of the Exchange Act.  The Exchange Act (Section 21D, 15 U.S.C. §78u-4)

10  provides for contribution to those injured by joint violators of the federal securities

11  laws.  *See also Musick, Peller & Garrett v. Employers Ins. of Wausau,* 508 U.S.

12  286 (1991) (holding that there is an implied right to contribution under §10(b) of the

13  Exchange Act, now codified at Section 21D(f)). Federal question jurisdiction also

14  arises from the alleged violations of section 14 of the Exchange Act and Rule 14a-9

15  for the dissemination of a materially false and omissive Proxy Statement.  Plaintiffs

16  also asserted and assert supplemental claims under state law pursuant to 28 U.S.C. §

17  1367.

18       13.  This Court additionally had and has jurisdiction over the subject matter

19  over the LMPERS Consolidated Action pursuant to 28 U.S.C. §1332 (diversity

20  jurisdiction).    As to such diversity jurisdiction, Plaintiff LMPERS was and is a

21  citizen of the State of Louisiana while each defendant was at the time of filing a

22  citizen of a state other than Louisiana.

23       14.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  A

24  number of the claimed wrongful acts and practices asserted herein occurred in this

25  District.

26       15.  In connection with the acts, conduct and other wrongs alleged in this

27  Complaint, defendants, directly or indirectly, used the means and instrumentalities of

28  interstate commerce, including but not limited to, the United States mail, interstate

1  telephone communications, the Internet and the facilities of the national securities

2  exchange.

3                                    **PARTIES**

4          16.    Plaintiff Advanced Advisors has held JAKKS shares since July 2011, and

5  continues to hold JAKKS shares.

6          17.    Plaintiff LMPERS has held JAKKS shares since July 2012, and

7  continues to hold JAKKS shares. Plaintiff is a Louisiana-based retirement system

8  that provides retirement allowances and other benefits to full-time municipal police

9  officers and employees in the State of Louisiana.

10         18.    Defendant JAKKS is a Delaware corporation with its principal executive

11  offices located at 22619 Pacific Coast Highway, Malibu, California 90265.    Its

12  common stock trades on the NASDAQ under the ticker symbol "JAKK."    JAKKS

13  develops, produces, and markets toys and consumer products in the United States

14  and internationally. JAKKS is a citizen of California and/or Delaware.

15         19.    JAKKS operates in two segments, Traditional Toys and Electronics;

16  and Role Play, Novelty and Seasonal Toys. The Company offers action figures and

17  accessories primarily based on Monsuno, Batman, Ultimate Fighting Champion,

18  Total Non-Stop Action wrestling, and Pokémon franchises; Toy vehicles comprising

19  Road Champs, Fly Wheels, and MXS toy vehicles and accessories; and electronics

20  products under the SpyNet spy products, EyeClops Bionic Eye products, Laser

21  Challenge, and Plug It In & Play TV Games based on Disney and other brands. It

22  also offers small, large, fashion, and baby dolls based on Disney Princess, Disney

23  Fairies, Cabbage Patch Kids, Hello Kitty, Graco, and Fisher Price brands; private

24  label products; and pet products, which comprise toys, consumables, and accessories

25  under the JAKKS Pets, Kong, and American Classics brand names.   In addition, the

26  Company offers food play and activity kits under the Creepy Crawlers and BloPens

27  brands; and role play, dress-up, pretend play, and novelty products for boys and girls

28  based on Black & Decker, McDonalds, Dirt Devil, Disney Princess, Disney Fairies,

and Dora the Explorer, as well as on its proprietary brands. Further, it offers indoor and outdoor kids furniture, activity trays and tables, and room décor; kiddie pools and seasonal and outdoor products based on Crayola and Disney characters; Funnoodle pool floats; and Halloween and everyday costumes under the Spiderman, Iron Man, Toy Story, Sesame Street, Power Rangers, Hasbro, and Disney Princess brands, as well as Halloween accessories.

20.    Defendant Stephen G. Berman ("Berman") is, and has been, the Company's Chief Executive Officer and President, and a member of the Company's Board of Directors (the "Board") at all relevant times. He has been the corporate Secretary and a director since he co-founded JAKKS in January 1995. From January 1, 1999 he served as President. From February 17, 2009 through March 31, 2010 he was also Co-Chief Executive Officer and since April 1, 2010 he has been Chief Executive Officer. Berman is a citizen of California.

21.    Defendant Joel M. Bennett ("Bennett") is, and has been, the Company's Chief Financial Officer and Executive Vice President at all relevant times. He joined the Company in September 1995 as Chief Financial Officer and was given the additional title of Executive Vice President in May 2000. Bennett is a citizen of California.

22.    Defendant Murray L. Skala ("Skala") has been a director since October 1995. Since 1976, Skala has been a partner in the law firm Feder Kaszovitz LLP (f/k/a Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP), the Company's general counsel. Skala is a citizen of New York.

23.    Defendant Robert E. Glick ("Glick") has been a director since October 1996. Glick is a citizen of Florida.

24.    Defendant Marvin Ellin ("Ellin") was a director from October 2010 through December 6, 2013. Ellin is a citizen of New York.

25.    Defendant Michael G. Miller ("Miller") has been a Director since February 1996. Miller is a citizen of Florida.

26.    Defendant Dan Almagor ("Almagor") was a director from September 2004 through December 26, 2012. Almagor is a citizen of New Jersey.

27.    Defendant Leigh Anne Brodsky ("Brodsky") was a director from May 8, 2012 through December 6, 2013. Brodsky is a citizen of New Jersey.

28.    Defendant Peter F. Reilly ("Reilly") has been a JAKKS director since April 21, 2012. Reilly is a citizen of New Jersey.

29.    Defendant Rex H. Poulsen ("Poulsen") has been a JAKKS director since December 26, 2012. Poulsen is a citizen of California.

30.    Non-employee Directors are very well compensated by JAKKS. In addition to an annual cash stipend of $75,000, payments to committee chairs and the members of the audit committee total $30,000 and $15,000 respectively; payments to the chair of the compensation committee and the nominating and governance committee total $15,000 and each member of such committees receives an annual fee of $10,000. There is also an annual grant of restricted common shares to each Director in the amount of $100,000.

## SUBSTANTIVE ALLEGATIONS

**A.    THE BOARD BREACHES ITS FIDUCIARY DUTY THROUGH AN ENTRENCHMENT SCHEME**

**1.    The Board Repulses a Premium Bid and Decides to Effect a Defensive Repurchase to Save Itself**

31.    What follows are the facts relating to the Board's actions rejecting any *bona fide* offer to acquire the Company. Instead, it engaged in improper defensive maneuvers to entrench the Board in violation of the holding in *Unocal, supra* (the "Unocal Standard"). These improper acts included the wholly needless Defensive Repurchase which wasted $80 million of the Company's funds, and caused harm from which JAKKS may never recover.

32.    On September 13, 2011, Oaktree announced that certain funds and accounts that it managed (the "Oaktree Funds") made a proposal to acquire all outstanding shares of JAKKS common stock for $20 per share in cash, representing

a total equity value of approximately $670 million on a fully diluted basis.  The offer represented a 25% premium over the Company's closing stock price as of September 13, 2011, the 30-day average closing price of the Company's stock leading up to September 13, 2011; and the average closing price of the Company's stock over the preceding 24 months.[5]  Oaktree announced that it made the proposal public after the Board's continued refusal to engage in meaningful discussions about the options available for maximizing shareholder value at JAKKS, including an acquisition by the Oaktree Funds. The Oaktree Funds were then among JAKKS' largest shareholders, with a collective stake at that time of approximately 4.9% of JAKKS common shares.

33.    On October 5, 2011, the Board rejected the Offer.  It does not appear that the Board sought any meaningful negotiations to increase what was already an offer well above JAKKS' recent trading range.   The Board's letter that day to Oaktree stated in relevant part:

October 5, 2011

**VIA E-MAIL AND FEDERAL EXPRESS**
Mr. B. James Ford
Mr. Matthew Wilson
Oaktree Capital Management, L.P
333 South Grand Avenue, 28th floor
Los Angeles, CA 90071

Gentlemen:

I am writing on behalf of the Board of Directors (the "Board") of JAKKS Pacific, Inc. ("JAKKS" or the "Company") in response to your letter dated September 13, 2011, in which you express interest in discussing a "potential going private transaction at $20.00 per share," subject to your ability to conduct due diligence and raise the necessary debt financing.

---

[5]    Before Oaktree went public, JAKKS share price last exceeded $20 per share in 2008 and for a brief period in April-May 2011.

*****

***The Company Believes its Strategic Plan Will Produce Significantly Greater Value For JAKKS Stockholders Than Your Indication of Interest***

This is an exciting time for JAKKS. The Company is in a growth mode that includes several lines of new proprietary products and valuable intellectual property. The Monsuno property is ready for launch as a major televised cartoon series, line of toy products and licensing property, and the Company has entered into key partnerships relating to Monsuno with Nickelodeon, Fremantle, Dentsu and Topps. We believe the Monsuno project and the skill set and key relationships that have been developed to bring it to fruition will lead to similar proprietary projects that should have a positive impact on our share price. In addition, the Company has a number of new and promising proprietary and licensed products, including Baby Watch, Action Cam, Shogami and Winx Club, which could also be transformative and enhance stockholder value. ***Finally, given its cash position, strong balance sheet and market conditions***, the Company believes it is well positioned for continued growth and value creation, including through accretive acquisitions as it has done throughout its history - reinforcing the Board's judgment that execution of its strategic plan will create significantly greater value for the Company's stockholders than your indication of interest.

### Conclusion

I want to emphasize that the Board is committed to increasing the Company's value for all of our stockholders and we are confident that our actions will accrue to the benefit of all of our stockholders, including Oaktree.

Sincerely,
/s/ STEPHEN G. BERMAN

Stephen G. Berman
Chief Executive Officer, President, Secretary and Director

34.    As defendant Berman noted, JAKKS' "cash position" and "strong balance sheet" were key to JAKKS' ability to deliver superior returns. But when threatened with losing their positions, the Board members destroyed JAKKS' cash

1    position and strong balance sheet, crippling the Company, and rendering it highly

2    unlikely that value in excess of $20 can be achieved.

3        35.    Given the Board's unwavering pronouncements, one might have

4    expected a blowout 2011 Christmas season, which would serve to verify that the

5    Board was correct in its assessments. On December 20, 2011, just weeks after the

6    rejection letter was sent to Oaktree, JAKKS announced that expected 2011 revenues

7    and earnings would fall drastically below projections. Full year sales were expected

8    to be approximately $660 million, down from the previous estimate of $770 to $775

9    million. **Analysts were expecting $786.32 million.** Diluted earnings per share were

10   projected to be $0.37 to $0.40, down from previous guidance of $1.32 to $1.35.

11   **Analysts were currently expecting $1.34.** On January 25, 2012, research firm

12   Zacks lowered its rating on JAKKS to "underperform-short term strong sell" from

13   "neutral." The only reason the stock price did not plummet is that hopes of a

14   takeover were still alive.

15       36.    On February 21, 2012, JAKKS held a conference call and reported that

16   "Net sales for the full year of 2011 were $677.8 million compared to $747.3 million

17   in 2010. Net income reported for the full year period was $8.5 million or $0.32 per

18   diluted share...." CFO Bennett stated, however, that JAKKS was positioned very

19   well financially and that it had "internally-generated cash flow to support our

20   organic and acquisition growth strategies, maintain a strong balance sheet as well as

21   provide sustainable quarterly dividends to our shareholders." He further

22   emphasized that: "Our balance sheet remains very strong. We continue to evaluate

23   various uses of our funds and untapped financing capacity. Using our disciplined

24   approach we look for accretive acquisitions to complement the growth of our

25   business and effectively deploy our capital."

26       37.    On March 4, 2012, the Clinton Group, in support of Oaktree's position,

27   publically urged the JAKKS Board to conduct an auction for the Company. While

28   Oaktree did not have a history of engaging in hostile takeovers of public companies,

the Clinton Group was altogether different.  Since at least 2008, the Clinton Group had engaged in hostile maneuvers such as proxy contests to oust current management to increase shareholder value.  The Board was painfully aware that the Directors and Officers owned a very small amount of JAKKS shares, that four institutional investors owned approximately 38 percent of JAKKS shares, and that it was likely that smaller institutional investors owned shares in amounts which were likely significant.   The Board also knew that the Clinton Group could easily combine with Oaktree to push a successful proxy contest and end the Board's tenure at JAKKS.

38.    On March 5, 2012, JAKKS announced that its Board had unanimously adopted a "poison pill" stockholder rights plan and declared a dividend of one right for each outstanding share of the Company's common stock.  The Board claimed it adopted the rights plan in response to Oaktree's Offer as well as a recent indication by Oaktree that it might accumulate additional shares of the Company's stock in the open market.   The directors claimed that its rights plan was designed to protect against any potential coercive or abusive takeover techniques and to help ensure that the Company's stockholders were not deprived of the opportunity to realize full and fair value on their investment.  As described below, this was nonsense. The rights plan was adopted to entrench the Board and its adoption for that purpose violated the Unocal Standard.

39.    On April 17, 2012, Oaktree made public a letter it had sent to the JAKKS Board accusing it of entrenching itself, and opining that management had no realistic plan to maximize shareholder value.  The letter stated:

April 17, 2012

The Board of Directors of JAKKS Pacific, Inc.
22619 Pacific Coast Highway
Malibu, CA 90265

Attention: Stephen G. Berman and Murray L. Skala

Dear Messrs. Berman and Skala:

As investment manager to one of the largest shareholders of JAKKS Pacific, Inc. (JAKKS or the Company), we, Oaktree Capital Management, L.P. (Oaktree), remain deeply concerned by the Company's financial performance and strategic direction. In assessing the competency and motives of JAKKS's management team and Board of Directors, shareholders need only review the facts and events of the three-month period between October 2011 and January 2012:

JAKKSs Board of Directors rejects out of hand a $20.00 per share all cash offer by funds managed by Oaktree (Oaktree Funds) as inadequate and proclaims that execution of the Company's strategic plan will provide significantly greater value to the Company's stockholders.

JAKKS management additionally articulates bullish guidance ahead of the critical holiday season and states the Company's strategic plan would generate continued growth and value creation.

Two months hence, JAKKS management reduces its 2011 fiscal guidance for revenue and earnings by $110-$115 million and 70%, respectively. JAKKSs share price declines to $13.39 on January 19, 2012, prior to news reports indicating that Oaktree Funds were likely to make a reduced acquisition proposal.

Company discloses $3.8 million in legal and advisory fees, which represent over 28% of the Company's earnings for the entire fiscal year 2011. In fiscal year 2011, the Company paid a total of $3.4 million in legal fees to the law firm Feder Kaszovitz LLP, for which Mr. Skala, a member of the Company's Board of Directors, is a Partner.

Board installs material golden parachutes that may ultimately cost the shareholders and enrich an underperforming management team.

Based on the actions outlined above, Oaktree has no confidence in the capability and credibility of the current Board and management

team. Immediate change is required to preserve and protect the interest of public shareholders.

Oaktree Funds continue to hold the substantial equity stake in the Company of which we advised you previously. We have attempted repeatedly to engage in meaningful discussions with JAKKS management and its Board of Directors and are disappointed that you have continued to resist our efforts to open a constructive dialogue regarding potential value-enhancing transactions, which we believe would be in the best interest of all of the Company's stakeholders.

Since December we have reengaged actively with this Board's advisors seeking a path to acquire JAKKS at a premium valuation. After months of failed commitments and cat and mouse with your legal and financial advisors, representatives of Oaktree and Guggenheim Securities, LLC, our financial advisor, finally were invited to meet with your financial advisors on February 23, 2012. In this meeting we reaffirmed our pressing interest in engaging in an immediate dialogue toward maximization of shareholder value. We outlined our ability to finance and consummate a compelling transaction for shareholders within a 30-day period. On March 5, 2012, the Board and its advisors again formally rebuffed, without basis or rationale, our proposed premium cash acquisition of JAKKS. The JAKKS Board also entrenched itself and management further by unilaterally adopting a poison pill without shareholder vote.

This transaction is of the highest priority for us, and we are prepared to proceed as quickly as possible. In addition to engaging Guggenheim Securities, LLC as financial advisor, we have also engaged MacKenzie Partners, Inc. as proxy solicitors and retained Kirkland & Ellis LLP as legal counsel. We are ready to proceed immediately. With the Company's full cooperation, we can expeditiously (a) complete our confirmatory due diligence, (b) finalize committed debt financing, (c) reach agreements with the JAKKS management with respect to their ongoing roles with the Company, and (d) present to the JAKKS Board a firm acquisition proposal with certainty of close.

We would expect to finance the transaction with a combination of equity and debt. Oaktree has approximately $75 billion of assets under management and the Oaktree Funds can commit 100% of the

cash equity required to consummate the transaction. Guggenheim Partners, LLC has over $125 billion in assets under management and has an active and successful track record of lending to middle-market consumer/retail leveraged buy-out transactions. Guggenheim Corporate Funding, LLC intends to provide the fully committed debt financing required to complete the proposed transaction.

Given that this Board continues to support a management team who has grossly underperformed and continues to resist our efforts to deliver a premium valuation, we believe it is readily apparent that this Board is not willing to act in the best interests of shareholders. It is clear that we are not alone in this view. To that end on March 14, 2012, a major shareholder in JAKKS, Clinton Group, Inc. (Clinton), openly called for the Board to undertake a review of its strategic options and embark on a targeted auction process. Their letter continued that Clinton was dismayed at the Board's decision to adopt a poison pill and expects that its fiduciaries on the Board will permit any interested buyer to bring their proposal directly to the shareholders, who can decide for themselves whether they would prefer to remain invested in an independent JAKKS or would rather take the proposed offer. We share the views Clinton has expressed in their public disclosures and support Clinton's stated intention to solicit action by written consent.

We are hopeful that the Board will finally act in the interest of shareholders and immediately begin a process to explore alternatives to maximize shareholder value. Absent that, replacing this entrenched Board with new directors who will act in shareholders' best interests is paramount. Given the Company's rapidly deteriorating financial performance and damaged credibility amongst key constituents, we are concerned that further delay in initiating a strategic process will only risk further destruction of shareholder value. If the Board chooses not to pursue this path, please know that we are committed to protecting the value of our investment and, consequently, we are prepared to pursue any and all actions available to us in order to ensure that the JAKKS Board actively and thoughtfully pursues alternatives to maximize value for shareholders.

Sincerely,

_____

B. James Ford
Managing Director

Portfolio Manager, Global Principal Group

_____

Matthew Wilson
Managing Director

40.    Defendant Berman quickly responded, rejecting Oaktree's position.

41.    Despite the war of words with Oaktree, the real threat was the Clinton Group.    To entrench itself, the JAKKS Board therefore badly needed to mollify the Clinton Group in a manner short of a proxy fight, which it could easily lose.  Thus, the JAKKS Board resolved to negotiate a standstill with the Clinton Group. In essence, what the Board determined to do *was to indirectly pay Clinton Group to allow it to stay in office.*

42. On April 18, 2012, JAKKS reported its financial results for the first quarter, ending March 31, 2012.  It stated: "Net sales for the first quarter of 2012 were $73.4 million, up from  $72.3 million reported in the comparable period in 2011. The reported net loss for the first quarter was $16.0 million, or $0.62 per diluted share, which includes $1.4 million, or $0.03 per diluted share, related to financial and legal advisory fees and expenses. This compares to net loss of $10.6 million, or $0.39 per diluted share, reported   in the comparable period in 2011, which included $0.3 million, or $0.01 per diluted share, of financial and legal advisory fees and expenses."

43.    On an April 18, 2012 conference call, defendant Berman reiterated that an important part of JAKKS' financial plan was its ability to deploy its large cash position to expand. He stated: "we have been meeting often with our Board and our Board is reviewing many different alternatives with the capital base. One of our first and foremost strategic parts of our business has always been acquiring licenses, expanding international, and acquiring accretive acquisitions."

44.    On April 23, 2012 the directors revealed that they had decided, as part of an April 21, 2012 Standstill Agreement, to assuage the Clinton Group by

repurchasing at least *$80 million* worth of JAKKS shares (the "Defensive Repurchase") and increasing the size of the Board. The share buyback would be worth at least $20 a share, representing a 14% premium to stock prices that reflected the hope that JAKKS would be taken over. The Company agreed to add two members to its Board, for a total of eight. The Standstill Agreement provided that the Defensive Repurchase could be delayed but not terminated, even if the Board, exercising its fiduciary duty would have been obligated to do so. The omission of a fiduciary out clause or a MAC Clause is further evidence that the Standstill Agreement was for the benefit of the Board and not the Company or its shareholders.

45.     In exchange, Clinton Group agreed to certain standstill restrictions until 60 days before the Company's December 2013 annual meeting, and to vote for the Company's slate of board nominees at the upcoming annual meeting. To fulfill the Standstill Agreement, defendants Brodsky and Reilly joined the Board. In order to fund the Defensive Repurchase JAKKS was required to incur debt of over $53 million. As part of the Standstill Agreement, JAKKS agreed to negotiate with Oaktree. As before, no progress with Oaktree was made and Oaktree predictably lost interest in this hobbled Company.

46.     The Standstill Agreement was a reflection of the Board's desire to stay in power and to entrench itself. By agreeing to the Defensive Repurchase, the Director Defendants had neutralized the Clinton Group, and prevented an aggressive proxy battle which it would likely lose. The cost was JAKKS' financial future.

47.     On June 28, 2012, the Company announced the preliminary results of the Defensive Repurchase. The Company expected to accept for payment an aggregate of 4 million shares at a purchase price of $20 per share, for a total purchase price of $80 million. The 4 million shares bought back in the Defensive Repurchase represented approximately 15.4% of the Company's shares outstanding as of May 24, 2012.

48.   The Defensive Repurchase had no positive effect on JAKKS' share price.  Rather than increasing JAKKS' share price above the $20 per share Oaktree Offer, JAKKS' share price steadily declined thereafter. Indeed, on June 28, 2012, the stock closed at $15.61 per share, and fell to $12.35 per share by the end of 2012.

49.   Following the Defensive Repurchase, poor results soon began to be reported.   These results are attributable, wholly or in major part, to the adverse effects of the Defensive Repurchase.

50.   The financial results for the quarter ended June 30, 2012 (announced on July 17, 2012) were lackluster.   The net loss for the first six months of 2012, adjusted for legal fees, was $13.5 million, up from a loss of $5.6 million for the first six months of 2011.  At the time the Defensive Repurchase at $20 per share was launched and closed, defendants could not know that results for the quarter would reflect significant improvement or justify management's pronouncements.  Rather, the motivation was to neutralize Clinton Group.  As news service Benzinga.com reported that day: "Jakks Pacific's quarterly profit declined to $214,000, or a penny per share, versus $4.2 million, or $0.16 per share, in the year-ago period. Excluding items, its adjusted earnings came in at $0.06 per share. Its net sales climbed 10% to $145.4 million. *However, analysts were expecting a profit of $0.11 per share on revenue of $137 million*...Jakks Pacific shares closed at $15.81 yesterday."

51.   Within weeks of the June 28, 2012 close of the Defensive Repurchase, JAKKS revised its earnings downward.  On September 28, 2012 the Dow Jones Newswire reported:

> Jakks Pacific Inc. (JAKK) lowered its full-year guidance as the toy maker said it experienced "disappointing" domestic product sales and a slowdown in orders, as well as increased expenses. Shares were down 8.9% at $13.27 in after-hours trading.
>
> The company now expects adjusted earnings of about *68 cents to 74 cents* a share and revenue of $690 million to $700 million. Its prior view called for a profit of *$1.04 to $1.08 a share* and

revenue between $720 million and $728 million.

Jakks said it will take a one-time non-cash charge of $3.45 a share for impairment of its domestic deferred tax assets if it doesn't achieve meet at least the top-end of its new earnings projection.

The maker of Pokemon, Monsuno, Winx and Hello Kitty toys in July notched two consecutive quarters of sales growth after 2011's top line slid 9.3%. However, its second-quarter profit slumped 95% on higher legal advisory fees and lower income from a video game joint venture.

Jakks has touted an early favorable response to the launch of Monsuno action figures, the first line the company launched in which it also owns the entertainment content. Monsuno figures are tied to a character-based storyline featured on an animated television show that debuted in February.

The stock is off 24% over the past 12 months.

52.    Investors reacted angrily.   JAKKS had pegged its prospects on the Monsuno line of toys, but these were low-tech gadgets, and were tied to a Nickelodeon show which had met a mediocre reception.   Moreover, Nickelodeon itself was experiencing a steep decline in ratings, a decline that was evident at the time the Standstill Agreement was entered.   On an October 23, 2012 conference call JAKKS convened to discuss its third quarter, Jonathan Fite of KMS Investments summarized his company's grievances:

We have been shareholders of JAKKS for several years now, and given our tenure, just bear with me for a moment.
                                    * * *
[A]bout 18 months ago, you began touting the wondrous prospects of Monsuno, but these failed to deliver. You've severely missed earnings projections in 2011, and you've lowered expectations again for 2012.

Most recently, you refuse to negotiate in good faith with a firm willing to offer shareholders $20-plus, but instead you decided to spend shareholder money on a tender at the same price. Since that tender took place, you've weakened the balance sheet and presented over a 30% drop in the share price. Yet you've had your compensation contract renewed at pretty substantial levels.

So can you explain to me why you might deserve to have that contract renewed and why you think your capital allocation record over the past three years really deserves to be rewarded?

53.    Berman refused to directly address Fite's concerns, to which Fite responded: *"it seems that you have taken an approach of doing things that keep you and your management team in place, earning a really nice salary, but do that at the expense of shareholders…"*

54.    On that same call, Berman finally admitted that Nickelodeon's plummeting popularity had affected Monsuno sales:

[W]e've spent a good amount of marketing dollars and have it on Nick Tunes. *The viewership of Nickelodeon itself or Nick Tunes has dropped last year, as well it's dropped significantly over the last two years, so we're not getting the retention of the boys here.* So it's more working based off of advertising. So while it's extremely growing on a rapid basis all overseas, it's doing well here, but not as to what we expected..."

55.    JAKKS shares closed on October 23, 2012 at a price of $12.70 per share, 36.5% below the June 2012 repurchase price.

56.    Before the third quarter ended, desperate to derail any further bids for the Company, the Board searched for a friendly investor who would not have an interest in replacing the Board and management.

57.    Thus, on July 17, 2012 JAKKS announced that Dr. Patrick Soon-Shiong ("Dr. Soon"), a wealthy investor, had agreed to partner with the Company in an interactive toy joint venture.  JAKKS announced that the DreamPlay Toys joint venture with Dr. Soon's NantWorks LLC holding company would incorporate

NantWorks' proprietary image recognition technology.   Specifically, two joint ventures were formed: (1) DreamPlay Toys, LLC, focusing on toy products; and (2) DreamPlay, LLC, focusing on applying Nantworks technology in non-toy consumer products (the "DreamPlay Joint Ventures").   Berman was appointed General Manager of DreamPlay LLC.   As will be discussed herein, the terms of the DreamPlay Joint Ventures are extremely unfair to JAKKS, and were motivated to curry favor with—and enrich—Dr. Soon, the friendly investor who was not threatening to oust the Board.   As such, the DreamPlay Joint Ventures were "defensive measures", which (as negotiated) were contrary to the best interest of JAKKS.

58.    Dr. Soon had made a fortune in healthcare investments, and was not perceived as a threat to the Board.   Thus, the Board welcomed his soon-to-be-announced purchase of a large block the Company's shares in the open market (which purchase produced no funds for JAKKS).

59.    On October 15, 2012, it was announced that an investment company controlled by Dr. Soon had taken a roughly 9 percent stake in JAKKS.   As reported, Dr. Soon's California Capital Z LLC, based in Culver City, had first acquired a small stake in JAKKS in or about August 2012, and then added to its holdings, with purchases increasing in volume beginning on August 17, 2012.

60.    The financial damage inflicted on JAKKS did not end with the $80 million wasted on the Defensive Repurchase.   The 2012 fiscal year ended with a loss of a staggering $104 million, including $119.5 million in the fourth quarter alone.   Defendant Berman announced in a February 13, 2013 conference call that the once-flush JAKKS was now forced to keep a "tight rein" on expenses. JAKKS was forced to close its New York office, and move one division back to headquarters. Roughly 10% of the employees were fired.

61.    On July 17, 2013, deeply disappointing second quarter results were announced, including a $46.9 million net loss.  Defendant Berman stated that "we

are undertaking several initiatives to return the company to profitability and growth, including a suspension of our quarterly dividends and a deep restructuring plan designed to reduce operating costs."

62.    On July 19, 2013 JAKKS announced that it was forced to make a $100 convertible note offering (the "Convertible Note Offering"), at a conversion price that was so low that it would be highly dilutive should JAKKS ever return to profitability and would serve as a severe drag on JAKKS's shares climbing anywhere near $20 per share. JAKKS announced:

> "JAKKS Pacific, Inc. (JAKK) today announced the pricing of $100 million principal amount of 4.25% convertible senior notes due 2018 (the "notes"). The notes are senior unsecured obligations of JAKKS, will pay interest semi-annually at a rate of 4.25% per annum and will mature on August 1, 2018. The conversion rate will initially be 114.3674 shares of JAKKS common stock per $1,000 principal amount of notes (*equivalent to an initial conversion price of approximately $8.74 per share of common stock*), subject to adjustment in certain circumstances

63.    In other words, Convertible Note investors would not just get $4.25 million in interest per year, but for five years would have the right, upon conversion, to obtain shares at a price of only $8.74 a year, 56% below the $20 price JAKKS rejected just a year earlier. If all Convertible Notes are converted into shares, JAKKS will need to issue 11.43 million shares, increasing its share base from the current roughly 22 million shares to over 33 million shares, making a significant profit per share much harder to achieve. Had the entrenching Defensive Repurchase not occurred just one year prior, JAKKS would not have been compelled to sell the Convertible Notes on such poor terms.

64.    Despite JAKKS' diminished stock price, no further hostile takeover by a well-heeled investor can be expected. As of October 11, 2013, Dr. Soon (with the

acquiescence of the JAKKS' Board) had increased his stake in JAKKS to 24.9%, making a hostile acquisition of JAKKS at a premium even to the presently diminished price effectively impossible.  As noted by Forbes: "Soon's brand of activist investing is different than that of a Carl Icahn or Bill Ackman.  He's not an antagonist activist.  Soon creates value, working with companies, by being a great visionary, innovator and deal maker.  But he has yet to produce value for shareholders, including himself."[6]

### 1. The Board's Actions Were Designed to Entrench It

65.    The JAKKS Board claimed that if JAKKS stayed independent it would create greater shareholder value.   Whatever business plan JAKKS had, it was destroyed by the Defensive Repurchase and its economic fallout.   Indeed, even before the Defensive Repurchase, JAKKS had a history of failing to meet its own guidance, reflecting its inability to forecast accurately in this market.  To the extent that JAKKS' strategic plan hinged on leveraging its strong balance sheet to make acquisitions, increase marketing, and add product lines, that strong balance sheet was destroyed by the Defensive Repurchase, the Convertible Note Offering ,and other ill effects of the Board's entrenching actions.

a.    On December 16, 2011, JAKKS was forced to reveal its sales performance was disappointing during the important holiday season, and this had resulted in higher markdown allowances and higher royalty expenses relating to license guarantee shortfalls.  The Company announced anticipated net sales for the full year 2011 of approximately $660 million, with diluted earnings per share in the range of $0.37 to $0.40, excluding non-recurring financial and legal advisory charges.  This was a very substantial reduction from the Company's previously anticipated full year 2011 net sales of approximately $770 million to $775 million,

---

[6]    *Biotech Billionaire Takes A Beating Toying Around With JAKKS Pacific*, Forbes.com, Aug, 30, 2013, available at:   http://www.forbes.com/sites/greatspeculations/2013/08/30/biotech-billionaire-takes-a-beating-toying-around-with-jakks-pacific/

1    with diluted earnings per share in the range of $1.32 to $1.35, excluding such one-

2    time charges;

3          b.    On February 21, 2012, JAKKS announced guidance for 2012

4    including an increase in net sales of 6.2% to 7.4% to approximately $720 million to

5    $728 million, with diluted earnings per share in the range of approximately $1.01 to

6    $1.07, excluding any financial and legal advisory fees.  This guidance anticipated

7    first-quarter 2012 net sales in the range of $63 to $70 million, with a loss per share

8    in the range of $0.61 to $0.64;

9          c.    The 2012 forecast was heavily reliant on the success of the

10   Monsuno product line which, in turn, was heavily reliant on the success of

11   Nickelodeon, which broadcast the Monsuno animated shows. But, in March 2012, it

12   was revealed that Nick had for the first time ever fallen to second place in ratings to

13   Disney, and that its ratings were in free-fall, dropping 31% year over year.  The

14   directors did not revise projections based on this development.

15         d.    By September 28, 2012, with Clinton Group neutralized, the

16   Company lowered 2012 guidance as a result of claimed disappointing domestic

17   product sales and a slow-down in product orders, coupled with higher expenses,

18   including marketing and advertising expense commitments and minimum license

19   royalty guarantees.  The Company announced that it anticipated net sales for the full

20   year of approximately $690 million to $700 million, with revised non-GAAP

21   earnings per share in the range of approximately $0.68 to $0.74. Berman conceded

22   on the October 2012 conference call that there was a correlation between poor

23   Nickelodeon ratings and Monsuno sales.  His remarks contain a concession that this

24   situation was no surprise to him personally;

25         e.    On February 21, 2013 JAKKS reported results for the

26   Company's fourth quarter and full year ended December 31, 2012.  Net sales for the

27   fourth quarter of 2012 were $133.5 million, compared to $141.1 million reported in

28   the comparable period in 2011.  The reported net loss for the fourth quarter was

$119.5 million, or $5.45 per diluted share, which included a one-time non-cash charge of $91.7 million or $4.18 per diluted share, related to the impairment of deferred tax assets, and $0.8 million of pre-tax charges, or $0.03 per diluted share, related to legal and financial advisory fees and expenses associated with the unsolicited indication of interest and activist shareholder activities. Defendant Berman stated, "We are disappointed by our performance in the fourth quarter. The difficult and challenging toy environment did not generate the sales that had been anticipated, and several of our key products did not achieve the sales levels that we had planned for, also resulting in license royalty minimum guarantee shortfalls. However, we are optimistic for our future growth and profitability. We believe that our core business lead by our infant/preschool, seasonal and Halloween segments, in conjunction with meaningful reductions in operating costs, will return the Company to profitability in 2013." Berman continued, "We believe that the difficult environment for toys in 2012 resulted from rapid changes in children's play patterns as tablet and smartphone devices and interactive games and toys have more and more become cornerstones of their play and fun experiences. We recognize that it is critical for us to provide new, more exciting and magical experiences for today's child compatible with these new play patterns. We believe that our partnership with NantWorks in creating our DreamPlay line of toys using NantWorks proprietary ID recognition technology will place JAKKS in the forefront of the play revolution we are witnessing. We believe that applying this technology to a broad array of characters and play patterns will create new consumer demand for JAKKS products and will help JAKKS achieve substantial long range growth and profitability, warranting the investment in technology and content that we are making;"

   f. At the same time, the Company announced 2013 guidance foreseeing an increase in net sales of 4.0% to 5.0% to approximately $694 million to $700 million, with diluted earnings per share in the range of approximately $0.63 to $0.68. This guidance anticipated first-quarter 2013 net sales in the range

of $70 to $73 million, with a loss per share in the range of $0.83 to $0.85, which reflects 17.6% fewer common shares outstanding primarily as a result of the July 2012 Defensive Repurchase;

g.    On July 17, 2013, JAKKS announced its second Quarter 2013 results. Net sales for the second quarter of 2013 were $106.2 million compared to net sales of $145.4 million reported in the comparable period in 2012. The reported net loss for the second quarter was $46.9 million, or $2.14 per diluted share, which included charges for license minimum guarantee shortfalls of $14.1 million and inventory impairment of $12.2 million. This compared to net income of $0.2 million, or $0.01 per diluted share, reported in the comparable period in 2012, which included $1.7 million, or $0.5 per diluted share, of legal and financial advisory fees and expenses related to the 2011 unsolicited indication of interest. Net sales for the six months ending June 30, 2013, were $184.3 million compared to $218.8 million in 2012. The net loss reported for the six month period was $74.4 million, or $3.40 per diluted share, which includes $0.8 million, or $0.03 per diluted share, of pre-tax financial and legal advisory fees and expenses relating to the 2011 unsolicited indication of interest, and charges for license minimum guarantee shortfalls of $14.4 million and inventory impairment of $14.9 million. This compared to a net loss for the first six months of 2012 of $15.8 million, or $0.61 per diluted share, which included $3.1 million, or $0.09 per diluted share, of pre-tax financial and legal advisory fees and expenses. Defendant Berman stated, "We are disappointed that JAKKS has not met its second quarter target and will not achieve its full year 2013 forecast. Sales for the second quarter were significantly below expectations due to a variety of factors. Several retailers, both in the United States and in Europe, are struggling and have substantially decreased their orders. In addition, the poor performance of several of our key properties, including Monsuno and the Winx Club, also contributed to the decline, along with unusually cool weather that affected seasonal toy sales leading to more aggressive markdowns at

retail as shelves are cleared for back-to-school products. We also believe the decline in sales reflects the continuing change in play patterns of children of all ages, who continue to rely more and more on smart devices for their fun and entertainment. As previously announced, this shift in play patterns has caused companies like JAKKS to evolve to meet the changing demands of its consumers with technologically enhanced product offerings."  Berman further stated "We are making key, targeted moves to align operations, drive productivity and support innovation with the objective of returning the Company to profitability in 2014. We believe that JAKKS, which has now been in business for almost 18 years, will be able to weather the seismic shift that the toy industry is experiencing due in large part to our commitment to growing a segment of our portfolio that combines the power of digital content with physical product, such as our innovative DreamPlay line of toy products. These initiatives should be seen in this strategic context as we continue to reshape our business to improve innovation and product sales and with it our long-term ability to compete in a rapidly changing industry. Coupled with our core, evergreen business, we expect that JAKKS will be able to solidify its position in 2014 and beyond as one of the leading toy companies in the United States;" and

h.   At the same time as the Second Quarter earnings announcement JAKKS was forced to revise downward its full year 2013 guidance.  It was announced that the Company anticipated net sales for the full year of approximately $620.0 million, with revised loss per share in the range of approximately $56.1 million, or $2.56 per diluted share. The revised guidance represented a reduction from the Company's previously anticipated full year net sales of approximately $694 million to $700 million and diluted earnings per share in the range of approximately $0.63 to $0.68, excluding financial and legal advisory fees relating to the 2011 unsolicited indication of interest.

66.   From the time that the Defensive Repurchase was announced, JAKKS shares have never approached $20 per share.  Indeed, the Defensive Repurchase was

1   so over-subscribed that JAKKS was only able to purchase approximately 15% of the

2   over 22 million shares tendered. Indeed, a buy-out at $20 per share or above would

3   have received widespread shareholder support. As it was, when the results of the

4   Defensive Repurchase were announced, JAKKS shares dropped over 11% in value

5   the next day.

6        67.    Given the weaknesses in JAKKS' business over the long term as

7   known by the Board and management its share price has not provided any

8   significant gains for long-term shareholders. The very competitive toy market and

9   JAKKS' apparent inability to thrive in that market certainly signaled to anyone

10  taking a disinterested look that a buy-out of this Company at $20 per share or more

11  was certainly in the best interests of the shareholders. The Defensive Repurchase,

12  the Poison-Pill, the Standstill Agreement, the refusal to negotiate with Oaktree and

13  the repeated dissemination of financial guidance which indicated that success was

14  just around the corner, but which success never materialized, and the DreamPlay

15  Joint Ventures, all reflect the Board's breach of its fiduciary duty to act in the best

16  interest of JAKKS and not in their own narrow financial self-interest. JAKKS

17  shares have recently traded between $7-8 per share, a difference of roughly 60%

18  from the Offer. *Working capital has declined from $375 million at the end of 2011*

19  *to $120 million as of March 31, 2014.* Little or nothing has come from the

20  DreamPlay Joint Ventures. The Board's decisions were self-interested and not a

21  valid exercise of business judgment. Accordingly, the Defendants should be held

22  liable to the Company for all damages flowing from their breaches of fiduciary duty,

23  including their violation of the Unocal Standard.

24       2.    **The Director Defendants Cause JAKKS to Repurchase**

25           **Shares As a Means of Entrenchment**

26       68.    In effecting the Defensive Repurchase, the Repurchase Defendants

27  injured JAKKS by forcing it to repurchase shares at $20, which price was not

28  reflective of fair value, and which cost $80 million JAKKS could not spare.

69.    Much of JAKKS' cash as reflected on its balance sheet was held abroad in Hong Kong and not available to be used for domestic business purposes. After the Defensive Repurchase, JAKKS did not have sufficient domestic cash to support its 2012 business goals, including the promotion of existing products, and the development of high tech competitive products.

70.    JAKKS was forced to borrow funds to affect the Defensive Repurchase.

71.    As a result, the Director Defendants severely weakened JAKKS balance sheet and made it impossible for JAKKS to effect its business plans as it lacked the necessary financial resources.

72.    Moreover, the success of JAKKS' Monsuno product line was tied largely to the success of Nickelodeon, and its ability to stanch its ratings slide. The Defendants knew of this relationship (and its effect on sell-through and marketing costs) at the time the Defensive Repurchase was agreed upon and effectuated.

73.    Thus, as Berman was forced to admit in the October 2012 Analysts' Conference, JAKKS has been constrained in promoting its products by its lack of financial resources. While it has not discussed the amounts, much of its balance sheet cash is held abroad and unavailable to be used domestically to compete with toy giants Hasbro, Mattel and Disney. Its Monsuno products, which track the airing of the Monsuno TV cartoon program on the Nickelodeon network, are geared to boys. Yet Nickelodeon captures more girl viewers than boys and its overall viewer market share is declining. Monsuno product sales have been weak in the United States due to the Company's inability to properly advertise and promote the products. Thus, the purported business plan was and/or became unrealistic due to the lack of JAKK's domestic financial resources.

74.    *Unocal* places the burden on directors who take actions that are entrenching to justify their conduct. It requires that directors who take defensive action against a hostile takeover show (i) that "they had reasonable grounds for

believing that a danger to corporate policy and effectiveness existed," and (ii) that the response selected was "reasonable in relation to the threat posed." *Unocal*, 493 A.2d at 955   Defendants cannot show this, and thus violated the Unocal Standard and are liable for all of the financial harm caused JAKKS. *See also, Bennett v. Propp*, Del. Supr., 41 Del. Ch. 14, 187 A.2d 405, 409 (1962)("We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult.").

> 3.   **The Board's Interactions With Dr. Soon Also Breach Their Fiduciary Duties and Serve Entrenchment Goals.**

75.   The Board has permitted Dr. Soon, a "friendly" investor to acquire what is now a 24.9% controlling and blocking stake in JAKKS' shares.

76.   With Dr. Soon so ensconced, the Board need not worry about Clinton Group or Oaktree or similar overtures. But the relationship with Dr. Soon has come with a heavy price. The transactions with Dr. Soon's companies have been lopsided in favor of Dr. Soon, and any acquirer would inherit them. These transactions, too, violate the Unocal Standard and constitute a breach of the duty of loyalty. They deter takeovers at an unreasonable cost to JAKKS.

77.   In its latest quarterly filing on Form 10-Q, dated November 8, 2013, JAKKS describes the DreamPlay Joint Ventures with Dr. Soon's companies as follows:

> In September 2012, the Company entered into a joint venture ("DreamPlay Toys") with NantWorks LLC ("NantWorks") in which it owns a fifty percent interest. Pursuant to the operating agreement of DreamPlay Toys, the Company paid to NantWorks cash in the amount of $8.0 million and issued NantWorks a warrant to purchase 1.5 million shares of the Company's common stock at a value of $7.0 million in exchange for the exclusive right to arrange for the provision of

the NantWorks recognition technology platform for toy products. The Company has classified these rights as an intangible asset and will amortize the asset over the anticipated revenue stream from the exploitation of these rights. The joint venture entered into a Toy Services Agreement with an initial term of three years expiring on October 1, 2015 and a renewal period at the option of the Company expiring October 1, 2018, subject to the achievement of certain financial targets, to develop and produce toys utilizing recognition technologies owned by NantWorks. Pursuant to the terms of the Toy Services Agreement, *NantWorks is entitled to receive a preferred return* based upon net sales of DreamPlay Toys product sales and third-party license fees. *The Company retains the financial risk of the joint venture and is responsible for the day-to-day operations, including development, sales and distribution, for which it is entitled to receive any remaining profit or is responsible for any losses, and the results of operations of the joint venture will be consolidated with the Company's results.* Sales of DreamPlay Toys products have commenced in the third quarter of 2013.

In addition, the Company invested $7.0 million in cash in exchange for a five percent economic interest in a related entity, DreamPlay LLC, that will exploit the recognition technologies in non-toy consumer product categories. *NantWorks has the right to repurchase the Company's interest for $7.0 million.* The Company has classified this investment as a long term asset on its balance sheet.

78.   The various payments, investments and the warrant add up to value transferred to Dr. Soon's companies of $22 million, and this sum bears a remarkable similarity to the $23,134,741 cost of the JAKKS shares Dr. Soon purchased at about the time the DreamPlay Joint Ventures were agreed to (*i.e.,* during the period from August 17, 2012 through October 12, 2012). It thus may be inferred that these sums were meant, at least in part, to defray Dr. Soon's stock acquisition costs and subsidize the entrenchment of JAKKS' Board in office. It is plain the Board would spare no expense to maintain itself in office. This, too, violates *Unocal.*

79.    The DreamPlay Joint Venture terms are grossly unfair to JAKKS. For its $8 million investment in the DreamPlay Toys Joint Venture, JAKKS cedes a "preferred return" to Dr. Soon's NantWorks, but yet "retains the financial risk of the joint venture and is responsible for the day-to-day operations, including development, sales and distribution, for which it is entitled to receive any remaining profit or is responsible for any losses…" Such a deal, as described, is outrageously one-sided. In addition, JAKKS has invested $7 million for a paltry 5% stake in DreamPlay, LLC (valuing that new company immediately at *$140 million*). Should that $7 million be used to greatly increase the value of DreamPlay, NantWorks gets to buy back JAKKS' stake *at no profit to JAKKS*. Moreover, the Board granted Dr. Soon a warrant to buy 1.5 million *more* shares, valued under the Black-Scholes option pricing model as worth $7 million. Tellingly, the "strike price" for this warrant is well below $20 per share.

### 4.    The Board Alters Berman's Employment Contract as a Further Act of Entrenchment

80.    In a further act of entrenchment, the JAKKS Board extended the employment contract of its failed CEO, Defendant Berman to December 31, 2018, despite the fact that the Company's shares were trading at low prices, and modified his employment contract so he could be paid huge bonuses even if (as has historically been the case) the Company cannot meet EPS earnings goals. An independent Board would have fired Berman.

81.    By amending Berman's employment contract to extend the term, an acquirer of the Company would owe Berman almost $12 million if he is terminated due to a change in control. Further, a change in control includes the situation where a majority of the JAKKS directors are not re-elected.

82.    Traditionally, the CEO's compensation was tied closely to performance and shareholder value. As set forth in the JAKKS' 2010 Proxy Statement at p. 7:

The Compensation Committee has, with input from the Company's compensation consultant, Frederick W. Cook & Co., Inc. ("FWC"), established target performance levels for incentive bonuses based on a number of factors designed to further our executive compensation objectives, including our performance, the compensation received by similarly situated executive officers at peer group companies, the conditions of the markets in which we operate and the relative earnings performance of peer group companies.

83.    The 2010 Proxy Statement goes on to discuss that compensation and bonus payments were set based on meeting EPS target goals and compensation was compared with a comparable group of companies in the toy and gaming industries.

84.    However, the net result of this plan was not good for Berman. Since JAKKS has performed so poorly, Berman did not receive the compensation he desired. For instance, in 2011 and 2012, Berman received no bonus or option award, because the Company did not meet performance goals.

85.    For 2013, Berman's employment agreement was changed to remove the requirement that the vesting of his stock grants be tied solely to meeting EPS performance goals. EPS performance goals bear a close relationship to stock prices. As stated in the most recent Proxy Statement dated October 28, 2013:

Mr. Berman's agreement as in effect on January 1, 2012 provided for an annual grant of $500,000 of restricted stock, the initial vesting of which depended *solely on EPS targets established in the agreement*; if initial vesting occurred, then the restricted stock vested over time.

Pursuant to a September 2012 amendment to Mr. Berman's employment agreement, commencing in 2013, his annual bonus has been restructured so that part of it is now capped at 300% of his base salary and the performance criteria and vesting are solely within the discretion of the Compensation Committee, which will establish all of the criteria during the first quarter of each fiscal year for that year's bonus, *based upon financial and non-financial factors selected* by the Compensation Committee, and another part of his annual performance bonus *will be based upon the success of a joint venture entity we*

*initiated in September 2012.* The portion of the bonus equal to 200% of base salary is payable *in cash* and the balance in restricted stock vesting over three years. *In addition, the annual grant of $500,000 of restricted stock was changed to $3,500,000 of restricted stock and the vesting criteria was also changed from being solely based upon established EPS targets* to being based upon performance standards established by the Compensation Committee during the first quarter of each year. (Emphasis added.)

86.    Amazingly, Berman's employment agreement was also amended in December 2012 to extend the term until December 31, 2018. This is inconceivable given the harm Berman's tenure has done to the Company.

87.    Such a compensation agreement could not have been the result of a reasoned business decision but rather reflects the relationship between Berman, Glick and Miller, and/or Berman's domination of the two directors.[7]

**B.    ALLEGATIONS    PERTAINING    TO    THE    CLASS    ACTION LITIGATION**

88.    What follows is a summary of the key allegations contained in the Securities Class Action. (*See, e.g. Melot v. JAKKS, Inc., et al.*, 13 CV 5388, United States District Court, Central District of California.) Plaintiff does not allege that these allegations are true, but rather that they have been made and if proven would subject the Company to significant liability. If such liability is proved, Plaintiff seeks damages and/or contribution from the relevant Individual Defendants, the ones responsible for having caused the harm to JAKKS, rather than allowing the innocent shareholders to bear such cost.

89.    The allegations may be summarized as follows with respect to the

---

[7]  On April 4, 2014, JAKKS filed a new compensation plan which creates new links between Berman's compensation and EPS and stock price goals. Thus, Plaintiffs' complaints in this regard, as initially asserted, may have been partially mooted. The enactment of the 2012 compensation policy, and its terms, remains relevant to the question of the independence of the Board and where demand would have been futile under Delaware law and Fed. R. Civ. P. 23.1.

period July 17, 2012 and July 17, 2013 (the "Class Period"):

> Throughout the Class Period, Defendants Berman and Bennett made materially false and misleading statements regarding the Company's business and operations and/or failed to disclose that: (i) the Individual Defendants had consistently manipulated JAKKS' sales and forecast numbers in order to mislead investors; (ii) JAKKS systematically laid off workers at the end of a quarter in an effort to meet earnings projections and rehired workers to fill the same positions at the start of the following quarter; (iii) to secure licenses for popular trademarks and brand names, the Individual Defendants guaranteed minimum royalty payments, knowingly or recklessly disregarding that the Company would be unable to meet the minimum sales needed to cover those payments, thereby incurring substantial write-downs; and (iv) Defendants were aware that the Monsuno and Winx lines performed poorly upon their launch yet continued to tout their success to unsuspecting investors.

## C.  DERIVATIVE DEMAND ALLEGATIONS

90.  Plaintiff brings this action as a derivative action pursuant to Federal Rules of Civil Procedure 23.1 on behalf of and for the benefit of JAKKS.

91  Plaintiff will fairly and adequately represent the interests of JAKKS in enforcing and prosecuting its rights, and has retained competent counsel experienced in this type of litigation.

92.  Demand on the JAKKS Board to bring this action was not been made and is excused because such demand would be have been futile.  Under Delaware law, demand futility is measured as of the time of the filing of the initial complaint or complaints (with certain exceptions not here relevant). The "Relevant Board" is the Board that was in office at the time the actions were brought.  As of the filing of the constituent Complaints, JAKKS Board consisted of the following six Directors: Defendants Stephen G. Berman, Robert E. Glick, Michael G. Miller, Murray L. Skala, Peter F. Reilly and Rex H. Poulsen.  Demand is found futile if

1  a reasonable doubt has been raised that at least half the Board members could
2  not independently consider a demand to take legal action.

3       93.    Under Delaware jurisprudence, whether a plaintiff has stated a
4  *Unocal* claim is judged under lenient Rule 12(b) (6) standards. If such a claim
5  is stated, then demand is considered excused, as a Board that is facing colorable
6  claims of entrenchment has the burden of disproving the allegations, and cannot
7  be considered to be independent or to have acted with reasonable business
8  judgment. *See e.g., In re Gaylord Container Corporation Shareholders*
9  *Litigation*, 747 A.2d 71, 81 (Del. Ch. 1999)("So long as the plaintiff states a claim
10 implicating the heightened scrutiny required by *Unocal*, demand has been excused
11 under the *Aronson v. Lewis* demand excusal test.").

12   **1.    DEMAND IS EXCUSED FOR FUTILITY AS TO THE**
13          **DEFENSIVE REPURCHASE *UNOCAL* CLAIMS**

14       94.    All previous allegations are incorporated by reference herein.

15       95.    Demand on the JAKKS Board to bring this action has not been made as
16 to the Defensive Repurchase claims and is excused because such demand would be
17 futile. Defendants Berman, Glick, Miller, and Skala, a majority of the relevant
18 Board members, were Board members at the time the Board approved the
19 Defensive Repurchase.

20       96.    The Oaktree and Clinton Group overtures were made when JAKKS
21 was losing money, had repeatedly missed projections, had no well-defined plan
22 to completely change the Company's fortunes, and faced growing competition
23 from much better financed competitors. The "threat" presented, an offer at $20
24 per share at more, was no threat at all, but rather a golden opportunity to rescue
25 a company that was--and would continue to be--at a severe competitive
26 disadvantage.

27       97.    Instead of informing themselves as to how high an offer they could
28 get for JAKKS, the Board stonewalled the bidders. When a potential bidder

appeared on the scene that had a history of conducting hostile proxy fights, Clinton Group, the Board completely wrecked JAKKS' balance sheet through a disastrous $80 million stock buyback. Huge debt had to be incurred; operations soon needed to be cut back; advertising and development funds were limited; and a $100 million Convertible Note Offering was undertaken at a conversion price that will severely hamper JAKKS as a Company and severely depress JAKKS' stock price.

98.     The actions of the Board in hobbling JAKKS financially in order to "save it" from premium bids were patently reckless, and cannot meet the test of reasonable business judgment. Demand is therefore excused.

    2.     **DEMAND IS EXCUSED FOR FUTILITY AS TO THE *UNOCAL* CLAIMS RELATED TO THE TRANACTIONS WITH DR. SOON AND COMPANIES HE CONTROLS**

99.     All previous allegations are incorporated by reference herein.

100.     Once the Defensive Repurchase was completed, JAKKS' balance sheet was ruined, and the Company was in dire need of cash so that it might compete in its industry. A well-funded acquirer would have been the answer to JAKKS' problems, but the Board knew such an acquirer would replace them. They thus undertook efforts to ensure that JAKKS could not be subjected again to the "threat" of a premium takeover bid by a larger company.

101.     The Board knew that Dr. Soon had no history of being a hostile investor. It waived the Poison Pill protections so that Dr. Soon could buy up increasing numbers of shares in JAKKS, without Dr. Soon ever investing a single penny into the Company itself. Dr. Soon's purchases now make him the largest shareholder and place him in a control position, whereby he can effectively block any proxy contest or takeover bid. Unless Dr. Soon alters his passive approach to investments, the Board is now free of the "threat" of a takeover at a premium price, much to the detriment of JAKKS' long-suffering shareholders.

102.     The many one-sided transactions with Dr. Soon reflect the Board's desire to entrench themselves and ingratiate themselves with Dr. Soon by

1  acquiescing to unfair deals.  By transferring $22 million worth of value to Dr. Soon

2  in 2012 (in the form of cash and a warrant to purchase shares), the Board largely

3  subsidized Dr. Soon's share purchases.

4      103.    JAKKS' Board agreed to the DreamPlay Joint Ventures whereby

5  JAKKS contributes money, management, pays rent, and bears the risk of loss, all

6  while according Dr. Soon a preferred return.  Dr. Soon extracted $8 million in cash

7  and a warrant valued at $7 million for these privileges.  Even worse, JAKKS' Board

8  agreed to a sham 5% "investment" in DreamPlay, LLC which not only inexplicably

9  values this new joint venture immediately at $140 million, but provides that even if

10  DreamPlay, LLC does grow and prosper Dr. Soon can have his 5% back for the

11  same price--$7 million, according JAKKS no profit.

12      104.    All of the foregoing acts and transactions were undertaken so as to

13  cement Dr. Soon's relationship with Berman and the Board as a friendly investor,

14  and are a clear violation of *Unocal*.  They are an unreasonable and disproportionate

15  reaction to the "threat" that a hostile bidder might come in who would pay a

16  premium price for JAKKS' shares, and provide it with the funding it sorely needs.

17      105.    The machinations of the JAKKS' Board, in its quest to entrench itself,

18  have cost JAKKS' shareholders hundreds of millions of dollars.  They do not reflect

19  reasonable business judgment.  Demand is futile and accordingly excused.

20  **3.    DEMAND IS EXCUSED FOR FUTILITY AS TO**

21  **THE PROXY VIOLATIONS**

22      106.    All previous allegations are incorporated by reference herein.

23      107.    The Board members have a positive legal duty to ensure that Proxy Statements

24  contain full and fair disclosures, and are not misleading or materially omissive in any way.

25  The transactions with Dr. Soon and his companies affected the personal interests of all of the

26  Board members, Dr. Soon, and particularly CEO Berman.  The 2013 Proxy, dated October

27  28, 2013, states *inter alia* that: "Pursuant to a September 2012 amendment to Mr.

28  Berman's employment agreement, commencing in 2013, his annual bonus has been

restructured so that part of it is now capped at 300% of his base salary and the performance criteria and vesting are solely within the discretion of the Compensation Committee, which will establish all of the criteria during the first quarter of each fiscal year for that year's bonus, based upon financial and non-financial factors selected by the Compensation Committee, *and another part of his annual performance bonus will be based upon the success of a joint venture entity we initiated in September 2012.*" In addition, part of Berman's compensation was tied to the performance of both DreamPlay joint ventures (referred to in his Employment Agreement dated September 21, 2012 as the "DreamPlay Transaction"). In the latest SEC filing concerning Berman's compensation, his compensation scheme appears still to be tied in significant part to the performance of "DreamPlay Products", defined broadly as: "products incorporating technology licensed by the Company from NantWorks LLC."

108.    In order to understand the transactions with the aforementioned "joint venture entity", and the effect of the "DreamPlay Transaction", the 2013 Proxy was required to explain how the joint ventures work, including specification of the preferences allotted to Dr. Soon; the financial detriments accepted by JAKKS; the conditions under which JAKKS might ever earn a profit; the reasons for and valuation of the 5% interest in DreamPlay, LLC, and the $7 million "no profit to JAKKS" repurchase right related to JAKKS' $7 million investment in DreamPlay, LLC. Only with these facts in hand, can investors fully understand the nature of the DreamPlay Joint Ventures; the stewardship of the directors; the relationship with Dr. Soon; and the factors which may affect Berman's compensation and his judgments and decisions.[8]

---

[8] Under SEC rules, JAKKS is required to publicly file all material contracts, but the DreamPlay Joint Venture agreements do not appear ever to have been publicly filed. *See* Item 601(b) of Regulation S-K, 17 C.F.R. § 229.601 (b)(10)(ii)(B).

109.   The 2013 Proxy failed to fully and fairly explain any of these matters. The Board has access to all these details, but has failed to properly disclose them. As the Board does not have discretion whether to disclose material facts, their non-disclosure cannot be deemed a reasonable exercise of business judgment, and demand is excused as futile.

### 4.    DEMAND IS EXCUSED FOR FUTILITY AS TO THE SECURITIES VIOLATIONS

110.   Given that the JAKKS Board will have to defend the Securities Class Actions and maintain in those Actions that the Defendants sued therein did nothing wrong, they cannot fairly decide whether to commence action against Defendants Berman and Bennett on behalf of JAKKS. Moreover, the Board members cannot be asked to pursue these claims because, if they did, the allegations they put forward might be construed against the Company, and to its detriment. Thus, they cannot independently consider a demand as to these contingent claims.

### FIRST CLAIM FOR RELIEF

(Against the Defendants Berman and Bennett for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

111.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

112.   Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

113.   These Individual Defendants have been sued in the Securities Class Action alleging that these Individual Defendants caused the Company to issue materially false statements to the investing public, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

114.   It is alleged in the Securities Class Action that these Individual Defendants acted with scienter in that they knew that the public documents and

statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, these Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS and its financial performance and prospects and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, were active and culpable participants in the fraudulent scheme alleged herein. These Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing alleged fraudulent scheme alleged in the Securities Class Actions could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

115. During the Class Period alleged in the Securities Class Actions, the Individual Defendants allegedly caused JAKKS to carry out a plan, scheme and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JAKKS securities; and (iii) cause the class action plaintiff and other members of the Class to purchase JAKKS stock at artificially inflated prices.

116. As alleged in the Securities Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an

1  effort to maintain artificially high market prices for JAKKS securities in violation of

2  Section 10(b) of the Exchange Act and Rule 10b-5.   These defendants are sued as

3  primary participants in the wrongful and illegal conduct charged herein.

4      117.   It is alleged in the Class Actions that these defendants, individually and

5  in concert, directly and indirectly, by the use of the mails or other means or

6  instrumentalities of interstate commerce, engaged and participated in a continuous

7  course of conduct to conceal adverse material information about the business,

8  business practices, performance, operations and future prospects of JAKKS as

9  specified herein.   These defendants employed devices, schemes and artifices to

10  defraud, while in possession of material adverse non-public information and

11  engaged in acts, practices, and a course of conduct as alleged herein in an effort to

12  assure investors of JAKKS's value and performance and substantial growth.   This

13  included the making of, or the participation in the making of, untrue statements of

14  material facts and omitting to state material facts necessary in order to make the

15  statements made about JAKKS and its business, operations and future prospects in

16  the light of the circumstances under which they were made, not misleading, as set

17  forth more particularly herein, and engaging in transactions, practices and a course

18  of business which operated as a fraud and deceit upon the purchasers of JAKKS

19  securities during the Relevant Period.

20      118.  As alleged in the Securities Class Action, as a result of the

21  dissemination of the materially false and misleading information and failure to

22  disclose material facts, as set forth above, the market price of JAKKS's securities

23  was artificially inflated during the Relevant Period. Unaware of the fact that the

24  market price of JAKKS's shares was artificially inflated, and relying directly or

25  indirectly on the false and misleading statements made by these defendants, or upon

26  the integrity of the market in which the securities trade, and/or on the absence of

27  material adverse information that was known to or recklessly disregarded by these

28  defendants but not disclosed in public statements during the Relevant Period, and

1   Class members acquired JAKKS securities during the Relevant Period at artificially

2   high prices and were damaged thereby.

3        119.  As alleged in the Class Actions, at the time of said misrepresentations

4   and omissions, the Class members were unaware of their falsity, and believed them

5   to be true.  Had the Class members of the Class and the marketplace known of the

6   true performance, business practices, future prospects and intrinsic value of JAKKS,

7   which were not disclosed by these defendants, plaintiff and other members of the

8   Class would not have purchased or otherwise acquired their JAKKS securities

9   during the Relevant Period, or, if they had acquired such securities during the

10  Relevant Period, they would not have done so at the artificially inflated prices which

11  they paid.

12       120.  As alleged in the Securities Class Action, by virtue of the foregoing,

13  these individual defendants each violated Section 10(b) of the Exchange Act and

14  Rule 10b-5.

15       121.  It is further alleged in the Class Actions that the Company participated

16  in the wrongful conduct and is equally liable for violation of Section 10(b) of the

17  Exchange Act. Assuming that the Company is liable, these individual defendants

18  caused the Company to violate Section 10(b) of the Exchange Act, and incur

19  liability for damages for violation of the Securities Fraud laws.

20       122.  Although Plaintiffs herein do not assert that any fraud was committed,

21  if the Company is deemed to have violated the Federal Securities Laws, and incurs

22  damages therefore, these individual defendants should be held liable to the

23  Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange

24  Act.

25  ///

26  ///

27

28

## SECOND CLAIM FOR RELIEF

(Derivatively and Directly Against Defendants Berman, Brodsky, Ellen, Glick, Miller, Reilly, Poulsen and Skala for Violation of Section 14 of the Exchange Act and Rule 14a-9)

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein. This Cause of Action is brought both derivatively and directly.

124. Defendants had the obligation in disseminating the JAKKS Proxy Statement dated October 25, 2013, to disclosure Defendant Berman's compensation, and all facts, contracts, joint ventures, and agreements germane thereto, in clear, concise and understandable language. *See,* 17 CFR § 229.402.

125. The Discussion and Analysis section of the Proxy Statement is obfuscatory, vague and confusing as it applies to Defendant Berman's compensation. Specifically, the Proxy Statement fails to make disclosure of all factors relating to and affecting Defendant Berman's compensation in clear, concise and understandable language. Rather, the discussion of how Berman will be paid, the criteria used to determine his payment and the discussion of his amended employment agreement is materially misleading.

126. The various transactions with Dr. Soon and his companies have affected and will personally affect the personal interests of all members of the Board.

127. In order to understand compensation issues, and the transactions with Dr. Soon's companies, the Proxy was required to explain how these joint ventures work, including specification of the preferences allotted to Dr. Soon; the financial loss detriments accepted by JAKKS; the reasons for and valuation of the 5% interest in DreamPlay, LLC, and the $7 million "no profit to JAKKS" repurchase right related to JAKKS' $7 million investment in DreamPlay, LLC. Only with these facts in hand, can investors fully understand the nature of the DreamPlay Joint Ventures;

1  the stewardship of the directors; the relationship with Dr. Soon; and the factors

2  which may affect Berman's compensation and his judgments and decisions.

3    128.  As a result of the foregoing deficiencies, Defendants have violated

4  Section 14(a) of the Exchange Act, and Rule 14a-9.

5    129.  Plaintiff seeks a declaration on behalf of JAKKS that the Proxy

6  Statement disclosures as to Defendant Berman's compensation and the DreamPlay

7  Joint Ventures violated the above statute and rule, and that the Directors be

8  compelled to order that a new vote be held, and compelled by means of injunction or

9  otherwise to correct such errors and omissions in the next Proxy Statement.

10  **THIRD CLAIM FOR RELIEF**

11  (Derivatively Against Defendants Berman, Miller, Skala, Glick, Ellin, Reilly,

12  Brodsky and Almagor for Breaches of Fiduciary Duty, Including

13  *Unocal* Violations)

14    130.  Plaintiff repeats and realleges all previous allegations, set forth above,

15  as if fully set forth herein.

16    131.  The Defendants, as Directors, had a duty to act with loyalty toward

17  JAKKS, and in its best interests, and with the utmost good faith.

18    132.  The Defendants had the obligation not to oppose acquisition interest in

19  the Company unless such opposition was in utmost good faith and to the benefit of

20  the Company and its shareholders.

21    133.  That was not the case here.  JAKKS had no viable and superior plan for

22  increasing shareholder value, and that the best interests of the Company were not

23  served by rebuffing Oaktree's $20 offer.

24    134.  Rather, in order to entrench themselves, and avoid a proxy contest in

25  which a combined effort of Oaktree and Clinton Group would likely unseat them,

26  the Defendants determined to effectuate the Defensive Repurchase, which was

27  approved so as to pay Clinton Group a premium price not to unseat them.  To use

28  corporate funds to effect entrenchment is unreasonable misconduct.  Moreover, it

1  was plain that the Defensive Repurchase would inflict severe and enduring financial
2  damage upon the Company, and work to prevent it from returning superior value to
3  shareholders.  Damages related to the Defensive Repurchase must be paid by the
4  directors who approved it, the Repurchase Defendants (defendants Almagor,
5  Berman, Ellin, Glick, Miller and Skala).

6      135.  Further, defendants Berman, Skala, Glick, Ellin, Miller, Almagor, Reilly
7  and Brodsky permitted and caused a blocking interest to be acquired by Dr. Soon to
8  the detriment of shareholders; paid sums to his companies directly and indirectly
9  defray the cost of his investment in JAKKS stock; and caused JAKKS to enter into
10  lopsided and unfair transactions, i.e., the DreamPlay Joint Ventures—to curry favor
11  with Dr. Soon and entrench themselves.

12      136  For the foregoing reasons, the Defendants named in this Cause of
13  Action, as specified, are liable to JAKKS for all damages suffered as a result of the
14  violation of the *Unocal* standard, including harms flowing from the Defensive
15  Repurchase, the Dr. Soon stock acquisitions, and the DreamPlay Joint Ventures.

16  **FOURTH CLAIM FOR RELIEF**
17  (Against the Defendants Berman and Bennett for Breach of Fiduciary Duty as To
18  Liabilities the Company is Exposed to in the Securities Class Action)

19      137  Plaintiff incorporates by reference and realleges each and every
20  allegation set forth above as if fully set forth herein.

21      138  Defendants had a duty not to defraud the investing public by the
22  dissemination of materially false and misleading press releases and the
23  dissemination of materially false and misleading financial statements.

24      139  The Defendants had a fiduciary duty to carry out the actions of JAKKS
25  in accordance with the law, including the federal securities laws, and conscious
26  failure to do so is a bad faith breach of fiduciary duty.

27      140.  In light of the above, these Defendants are liable to JAKKS for the
28  damages it has or may incur by virtue of their breaches of fiduciary duty.

**DEMAND FOR TRIAL BY JURY**

To the full extent available, Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    Awarding compensatory damages in favor of the Company against the Individual Defendants, for all damages sustained by the Company as a result of defendants' wrongful acts and misconduct as alleged herein;

B.    Awarding the Company prejudgment and post-judgment interest, and awarding Plaintiff and its counsel as well as their reasonable attorneys' fees, expert fees and other costs; and

C.    Awarding such other and further relief as this Court may deem just and proper.

DATED: April 30, 2014

LAW OFFICES OF DAVID N. LAKE

By:    /s/
DAVID N. LAKE
Liaison Counsel for Plaintiffs

**INTERIM CO-LEAD COUNSEL:**

Laurence D. Paskowitz, Esq.
**THE PASKOWITZ LAW FIRM P.C.**
208 East 51st Street, Suite 380
New York, New York 10022
212- 685-0969
212-685-2306 (fax)
classattorney@aol.com

--and--

///

Jeffrey C. Block, Esq.
Joel Fleming, Esq.
**BLOCK & LEVITON, LLP**
155 Federal Street
Boston, MA 02110
(617) 398-5600
jeff@blockesq.com
joel@blockesq.com


OF COUNSEL:
Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**
317 Madison Avenue 21st Floor
New York, NY 10017
212- 867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com

## **VERIFICATION**

I, Randall Roche, am the General Counsel of the Louisiana Municipal Police Employees'
Retirement System. I verify and declare that I have reviewed the Verified Shareholder
Derivative Amended Complaint in this action captioned *Advanced Advisors, G.P. and Louisiana
Municipal Police Employees' Retirement System v. Stephan Berman, et al.* (the "Complaint").
The allegations contained within the Amended Complaint are true and correct to the best of my
knowledge, information and belief. I have also authorized the filing of this Complaint.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April 28, 2014

Randall Roche, Esq.

## VERIFICATION

I hereby verify under pain and penalty of perjury that, as Managing Partner of Plaintiff, I have read the foregoing Verified Shareholder's Amended Derivative Complaint, that its allegations are true, to the best of my information, knowledge and belief, and that I have authorized its filing.

_____
Lawrence Bass